Filing # 196586006 E-Filed 04/19/2024 01:49:03 PM

<table>
<tr><td></td><td>IN THE CIRCUIT COURT, FOURTH<br>JUDICIAL CIRCUIT, IN AND FOR<br>DUVAL COUNTY, FLORIDA</td></tr>
</table>

HOWARD BUFF, an individua; JEFF BERNHARD, and individual; and STEPHEN LERCH, an individual,

      Plaintiffs,

v.

RSUI INDEMNITY COMPANY, a foreign corporation,

      Defendant.

_____/

CASE NO.:

DIVISION

## **COMPLAINT**

Plaintiffs, Howard Buff, Jeff Bernhard, and Stephen Lerch (collectively, "Plaintiffs"), sue Defendant, RSUI Indemnity Company ("RIC"), and allege as follows:

### **PARTIES, JURISDICTION, AND VENUE**

1.    Plaintiff, Howard Buff ("Buff"), is an individual domiciled in the State of Florida. Buff served as an officer and director of ReviveHealth, Inc. ("ReviveHealth"), Revive Holding Company ("Revive Holding"), and EIR RH Midco LLC ("EIR Midco"), at all times relevant to this Complaint.

2.    Plaintiff, Jeff Bernhard ("Bernhard"), is an individual domiciled in the State of Florida. Bernhard served as an officer and director of ReviveHealth, Revive Holding, and EIR Midco at all times relevant to this Complaint.

3.  Plaintiff, Stephen Lerch ("Lerch"), is an individual domiciled in the State of Florida. Lerch served as an officer of ReviveHealth, Revive Holding, and EIR Midco at all times relevant to this Complaint.

4.  Buff, Bernhard, and Lerch are all omnibus insureds, if not named insureds, under the RIC insurance policy at issue.

5.  Defendant, RIC, is a foreign insurance company admitted to write insurance in Florida. RIC is subject to the jurisdiction of this Court in that, among other things, it is engaged in substantial and not isolated business activities in the state of Florida, delivered a policy of insurance to ReviveHealth in the state of Florida, and has breached a contract in the state of Florida by failing to cover Plaintiffs' defense costs under the policy of insurance at issue.

6.  All conditions precedent to bringing the causes of action alleged herein have occurred, been satisfied, or been waived.

7.  Plaintiffs have hired the undersigned counsel and are obligated to pay them a reasonable fee for their services.

8.  This Court has subject matter jurisdiction over this action, in that, among other things, Plaintiffs seek a declaratory judgment and the amount in controversy exceeds the sum of $50,000, exclusive of interest, costs, and attorneys' fees.

## GENERAL ALLEGATIONS

### A.    The RIC Insurance Policy

9.  On or about December 14, 2022, RIC issued a Private Company Management Liability Policy to ReviveHealth (the "RIC Policy"). A copy of the RIC Policy is attached as **Exhibit A**.

10.    Among other coverages, the RIC Policy provided Directors and Officers Liability Insurance coverage for up to $2,000,000 to ReviveHealth for claims made against ReviveHealth, its subsidiaries, and its officers and directors between December 14, 2022, and December 27, 2022.

11.    ReviveHealth exercised its option under the RIC Policy to purchase an Extended Reporting Period, or tail coverage, such that the RIC Policy was in effect through December 27, 2028, at 12:01 a.m.

**B.    The RIC Policy Contains a Misnomer of the Named Insured**

12.    The parties intended that ReviveHealth's parent company, Revive Holding be the named insured under the RIC Policy, such that ReviveHealth and the officers and directors of both Revive Holding and ReviveHelath would be covered under the RIC Policy.

13.    The RIC Policy itself evidences this misnomer. Specifically, the RIC Policy with the extended reporting coverage as issued on May 23, 2023, contains a Waiver of Change in Control endorsement which provides:

> It is agreed that with respect to EIR Partners acquisition of a controlling interest in ReviveHealth, Inc., which occurred on December 23, 2022, the Insurer [RIC] hereby waives paragraph 3.b. in Section V. – CONDITIONS, G. Merger, Consolidation or Acquisition, of the Common Policy Terms and Conditions Coverage Section.

14.    EIR Partners, however, did not acquire a controlling interest in ReviveHealth. ReviveHealth was a wholly owned subsidiary of Revive Holding.

15.    As the parties to the RIC Policy contemplated when agreeing to this specific endorsement, on December 27, 2022, EIR Partners acquired a controlling interest in Revive Holding (the "EIR Acquisition"). RIC knew that EIR Partners acquired a controlling interest in Revive Holding, not ReviveHealth, as the RIC Policy and endorsement were issued after the EIR Acquisition occurred.

16. Quite simply, the parties intended that the parent company, Revive Holding, be the named insured. However, through ministerial error the policy identified ReviveHealth, the subsidiary, as the named insured.

17. Directors and Officers liability policies (to include the RIC policy at issue) contain clauses that define an "Insured Person" as "[a]ny past, present or future director, office, or Employee, management committee members or members of the Board of Managers of the Insured Organization." *See* Ex. A. An "Insured Organization," in turn, is defined as "the organization named in item 1. of the Declarations Page and any subsidiary existing prior to or at the inception date of this policy." *Id.* As such directors and officers policies are issued to protect the parent company, its subsidiaries, and all of their officers and directors.

18. If the ministerial error of identifying ReviveHealth (the subsidiary) was allowed to stand, it would work an injustice as there would be no coverage for the parent when the policy was issued to benefit the parent and its subsidiaries and the officer and directors of all of the foregoing.

19. Moreover, the premium RIC charged Revive Holding was consistent with the intended coverage for the parent and its subsidiaries' officers and directors. Further, if ReviveHealth was intended to be the named insured under the RIC Policy, then the endorsement to waive the RIC Policy's change in control provision would not have been necessary as a result of the EIR Acquisition. Specifically, ReviveHealth did not undergo an acquisition or change in control as defined in the RIC Policy's "Merger, Consolidation or Acquisition" endorsement as a result of EIR Acquisition. Instead, only Revive Holding underwent an acquisition or change in control as defined in the RIC Policy. Thus, the inclusion of the Waiver of Change in Control endorsement in the RIC Policy for the EIR Acquisition demonstrates that the parties intended Revive Holding, not ReviveHealth, to be the named insured on the RIC Policy.

4

## C.    **Private Lawsuit Against Plaintiffs**

20.    On or about July 25, 2023, certain stockholders of Revive Holding (the ("Underlying Plaintiffs") filed a Complaint against Plaintiffs and Revive Holding in Chancery for the State of Delaware, styled as <u>Lascano, et al. v. Buff, et al</u>, Case No.: C.A. 2023-0758-NAC (Del. Ch.) (the "Lascano Lawsuit").

21.    In the initial complaint in the Lascano Lawsuit, the Underlying Plaintiffs asserted claims against the Bernhard, Lerch, and Buff (the Plaintiffs in this action), for breach of fiduciary duty and for declaratory relief for actions they took as officers and/or directors of Revive Holding in connection with EIR Acquisition. Specifically, the initial complaint in the Lascano Lawsuit asserted claims against Bernhard, Lerch, and Buff for acts occurring prior to, during, and after December 27, 2022. A duplicate of this Complaint is attached as **Exhibit B.**

22.    On September 12, 2023, Plaintiffs notified RIC of the Lascano Lawsuit, and sought advancement of defense costs, or alternatively, for RIC to retain counsel to defend Plaintiffs. A copy of the notice Plaintiffs provided to RIC is attached as **Exhibit C**.

23.    On October 13, 2023, RIC denied Plaintiffs' claim (the "First Denial of Coverage Letter"). A copy of RIC's First Denial of Coverage Letter is attached hereto as **Exhibit D**.

24.    On or about January 5, 2024, Plaintiffs amended the Complaint in the Lascano Lawsuit (the "Lascano Amended Complaint"). In the Lascano Amended Complaint, the Underlying Plaintiffs sued both ReviveHealth and Revive Holding and  Bernhard, Lerch, and Buff for, inter alia, alleged breaches of their fiduciary duties to both Revive Holding and ReviveHealth for time periods that pre-dated and post-dated the EIR Acquisition (December 27, 2022). A copy of the Amended Lascano Complaint is attached as **Exhibit E**.

25. On January 22, 2024, Plaintiffs retendered the case to RIC requesting again that it either defend Buff, Lerch, and Bernhard for the claims brought in the Lascano Amended Complaint or agree to reimburse and advance their defense costs.

26. On February 1, 2024, RIC again denied Plaintiffs' claim (the "Second Denial of Coverage Letter"). A copy of RIC's Second Denial of Coverage Letter is attached hereto as **Exhibit F**. In its Second Denial of Coverage Letter, RIC reasoned that because the Lascano Amended Complaint alleges misconduct on behalf of ReviveHealth and its directors that occurred on December 27, 2022, the day Eir Midco acquired ReviveHealth, policy claims for the Lascano Lawsuit fall outside the window of the RIC Policy coverage, which ended on December 27, 2022, at 12:01 A.M.

## COUNT I – REFORMATION

27. Plaintiffs reallege and incorporate by reference paragraphs 1 through 26, above, as if set forth fully herein.

28. On or about December 14, 2022, RIC issued the RIC Policy to ReviveHealth instead of Revive Holding as a result of a misnomer of the named insured. The misnomer was the result of a mistake by RIC, which Revive Holding failed to notice.

29. On or about October 13, 2023, Revive Holding discovered that the RIC Policy does not properly express Revive Holding and RIC's agreement on certain and essential material terms of the RIC Policy due to the misnomer.

30. On or about December 8, 2023, Revive Holding advised RIC that the RIC Policy misidentifies the insured organization as ReviveHealth instead of Revive Holding, and requested that RIC provide coverage to Plaintiffs with Directors and Officers Liability Coverage under the RIC Policy as a result of the Lascano Lawsuit.

31. RIC has refused to correct the RIC Policy or provide coverage to Plaintiffs thereunder.

32. As a result of the aforementioned mistake, Plaintiffs request that the Court reform the RIC Policy so that it accurately expresses Revive Holding and RIC's agreement at the time Revive Holding and RIC entered into the RIC Policy.

WHEREFORE, Revive Holding Company requests the Court reform the RIC Policy by replacing Revive Holding Company as the insured organization instead of ReviveHealth, Inc., and award Revive Holdco incidental damages, costs, interest, and all other relief that the Court deems just and proper.

## COUNT II – DECLARATORY JUDGMENT

33. Plaintiffs reallege and incorporate by reference paragraphs 1 through 26 above, as if set forth fully herein.

34. This is an action for declaratory relief under Chapter 86, Florida Statutes.

35. RIC issued ReviveHealth the RIC Policy, which provided directors & officers and employment practices liability coverage with an effective period between December 14, 2022, and December 27, 2022, bearing policy number NPP703174.

36. The RIC Policy is a valid and binding contract.

37. Plaintiffs Buff and Bernhard were officers and directors of ReviveHealth and Revive Holding, and Plaintiff Lerch was an officer of ReviveHealth and Revive Holding during the effective period of the RIC Policy.

38. ReviveHealth was a subsidiary of Revive Holding during the effective period of the RIC policy.

39.     Plaintiffs contend that the claims asserted against Plaintiffs in the Lascano Amended Complaint are covered and non-excluded claims against Plaintiffs for alleged wrongful acts that Plaintiffs engaged as officers and/or directors of Revive Holding and ReviveHealth during the effective period of the RIC Policy.

40.     RIC has denied coverage for the claim and denied that the claims in the Lascano Amended Complaint are covered by the RIC Policy.

41.     Accordingly, there exists a bona fide, actual, and present dispute and need for a declaration between Plaintiffs and RIC as to whether RIC wrongfully denied directors and officers liability insurance coverage to Plaintiffs as a result of the wrongful acts alleged in the Amended Lascano Complaint.

42.     Plaintiffs and RIC have an actual, present, adverse, and antagonistic interest in the subject matter of the dispute.

WHEREFORE, Plaintiffs, Howard Buff, Steven Lerch, and Jeff Bernhard request this Court enter a Final Judgment declaring Plaintiffs are entitled to directors and officers liability insurance coverage from RSUI Indemnity Company under the RSUI Indemnity Company policy of insurance issued to ReviveHealth, Inc., for the claims against them in the Lascano Lawsuit, awarding Plaintiffs' their attorneys' fees and costs incurred in prosecution of this cause of action pursuant to Section 86.121 Florida Statutes, and granting any further relief the Court deems just and proper under the circumstances.

**SMITH, GAMBRELL & RUSSELL, LLP**

*/s/ Jonathon D. Pressley*
Alan S. Wachs
Florida Bar No.: 980160
awachs@sgrlaw.com
tgreene@sgrlaw.com
dhsmith@sgrlaw.com
Jonathon D. Pressley
Florida Bar No. 84579
jpressley@sgrlaw.com
asalane@sgrlaw.com
Tucker J. Pryor
Florida Bar No.: 1010304
tpryor@sgrlaw.com
50 N. Laura Street, Suite 2600
Jacksonville, Florida 32202
(904) 598-6110 (Telephone)
(904) 598-6210 (Facsimile)

*Attorneys for Plaintiffs*

# EXHIBIT A



**Corporate Office**
945 East Paces Ferry Rd.
Atlanta, GA  30326-1160

# PRIVATE COMPANY
# MANAGEMENT LIABILITY POLICY

**NOTICE:** THIS IS A CLAIMS MADE AND REPORTED POLICY THAT APPLIES ONLY TO THOSE **CLAIMS** FIRST MADE AGAINST THE **INSURED** DURING THE **POLICY PERIOD** THAT ARE REPORTED TO THE **INSURER** DURING THE **POLICY PERIOD**, OR EXTENDED REPORTING PERIOD (IF APPLICABLE) AND REPORTED IN ACCORDANCE WITH THIS POLICY'S REPORTING PROVISIONS.  THE LIMIT OF LIABILITY AVAILABLE TO PAY **LOSS** SHALL BE REDUCED OR TOTALLY EXHAUSTED BY PAYMENT OF **DEFENSE EXPENSES**.

**PLEASE READ YOUR POLICY CAREFULLY**

## CLAIM NOTICE

Mail notices to:   **RSUI Group, Inc.**
**945 East Paces Ferry Rd.**
**Suite 1800**
**Atlanta, GA 30326-1160**

Fax notices to:   **(404) 231-3755**
**Attn: Claims Department**

E-mail notices to:   **reportclaims@rsui.com**

RSUI's Panel Counsel Finder: **Panel Counsel Link**

*A member of Alleghany Insurance Holdings LLC*

# PRIVATE COMPANY COMMON POLICY DECLARATIONS



Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER | RENEWAL OF |
|---|---|---|
| N | PP703174 | N/A |

●THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:   RSUI Indemnity Company (hereinafter referred to as the Insurer)

**ITEM 1.**   INSURED ORGANIZATION'S NAME AND MAILING ADDRESS          PRODUCER'S NAME AND ADDRESS

REVIVEHEALTH, INC.
5000 SAWGRASS VILLAGE CIRCLE
SUITE 4
PONTE VEDRA BEACH, FL 32082

IN CONSIDERATION OF THE PAYMENT OF THE PREMIUM, IN RELIANCE UPON THE STATEMENTS HEREIN OR ATTACHED HERETO, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, THE INSURER AGREES TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

## ITEM 2. POLICY PERIOD:

FROM _____12/14/2022_____ TO _____12/27/2022_____ 12:01 AM Standard Time at the Insured's address as stated herein

## ITEM 3. COVERAGE SECTIONS APPLICABLE TO POLICY:

| | **Purchased** | **Shared Limit** | **Separate Limit** |
|---|---|---|---|
| A.  Directors and Officers Liability Insurance | ☒ Yes  ☐ No | ☐ | ☒ |
| B.  Employment Practices Liability Insurance | ☒ Yes  ☐ No | ☐ | ☒ |
|    1)  Third Party Liability Coverage | ☒ Yes  ☐ No | | |
| C.  Fiduciary Liability Insurance | ☐ Yes  ☒ No | ☐ | ☐ |

## ITEM 4. LIMIT OF LIABILITY:

$ _____2,000,000_____   Aggregate Limit of Liability for All **Coverage Sections**

## ITEM 5. PREMIUM:

$ _____39,510.00_____   Total Policy Premium for All Coverage Sections

+ 2022-1 FIGA Assessment Surcharge $276.57

+ 2022-2 FIGA Assessment Surcharge $513.63

## ITEM 6. POLICY FORM AND ENDORSEMENTS MADE A PART OF THIS POLICY AT THE TIME OF ISSUE:
SEE SCHEDULE OF ENDORSEMENTS – RSG 240041 0118

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Countersigned: _____     _____May 23, 2023_____     _____
                                                                  DATE                      AUTHORIZED REPRESENTATIVE

# PRIVATE COMPANY DIRECTORS AND OFFICERS LIABILITY DECLARATIONS



Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER |
|---|---|
| N | PP703174 |

●THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:   RSUI Indemnity Company (hereinafter referred to as the Insurer)

**ITEM 1.**   INSURED ORGANIZATION'S NAME

REVIVEHEALTH, INC.

## ITEM 2. LIMIT OF LIABILITY:

| | |
|---|---|
| A.  Directors and Officers Limit of Liability | $ 1,000,000 |
| B.  Additional Side-A Limit of Liability | $ 500,000 |
| C.  Investigative Costs Sublimit of Liability | $ 250,000 |

## ITEM 3. RETENTION:

A. Directors and Officers Liability Retentions

| | |
|---|---|
| 1)  Insuring Agreement A | $ 0 |
| 2)  Insuring Agreement B | $ 100,000 |
| 3)  Insuring Agreement C | $ 100,000 |

## ITEM 4. PRIOR AND/OR PENDING LITIGATION DATE:

Directors and Officers Prior and/or Pending Litigation Date:     12/14/2020

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Countersigned: _____     May 23, 2023          _____
                                          DATE                   AUTHORIZED REPRESENTATIVE

# PRIVATE COMPANY EMPDOYMENT PRACTICES DIAFIDITY LECDARATIONS



Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER |
|---|---|
| N | PP703174 |

●THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:   RSUI Indemnity Company (hereinafter referred to as the Insurer)

**ITEM B1**   INSURED ORGANIZATION'S NAME

REVIVEHEALTH, INC.

**ITEM . 1DIMIT O2 DIAFIDITY:**

    A.  Employment Practices Limit of Liability        $  1,000,000

        (Including Third Party Liability, if purchased)

    B.  Workplace Violence Expenses Sublimit        $  250,000

**ITEM 31RETENTION:**

    A.  Employment Practices Liability Retentions

        1)   Employment Practices Liability        $  35,000

        2)   Third Party Liability Coverage        $  35,000

**ITEM 41PRIOR ANL/OR PENLING DITIGATION LATE:**

    Employment Practices Prior and/or Pending Litigation Date:    12/14/2020

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Countersigned: _____    May 23, 2023      _____

                                        DATE            AUTHORIZED REPRESENTATIVE

# PRIVATE COMPANY MANAGEMENT LIABILITY POLICY
# SUPPLEMENTAL DECLARATIONS



POLICY NUMBER:     NPP703174

## SCHEDULE OF FORMS AND ENDORSEMENTS

| TITLE | FORM NUMBER |
|---|---|
| Florida Changes | RSG 202250 0118 |
| Florida Changes-Marital Estate | RSG 202152 0118 |
| Florida Changes-Merger, Consolidation or Acquisition | RSG 202268 0118 |
| Florida Changes-No Action Against Insurer | RSG 202278 0121 |
| Florida-Changes-Punitive Damages | RSG 202061 0118 |
| Florida Changes-Cancellation and Nonrenewal | RSG 203009 0118 |
| Disclosure Pursuant to Terrorism Risk Insurance Act | RSG 204123 0121 |
| Cap on Losses From Certified Acts of Terrorism | RSG 204198 0118 |
| **FORMS APPLICABLE TO MULTIPLE COVERAGE PARTS** | |
| Common Policy Terms and Conditions Coverage Section-Private Company | RSG 241001 0622 |
| Absolute Exclusion-Bodily Injury and Property Damage with Allocation | RSG 206117 0119 |
| Additional Insureds With Prior And/Or Pending Litigation Dates and Prior Acts Dates | |
| Amended Conditions - 35% Acquisition Threshold | RSG 204178 0118 |
| Amended Definition of Insured Person-Additional Positions | RSG 204089 0118 |
| Amended Notice of Claim or Circumstance-Specific Position Trigger | RSG 204151 0118 |
| Amended Settlement Provision | RSG 204160 0118 |
| Coverage Extension-Crisis Management | RSG 204163 0118 |
| Exclusion - Biometric Privacy Claims with Allocation | |
| Exclusion - Broadcasting Advertising and Publishing Liability with Allocation | |
| Exclusion - Network Security and Privacy Information | |
| Exclusion-Sexual Abuse and Sexual Misconduct | RSG 206135 0722 |
| Exclusion-Specific Litigation | RSG 206115 0118 |
| Extended Reporting Period Election | RSG 207001 0819 |
| Extradition Coverage | RSG 204174 0118 |
| Final Non-Appealable Conduct Exclusions | RSG 246014 0119 |
| Florida-Amended Definition of Loss-Defense Claims for ADA | RSG 242062 0118 |
| Florida-Coverage Extension-Federal Immigration and Nationality Act | RSG 202163 0118 |
| Florida-Full Severability | RSG 202057 0118 |

| | |
|---|---|
| Fully Non-Rescindable Coverage | RSG 204157 0119 |
| Predetermined Allocation | RSG 204132 0118 |
| Six (6) Year Bilateral Extended Reporting Period | RSG 204173 0118 |
| Specific Entities and Individuals-Higher Retention-Highly Compensated Employees | RSG 204222 0422 |
| State Amendatory Discrepancy | RSG 204202 0118 |
| Waiver of Change in Control | RSG 204209 0118 |

**FORMS APPLICABLE TO DIRECTORS & OFFICERS LIABILITY**

| | |
|---|---|
| Directors and Officers Liability Coverage Section-Private Company | RSG 241007 0121 |
| Exclusion - Malpractice with Allocation | |
| Florida-Regulatory Coverage | RSG 202165 0320 |
| Modified Insured vs. Insured Exclusion | RSG 244009 0118 |
| Sublimit-Anti-Trust Claim | RSG 244042 0321 |

**FORMS APPLICABLE TO EMPLOYMENT PRACTICES LIABILITY**

| | |
|---|---|
| Employment Practices Liability Coverage Section-Private Company | RSG 241008 0118 |
| Sublimit-Defense Expenses-Wage and Hour Claims | RSG 204153 0118 |

# *IMPORTANT NOTICE*

**IMPORTANT INFORMATION TO FLORIDA POLICYHOLDERS**

**KEEP THIS NOTICE WITH YOUR INSURANCE PAPERS**

**QUESTIONS ABOUT YOUR INSURANCE? -** If you have any inquiries, need to obtain coverage information or need assistance in resolving complaints, please do not hesitate to contact your insurance company or agent.

FOR **COMMERCIAL INSURANCE** CONTACT:

RSUI Group, Inc.
945 East Paces Ferry Road
Suite 1800
Atlanta, GA  30326

Call Collect          (404) 231-2366

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# FLORIDA CHANGES

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION IV. – EXCLUSIONS, 2. of  the Common Policy Terms and Conditions Coverage Section is deleted in its entirety.

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# FLORIDA CHANGES – MARITAL ESTATE

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION II. – COVERAGE EXTENSIONS, A. Marital Estate of the Common Policy Terms and Conditions Coverage Section is deleted in its entirety and replaced with the following:

**A. Marital Estate**

This policy shall cover **Loss** arising from any **Claim** made against the lawful spouse or any legally recognized "domestic partner" of an **Insured Person** for **Claims** arising solely out of his or her status as the spouse or "domestic partner" of an **Insured Person** (where such status is derived by reason of statutory law or common law) where such **Insured Person** is entitled to coverage under this policy.  Such coverage shall extend to any **Claim** in which a recovery is sought from marital community property, property jointly held by the **Insured Person** and the spouse or domestic partner, or property transferred from the **Insured Person** to the spouse or domestic partner.

Provided, however, that this COVERAGE EXTENSION shall not extend coverage to any **Claim** for, arising from, based upon or attributable to any actual or alleged **Wrongful Act** of the spouse or "domestic partner".

"Domestic Partner" means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# FLORIDA CHANGES – MERGER, CONSOLIDATION OR ACQUISITION

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION V. – CONDITIONS, G. Merger, Consolidation or Acquisition of the Common Policy Terms and Conditions Coverage Section is deleted and replaced by the following:

**G. Merger, Consolidation or Acquisition**

1. If, after this policy's inception date, the **Insured Organization** creates or acquires a **Subsidiary** whose assets do not exceed twenty five percent (25%) of the total consolidated assets of the **Insured Organization**, not including the assets of the created or acquired **Subsidiary**, such **Subsidiary** shall be deemed to qualify as an **Insured Organization**, but solely for a **Wrongful Act** that takes place on or after the effective date of such creation or acquisition.

2. If, after this policy's inception date, the **Insured Organization** creates or acquires a **Subsidiary** whose assets exceed twenty five percent (25%) of the total consolidated assets of the **Insured Organization**, not including the assets of the created or acquired **Subsidiary**, such **Subsidiary** shall be deemed to qualify as an **Insured Organization**, but solely for a **Wrongful Act** that takes place within the first ninety (90) days after the date of such creation or acquisition.  After this ninety (90) day period, the created or acquired **Subsidiary** shall no longer be deemed an **Insured Organization,** unless:

   a. Written notice of the **Subsidiary's** creation or acquisition has been provided to the **Insurer** by the **Insured Organization,** as soon as practicable, and in no event later than ninety (90) days after the date of the creation or acquisition;

   b. The **Insured Organization** has provided the **Insurer** with any additional information the **Insurer** may request;

   c. The **Insured Organization** has agreed to the terms, conditions, exclusions and additional premium charge as may be required by the **Insurer**; and

   d. The **Insurer**, at its sole discretion, has agreed in writing to extend the coverage of this policy to the created or acquired **Subsidiary**.

3. If during the **Policy Period**:

   a. The **Insured Organization** shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

   b. Any person or entity or group of persons or entities acting in concert shall acquire an amount of more than fifty percent (50%) of the voting power for the election of directors of the **Insured Organization**;

   (either of the above events in 3. a. or b. are hereunder referred to as the "Transaction" ),

   then this policy shall continue in full force and effect for any **Wrongful Act** occurring prior to the effective time of the Transaction, but there shall be no coverage afforded by any provision of this policy for any actual or alleged **Wrongful Act** occurring after the effective time of the Transaction.

   The **Insured Organization** shall give the **Insurer** written notice of the Transaction as soon as practicable, but not later than thirty (30) days after the effective date of the Transaction.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP703174    **Effective:** 12/14/2022

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# FLORIDA CHANGES – NO ACTION AGAINST INSURER

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION V. – CONDITIONS, I. No Action Against Insurer of the Common Policy Terms and Conditions Coverage Section is deleted in its entirety and replaced with the following:

**I.  No Action Against Insurer**

No action may be taken against the **Insurer** unless there has been full compliance with all of the terms and conditions of this policy and until the amount of any **Insured's** obligation to pay **Loss** has been finally determined either by judgment against such **Insured** after adjudicatory proceedings, or by written agreement of the **Insured**, the claimant and the **Insurer**.

No **Insured** has any right under this policy to join the **Insurer** as a party to any **Claim** against an **Insured** to determine the liability of such **Insured**, nor shall the **Insurer** be impleaded by an **Insured** or his, her or its legal representative in any such **Claim**.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy. Please Read It Carefully.*

# FLORIDA - CHANGES- PUNITIVE DAMAGES

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The last paragraph of DEFINITIONS, **Loss** in the Directors and Officers Liability Coverage Section and Employment Practices Liability Coverage Section is amended to read as follows:

The DEFINITION of **Loss** shall include:

1) vicarious liability for punitive or exemplary damages incurred by the Insured, but only to the extent that this policy is construed by a court of competent jurisdiction, or an arbitration panel, pursuant to Florida law, and the multiplied portion of any multiplied damage award, if and where insurable; or

2) punitive or exemplary damages, but only to the extent:

   a. such damages are insurable under the law of any jurisdiction other than Florida that has a substantial relationship to the **Insured**, the **Claim**, the **Insurer**, or this policy and is most favorable to the insurability of such damages; and

   b. that this policy is construed by a court of competent jurisdiction, or an arbitration panel, pursuant to the laws of any jurisdiction other than Florida.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# FLORIDA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION V. – CONDITIONS, F. Cancellation; Renewal Provision of the Common Policy Terms and Conditions Coverage Section is deleted and replaced by the following:

**F.  Cancellation; Renewal Provision**

The **Insured Organization** may cancel this policy at any time by written notice or by surrender of this policy to the **Insurer** at its address shown on the Declarations Page.

This policy may only be cancelled by or on behalf of the **Insurer** in the event the **Insured Organization** fails to pay any premium when due.  In the event of non-payment of premium by the **Insured Organization**, the **Insurer** may cancel this policy upon ten (10) days written notice accompanied by the specific reason for cancellation.  The **Insurer** will mail notice to the **Insured Organization's** address as shown in Item 1. of the Declarations Page.  The mailing of such notice as aforesaid shall be sufficient proof of notice.

If the **Insured Organization** cancels this policy, the refund may be less than pro rata.

The **Insurer** shall not be required to renew this policy upon its expiration.  The offer by the **Insurer** of renewal terms, conditions, Limit of Liability and/or premiums varying from those of the expiring policy shall not constitute a refusal to renew.

**Nonrenewal**

1. If the **Insurer** decides not to renew this policy, the **Insurer** will mail or deliver to the **Insured Organization** written notice of nonrenewal, accompanied by the specific reason for nonrenewal, at least forty-five (45) days prior to the expiration of this policy.

2. Any notice of nonrenewal will be mailed or delivered to the **Insured Organization's** last mailing address known to the **Insurer**.  If notice is mailed, proof of mailing will be sufficient proof of notice.

All other terms and conditions of this policy remain unchanged.

**THIS ENDORSEMENT IS ATTACHED TO AND MADE A PART OF THIS POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THIS POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

### SCHEDULE*

| |
|---|
| **Terrorism Premium** $0 |
| **Additional information, if any, concerning the terrorism premium:** **The portion of your premium for the policy term attributable to coverage for all acts of terrorism covered under this policy including terrorist acts certified under the Act is listed above.** |

*Information required to complete this Schedule, if not shown above, will be shown in the Declarations Page.

A. **Disclosure of Premium**

In accordance with the federal Terrorism Risk Insurance Act, as amended, the **Insurer** is required to provide the **Insured** with a notice disclosing the portion of the **Insured's** premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of the **Insured's** premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations Page.

As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury – in consultation with the Secretary of Homeland Security, and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

B. **Disclosure of Federal Participation in Payment of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 80% of that portion of the amount of such insured losses that exceeds the applicable **Insurer** retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

C. **Cap Insurer Participation in Payment of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the **Insurer** has met our **Insurer** deductible under the Terrorism Risk Insurance Act, the **Insurer** will not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**Policy No.:** NPP703174     **Effective:** 12/14/2022

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

*This Endorsement Changes The Policy. Please Read It Carefully.*

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to the Common Policy Terms and Conditions Coverage Section:

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the **Insurer** has met our insurer deductible under the Terrorism Risk Insurance Act, the **Insurer** shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**Certified Act of Terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a **Certified Act of Terrorism** include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Policy, such as losses excluded by the Nuclear Exclusion.

All other terms and conditions of this policy remain unchanged.



# *www.RSUIextra.com*

## Online Human Resource Loss Prevention Services for Directors and Officers Liability Policyholders

### Key Features

- Best Practice Help Line for call-in assistance
- Checklist database for lowering risk
- Links to important federal and state government sites
- Online library with up-to-date articles on productivity, leadership and loss prevention
- Sample Human Resource policies and forms
- Online reporting function allows the Site Administrator to monitor usage
- Online training modules designed for managers and supervisors with the ability to adapt programs to meet their own needs. Best Practice training modules include:
  - Preventing Sexual Harassment
  - Preventing Discrimination
  - Preventing Wrongful Termination
  - Promoting Ethical Behavior

### How to get started

1. Designate a person to serve as the Site Administrator for your organization.
2. Go to *www.RSUIextra.com*.
3. Click the *Register* link on the left-hand side of the home page.
4. Enter your RSUI policy number as the Passcode/Organization Code (i.e. NHP123456).
5. Complete the Registration Information and click *Submit*.
6. You are now registered as the Site Administrator.

### Who is a Site Administrator?

A Site Administrator is often a person who works with personnel or legal matters and is the person who will oversee the use of *www.RSUIextra.com*. A Site Administrator will have the ability to recruit and add other users as well as make training decisions.

### Questions?

Please call The McCalmon Group at (888) 712-7667 or click *CONTACT US* at *www.RSUIextra.com* on the upper right hand side of the home page. You will be directed to The McCalmon Group for assistance.

*This site is administered by The McCalmon Group.*

# COMMON POLICY TERMS AND CONDITIONS
## COVERAGE SECTION (PRIVATE)
## PLEASE READ YOUR POLICY CAREFULLY

Words and phrases that appear in **bold** text have special meaning. Refer to SECTION III. - DEFINITIONS.

In consideration of the payment of premium and in reliance upon all statements made to the **Insurer** in the **Application**, and subject to the terms, conditions, definitions, exclusions and limitations hereinafter provided, the **Insurer** agrees:

## SECTION I. – COMMON POLICY TERMS AND CONDITIONS

The Common Policy Terms and Conditions Section of this policy shall apply to all **Coverage Sections**. Unless stated to the contrary in any **Coverage Section**, the terms and conditions of each **Coverage Section** of this policy shall apply only to that **Coverage Section** and shall not apply to any other **Coverage Section** of this policy. If any provision in the Common Policy Terms and Conditions sections is inconsistent or in conflict with the terms and conditions in any **Coverage Section**, including any endorsements attached thereto, the terms and conditions of such **Coverage Section** or endorsement, shall supersede for the purposes of that **Coverage Section**.

## SECTION II. - COVERAGE EXTENSIONS

### A. Marital Estate

This policy shall cover **Loss** arising from any **Claim** made against the lawful spouse or any legally recognized domestic partner of an **Insured Person** for **Claims** arising solely out of his or her status as the spouse or domestic partner of an **Insured Person** (where such status is derived by reason of statutory law or common law) where such **Insured Person** is entitled to coverage under this policy. Such coverage shall extend to any **Claim** in which a recovery is sought from marital community property, property jointly held by the **Insured Person** and the spouse or domestic partner, or property transferred from the **Insured Person** to the spouse or domestic partner.

Provided, however, that this COVERAGE EXTENSION shall not extend coverage to any **Claim** for, arising from, based upon or attributable to any actual or alleged **Wrongful Act** of the spouse or domestic partner.

### B. Extended Reporting Period

If the **Insurer** shall refuse to renew this policy or the **Insured Organization** shall cancel or refuse to renew this policy, the **Insured Organization** shall have the right, upon payment of seventy five percent (75%) of the Full Annual Premium, to a period of three hundred and sixty five (365) days following the effective date of such cancellation or nonrenewal (herein referred to as the "Extended Reporting Period") in which to give written notice to the **Insurer** of any **Claim** first made against the **Insured** during said three hundred and sixty five (365) day period for any **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by this policy. As used herein, "Full Annual Premium" means the premium stated in Item 5. of the Common Policy Declarations Page and any additional premium(s) charged during the **Policy Period**. The rights contained in this clause shall terminate unless written notice of such election together with the additional premium due is received by the **Insurer** at its address shown on the Declarations Page within thirty (30) days of the effective date of cancellation or nonrenewal.

The Extended Reporting Period is not cancelable and the additional premium charged shall be fully earned at the inception of the Extended Reporting Period.

The Limit of Liability available under the Extended Reporting Period is part of and not in addition to the Limit of Liability stated in Item 4. of the Declarations Page.

The rights contained in this clause shall not apply in the event of cancellation resulting from non-payment of premium.

### C. Estates and Legal Representatives

This policy shall cover **Loss** arising from any **Claim** made against the estates, heirs, legal representatives or assigns of an **Insured Person** who is deceased, or against the legal representatives or assigns of an **Insured Person** who is incompetent, insolvent or bankrupt, for the **Wrongful Act** of such **Insured Person**.

## SECTION III. - DEFINITIONS

A. **Application** means the application attached to and forming a part of this policy, including any materials submitted or requested in connection with such application within 12 months prior to the inception date of this policy, all of which are deemed a part of this policy.

B. **Claim** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

C. **Coverage Section** means, individually or collectively, the purchased coverage sections listed in Item 3. of the Declarations, including all endorsements attached thereto.

D. **Defense Expenses** means reasonable and necessary legal fees and expenses incurred, with the **Insurer's** consent, by any **Insured** in defense of a **Claim**, including any appeal therefrom. **Defense Expenses**, however, shall not include:

   1. Remuneration, overhead or benefit expenses associated with any **Insured Person**; or

   2. Any obligation to apply for or furnish any appellate or similar bond.

E. **Employment Practices Wrongful Act** shall have the meaning set forth in the Employment Practices Liability Coverage Section, whether or not purchased.

F. **Fiduciary Wrongful Act** shall have the meaning set forth in the Fiduciary Liability Coverage Section, whether or not purchased.

G. **Insured** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

H. **Insured Organization** means:

   1. The organization named in Item 1. of the Declarations Page and any **Subsidiary** existing prior to or at the inception date of this policy; or

   2. Subject to SECTION V. - CONDITIONS, G. Merger, Consolidation or Acquisition of this policy, **Insured Organization** shall include any **Subsidiary** created or acquired after the inception date of this policy; or

   3. In the event a bankruptcy proceeding shall be instituted by or against the foregoing entities, the resulting debtor-in-possession (or equivalent status outside the United States), if any.

I. **Insured Person** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

J. **Insurer** means the Company providing this insurance as shown on the Declarations Page.

K. **Loss** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

L. **Policy Period** means the period beginning at the inception date and ending at the expiration date stated in Item 2. of the Declarations Page or to any earlier policy cancellation or termination date.

M. **Subsidiary** means any entity of which the **Insured Organization**, either directly or indirectly, or through one or more of its **Subsidiaries**:

   1. Owns more than fifty percent (50%) of the voting stock and/or outstanding securities; or

   2. Has the right to elect or appoint more than fifty percent (50%) of the voting directors, management committee members or members of the Board of Managers.

   A **Subsidiary** ceases to be a **Subsidiary** when the **Insured Organization** no longer owns more than fifty percent (50%) of the voting stock and/or outstanding securities, or no longer has the right to elect or appoint more than fifty percent (50%) of the voting directors, management committee members or members of the Board of Managers, or the means by which the **Insured Organization** is legally enabled to exercise fifty percent (50%) ownership or control is formally extinguished.

N. **Third Party** shall have the meaning set forth in the Employment Practices Liability Coverage Section, whether or not purchased.

O. **Third Party Discrimination** shall have the meaning set forth in the Employment Practices Liability Coverage Section, whether or not purchased.

**P. Third Party Harassment** shall have the meaning set forth in the Employment Practices Liability Coverage Section, whether or not purchased.

**Q. Wrongful Act** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

## SECTION IV. - EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

1. Alleging, arising out of, based upon or attributable to, directly or indirectly, the same or essentially the same facts underlying or alleged in any matter which, prior to the inception date of this policy, has been the subject of notice to any insurer of a **Claim**, or a potential or threatened **Claim**, or an occurrence or circumstance that might give rise to a **Claim** under any policy of which this insurance is a renewal or replacement or which it may succeed in time;

2. Based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any nuclear reaction, nuclear radiation, or radioactive contamination, or any related act or incident;

3. Any **Telecommunications Claim**, as defined below.

   A **Telecommunications Claim** is any **Claim**:

   a. Arising from, based upon, attributable to, or in consequence of any proceeding against any **Insured** brought by the Federal Trade Commission or any other federal, state or local regulatory agency or other administrative body alleging the violation of any federal, state or local laws or regulation pertaining to unsolicited or non-consensual advertising, through faxes, telephone calls, texting or any other medium; and/or

   b. Arising from, based upon, attributable to, or in consequence of, any actual or alleged violation of:

      (1) The Fair Debt Collection Practices Act or any amendments thereto or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state or local statutory law or common law anywhere in the world;

      (2) The CAN-SPAM Act of 2003 or any amendments thereto or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state or local statutory law or common law anywhere in the world;

      (3) The Telephone Consumer Protection Act (TCPA) of 1991 or any amendments thereto or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state or local statutory law or common law anywhere in the world; or

      (4) Any other law, ordinance, regulation, statute or common law relating to any communication, distribution, publication, sending or transmission via telephone, telephone facsimile machine, computer or other telephonic or electronic devices.

4. Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, in whole or in part, any actual or alleged violation of **Biometric Privacy Information** as defined below:

   **Biometric Privacy Information** is defined as the Biometric Information Privacy Act ("BIPA"), the California Consumer Privacy Act ("CCPA"), or any federal, state, municipal or local statutory biometric privacy law or any such similar law or statute anywhere in the world that governs or relates to the collection, use, safeguarding, handling, storage, retention or destruction of biometric identifiers, biometric data or biometric information of any kind, including but not limited to retina or iris scans, fingerprints, voiceprints or scans of hand or face geometry.

5. Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, in whole or in part, any actual or alleged violation of **Network Security and Privacy Information** as defined below:

   a. **Network Security and Privacy Information** shall mean:

      (1) failure to prevent the transmission of a **Computer Virus**; or

      (2) failure to provide any authorized user of the **Insured Organization's** website, or the **Insured Organization's** computer or communications network, with access to such website, or computer or communications network; or

      (3) failure to prevent unauthorized access to, or use of, data containing private or confidential information

of others; or

**(4)** failure to properly handle, manage, store, destroy or otherwise control confidential corporate or personally identifiable information; or

**(5)** failure to provide notification of any actual or potential unauthorized access to, or use of, data containing private or confidential information of others if such notification is required by any state or federal regulation or statute.

**b.** **Computer Virus** shall mean any malicious code which could destroy, alter, contaminate or degrade the integrity, quality or performance of data of any computer application software, computer network, or computer operating system or related network, upon the introduction of such malicious code through any computer, communications equipment or communications network that is owned or operated by the **Insured Organization**.

The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the EXCLUSIONS set forth in SECTION IV.

## SECTION V. - CONDITIONS

### A. Duty to Defend

It shall be the right and duty of the **Insurer** to defend any **Claim** against any **Insured** for which coverage applies under this policy, and the **Insurer** shall have the right to appoint counsel of its choosing. No **Insured** may incur any **Defense Expenses**, admit liability for or settle any **Claim** or negotiate any settlement without the **Insurer's** prior written consent; such consent not to be unreasonably withheld. Any **Defense Expenses** incurred or settlements made without the prior written consent of the **Insurer** will not be covered under this policy. The **Insurer** shall have the right to appoint counsel, investigate and conduct negotiations and, with the consent of the **Insured**, to enter into the settlement of any **Claim** that the **Insurer** deems appropriate. If the **Insured** refuses to consent to a settlement acceptable to the claimant in accordance with the **Insurer's** recommendations, the **Insurer's** liability for all **Loss** on account of such **Claim** shall not exceed:

**1.** The amount for which the **Insurer** could have settled such **Claim** plus **Defense Expenses** incurred as of the date such settlement was proposed in writing by the **Insurer** ("Settlement Opportunity Amount"); plus

**2.** Seventy percent (70%) of covered **Loss** in excess of such Settlement Opportunity Amount subject to the policy's Limit of Liability.

In no event shall the **Insurer** be liable under this policy for more than the Limit of Liability shown in Item 4. of the Common Policy Declarations Page.

### B. Limit of Liability; Retention; Payment of Loss

#### 1. Aggregate Limit of Liability

Regardless of **Coverage Sections** purchased, as stated in Item 3. of the Common Policy Declarations Page, the amount shown in Item 4. of the Common Policy Declarations Page is the maximum aggregate limit that the **Insurer** will pay for all **Loss** under all **Coverage Sections** combined, arising out of any and all **Claims** first made against the **Insured** during the **Policy Period** and the Extended Reporting Period (if purchased) and reported in accordance with the terms and conditions of this policy.

The **Insurer** will have no obligation to pay **Loss** or to defend or continue to defend any **Claim** after the aggregate Limit of Liability, stated in Item 4. of the Common Policy Declarations Page, has been exhausted by payment of **Loss**. **Defense Expenses** shall be part of and not in addition to the Limit of Liability and payment of **Defense Expenses** by the **Insurer** will reduce the Limit of Liability.

#### 2. Separate Limit of Liability

Regardless of any Separate Limit(s) of Liability purchased, as stated in Item 3. of the Common Policy Declarations, the maximum limit of the **Insurer's** liability for all **Loss** for each applicable **Coverage Section** purchased shall not exceed the Separate Limit of Liability as stated in Item 2. of each applicable Declarations for each applicable **Coverage Section**. Where two or more Separate Limits of Liability are or could be applicable to one **Claim** or series of interrelated **Claims** deemed to be a single **Claim** pursuant to Section V.B.4. below, the larger of the applicable Separate Limits of Liability shall apply, but in no event shall more than one Separate Limit of Liability apply to any **Claim** or series of interrelated **Claims** and in no event shall the Insurer be obligated to pay **Loss** or to defend or continue to defend any **Claim** after the Insurer has paid the applicable Separate Limit of Liability or the Aggregate Limit of Liability per Section V.B.1. of these Common Policy Terms and Conditions.

3. As a condition precedent to coverage under this policy, the **Insured** shall pay with respect to each **Claim** the applicable Retention amount, as identified in Item 3. of the Declarations Page for each applicable **Coverage Section** or as otherwise identified. The Retention amount shall be reduced solely by covered **Loss** and shall be applied to all **Loss**, including **Defense Expenses**, and the **Insurer** shall only be liable for the amount of **Loss** that is excess of the stated Retention amount.

4. All **Claims** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events, or the same or related series of facts, circumstances, situations, transactions or events, shall be deemed to be a single **Claim** for all purposes under this policy, shall be subject to the Retention stated in Item 3. of the Declarations Page for each applicable **Coverage Section**, or other applicable Retention, and shall be deemed first made when the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**.

5. In the event that a **Claim** implicates more than one Retention amount, then the largest of the applicable Retention amounts shall be applied, but in no event shall more than one Retention amount be applied to a **Claim**.

6. Any Retention amount applicable to a **Claim** against an **Insured Person** shall apply where indemnification by the **Insured Organization** is permitted or required, regardless of whether the **Insured Organization** has agreed, failed or refused to indemnify such **Insured Person**, provided it shall not apply when indemnification cannot be made by the **Insured Organization** by reason of the **Insured Organization's** financial insolvency.

7. The **Insurer's** duty to defend the **Insured** and pay **Defense Expenses** ends upon exhaustion of the Limit of Liability, which includes paying or tendering the Limit of Liability into court.

8. Except for payment of **Defense Expenses**, the **Insurer** shall pay for **Loss** only upon final disposition of any **Claim**.

## C. Notice of Claim or Circumstance

1. If, during the **Policy Period** or Extended Reporting Period (if applicable), any **Claim** is first made, it shall be a condition precedent to the **Insurer's** obligation to pay, that the **Insured** give written notice of such **Claim** to the **Insurer** as soon as practicable after such **Claim** is first made, but in no event shall such notice be given later than sixty (60) days after either the **Policy Period** expires or any earlier cancellation date of this policy.

2. If, during the **Policy Period** or Extended Reporting Period (if applicable), any **Insured** first becomes aware of any facts or circumstances which may reasonably be expected to give rise to a **Claim** against any **Insured** for any **Claim** made against the **Insured** for any **Wrongful Act** occurring prior to the end of the **Policy Period**, and as soon as practicable thereafter, but before the expiration date or any earlier cancellation date of this policy, gives to the **Insurer** written notice, of such facts or circumstances along with the full particulars described below, then any **Claim** subsequently made against any **Insured** arising out of such facts or circumstances will be deemed first made during the **Policy Period**. The written notice shall include, at a minimum:

   a. The names or identity of the potential claimants and a detailed description of the specific alleged **Wrongful Act**; and

   b. The circumstances by which the **Insured** first became aware of the specific alleged **Wrongful Act**.

Further, if any **Claim** first made after the **Policy Period** expires is nonetheless deemed to be made during the **Policy Period** pursuant to Section V.B.4., then it is a condition precedent to coverage for such **Claim** that the **Insured** report it to the **Insurer** as soon as practicable.

## D. Cooperation

In the event of a **Claim** or notice of circumstances under SECTION V. - CONDITIONS, C. Notice of Claim or Circumstance of this policy, the **Insured** will provide the **Insurer** with all information, assistance and cooperation that the **Insurer** reasonably requests, and will take no action, without the **Insurer's** prior written consent, that might prejudice the **Insured's** or the **Insurer's** position, potential or actual rights, or defense under this policy.

## E. Allocation

If both **Loss** covered under this policy and loss not covered under this policy are jointly incurred either because a **Claim** includes both covered and non-covered matters or covered and non-covered causes of

action or because a **Claim** is made against both an **Insured** and any other parties not insured by this policy, then the **Insured** and the **Insurer** shall use their best efforts to fairly and reasonably allocate payment under this policy between covered **Loss** and non-covered loss based on the relative legal exposures of the parties with respect to covered and non-covered matters or covered and non-covered causes of action.

If the **Insurer** and the **Insured** agree on an allocation of **Defense Expenses**, based on covered and non covered matters or persons, the **Insurer** shall advance **Defense Expenses** allocated to covered **Loss**. If there is no agreement on an allocation of **Defense Expenses**, the **Insurer** shall advance **Defense Expenses** that the **Insurer** believes to be covered under this policy until a different allocation is negotiated, arbitrated, or judicially determined.

Any negotiated, arbitrated or judicially determined allocation of **Defense Expenses** on account of a **Claim** shall be applied retroactively to all **Defense Expenses** on account of such **Claim**, notwithstanding any prior advancement to the contrary. Any advancement or allocation of **Defense Expenses** on account of a **Claim** shall not apply to or create any presumption with respect to the allocation of other loss on account of such **Claim**.

**F. Cancellation; Renewal Provision**

The **Insured Organization** may cancel this policy at any time by written notice or by surrender of this policy to the **Insurer** at its address shown on the Declarations Page.

This policy may only be cancelled by or on behalf of the **Insurer** in the event the **Insured Organization** fails to pay any premium when due. In the event of non-payment of premium by the **Insured Organization**, the **Insurer** may cancel this policy upon ten (10) days written notice. The **Insurer** will mail notice to the **Insured Organization's** address as shown in Item 1. of the Declarations Page. The mailing of such notice as aforesaid shall be sufficient proof of notice.

If the **Insured Organization** cancels this policy, the **Insurer** will retain the customary short rate proportion of the premium hereon.

The **Insurer** shall not be required to renew this policy upon its expiration. The offer by the **Insurer** of renewal terms, conditions, Limit of Liability and/or premiums varying from those of the expiring policy shall not constitute a refusal to renew.

If the **Insurer** decides not to renew this policy, the **Insurer** will mail or deliver to the **Insured Organization** written notice of non-renewal, stating the reasons for non-renewal, at least sixty (60) days prior to the expiration date of this policy.

Any notice of non-renewal will be mailed or delivered to the **Insured Organization's** last mailing address known to the **Insurer**. If notice is mailed, proof of mailing will be sufficient proof of notice.

**G. Merger, Consolidation or Acquisition**

1. If, after this policy's inception date, the **Insured Organization** creates or acquires a **Subsidiary** whose assets do not exceed twenty five percent (25%) of the total consolidated assets of the **Insured Organization**, not including the assets of the created or acquired **Subsidiary**, such **Subsidiary** shall be deemed to qualify as an **Insured Organization**, but solely for a **Wrongful Act** that takes place on or after the effective date of such creation or acquisition.

2. If, after this policy's inception date, the **Insured Organization** creates or acquires a **Subsidiary** whose assets exceed twenty five percent (25%) of the total consolidated assets of the **Insured Organization**, not including the assets of the created or acquired **Subsidiary**, such **Subsidiary** shall be deemed to qualify as an **Insured Organization**, but solely for a **Wrongful Act** that takes place within the first ninety (90) days after the date of such creation or acquisition. After this ninety (90) day period, the created or acquired **Subsidiary** shall no longer be deemed an **Insured Organization**, unless:

   a. Written notice of the **Subsidiary's** creation or acquisition has been provided to the **Insurer** by the **Insured Organization**, as soon as practicable, and in no event later than ninety (90) days after the date of the creation or acquisition;

   b. The **Insured Organization** has provided the **Insurer** with any additional information the **Insurer** may request;

   c. The **Insured Organization** has agreed to the terms, conditions, exclusions and additional premium charge as may be required by the **Insurer**; and

   d. The **Insurer**, at its sole discretion, has agreed in writing to extend the coverage of this policy to the created or acquired **Subsidiary**.

3. If during the **Policy Period**:

    **a.** The **Insured Organization** shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

    **b.** Any person or entity or group of persons or entities acting in concert shall acquire an amount of more than fifty percent (50%) of the voting power for the election of directors of the **Insured Organization**;

      (either of the above events in 3. a. or b. are hereunder referred to as the "Transaction"),

then this policy shall continue in full force and effect for any **Wrongful Act** occurring prior to the effective time of the Transaction, but there shall be no coverage afforded by any provision of this policy for any actual or alleged **Wrongful Act** occurring after the effective time of the Transaction. This policy may not be cancelled after the effective time of the Transaction and the premium for this policy shall be deemed fully earned as of such time.

The **Insured Organization** shall give the **Insurer** written notice of the Transaction as soon as practicable, but not later than thirty (30) days after the effective date of the Transaction.

## H. Representations

The **Insured** represents that the information, particulars, documents, representations and statements contained in the **Application** are complete, true and accurate; are deemed incorporated into and constituting part of this policy; are material to the acceptance of the risk assumed by the **Insurer** under this policy. This policy is issued in reliance upon the truth of such representations. No knowledge or information possessed by any **Insured** will be imputed to any other **Insured**. If any of the information, particulars, documents, representations and statements contained in the **Application** are untrue, this policy will be void with respect to any **Insured** who knew of such untruth.

## I. No Action Against Insurer

No action may be taken against the **Insurer** unless, as a condition precedent thereto, there has been full compliance with all of the terms and conditions of this policy and until the amount of any **Insured's** obligation to pay **Loss** has been finally determined either by judgment against such **Insured** after adjudicatory proceedings, or by written agreement of the **Insured**, the claimant and the **Insurer**.

No **Insured** has any right under this policy to join the **Insurer** as a party to any **Claim** against an **Insured** to determine the liability of such **Insured**, nor shall the **Insurer** be impleaded by an **Insured** or his, her or its legal representative in any such **Claim**.

## J. Subrogation

In the event the **Insurer** makes any payment under this Policy, the **Insurer** shall be subrogated to all of the rights of recovery of the **Insured**, who shall execute all papers and take all necessary actions to secure such rights, including the execution of any documents necessary to enable the **Insurer** to effectively bring suit in the name of an **Insured**.

## K. Authorization and Notices

The **Insured Persons** agree that the **Insured Organization** shown in Item 1. of the Declarations Page acts on their behalf with respect to giving and receiving all notices and return of premium from the **Insurer**.

## L. Changes

Notice to any agent or knowledge possessed by any agent or representations by persons acting on behalf of the **Insurer** do not effect a waiver or change in any part of this policy or estop the **Insurer** from asserting any right under the terms, conditions and limitations of this policy. The terms, conditions and limitations of this policy can only be waived or changed by written endorsement.

## M. Assignment

Assignment of interest under this policy does not bind the **Insurer** without its prior written consent.

## N. Acceptance

The **Insureds** agree that this policy, including the **Application** and any endorsements, constitutes the entire agreement between them and the **Insurer** relating to this insurance policy.

O. **Headings**

The description in the headings and sub-headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

P. **Governing Law Clause**

This policy shall, to the extent permitted by applicable law, be construed in accordance with the laws of the state or jurisdiction of incorporation or organization of the **Insured Organization** shown in Item 1. of the Declarations Page or, in the case of matters pertaining to a **Subsidiary**, the laws of the state or jurisdiction of incorporation or organization thereof.

Q. **Territory**

This policy shall apply to **Claims** made against any **Insured** anywhere in the world.

R. **Other Insurance**

Unless specifically stated otherwise, the insurance provided under this policy shall apply only as excess over any other valid and collectible insurance, unless such other insurance is written as specific excess insurance over the Aggregate Limit of Liability or Shared Limit of Liability provided by this policy. Any coverage otherwise available under any **Coverage Section** shall be specifically excess over any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **Claim** for which this policy may be obligated to pay **Loss**.

**In Witness Whereof**, the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the **Insurer**.

Secretary                                              President

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# ABSOLUTE EXCLUSION – BODILY INJURY AND PROPERTY DAMAGE WITH ALLOCATION

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

A.  SECTION IV. – EXCLUSIONS, 6. of the Directors and Officers Liability Coverage Section is deleted and replaced by the following:

6.  Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged;

provided that, regardless of any other terms or conditions in this Policy, including any endorsements, the covered and uncovered portions of **Loss** arising from any such **Claim** shall be allocated in accordance with this Policy's allocation provision.

B.  The first paragraph in SECTION IV. – EXCLUSIONS, 2. of the Employment Practices Liability Coverage Section is deleted and replaced by the following:

2.  Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly:

a.  Bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; provided, this EXCLUSION 2.a. will not apply to allegations of mental anguish or emotional distress made solely in connection with an **Employment Practices Claim** or a **Claim** for **Third Party Discrimination** and/or **Third Party Harassment**; or

b.  Damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged;

provided that, regardless of any other terms or conditions in this Policy, including any endorsements, the covered and uncovered portions of **Loss** arising from any such **Claim** shall be allocated in accordance with this Policy's allocation provision.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# ADDITIONAL NAMED INSUREDS WITH PRIOR AND/OR PENDING LITIGATION DATES AND PRIOR ACTS DATES

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The **Insured Organization**, as set forth in Item 1. of the Common Policy Declarations Page, is amended to include the following:

| Additional **Insured Organization**: | Prior and/or Pending Litigation Date: | Prior Acts Date: |
|---|---|---|
| SwiftMD | 12/23/2022 | 12/23/2022 |

If a date is specified above, it is further understood and agreed that the **Insurer** shall not be liable to make any payment for **Loss** with respect to the above organizations in connection with any **Claim** made against them or any **Insured** alleging, arising out of, based upon or attributable to, in whole or in part, any litigation for any **Wrongful Act** involving any **Insured** that was commenced or initiated prior to, or pending as of the Prior and/or Pending Litigation Dates shown in the table above, or arising out of or based upon, in whole or in part, any facts or circumstances underlying or alleged in any such prior or pending litigation.

It is further understood and agreed that the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured** that alleges, arises out of, is based upon or attributable to, directly or indirectly, in whole or in part, any actual or alleged **Wrongful Acts** which first occurred prior to the Prior Acts Date as specified above.

The above addition shall not serve to increase the Limit of Liability as set forth in Item 4. of the Common Policy Declarations Page.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy. Please Read It Carefully.*

# AMENDED CONDITIONS – 35% ACQUISITION THRESHOLD

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION V. – CONDITIONS, G. of the Common Policy Terms and Conditions Coverage Section is deleted and replaced by the following:

**G. Merger, Consolidation or Acquisition**

1.  If, after this policy's inception date, the **Insured Organization** creates or acquires a **Subsidiary** whose assets do not exceed thirty five percent (35%) of the total consolidated assets of the **Insured Organization**, not including the assets of the created or acquired **Subsidiary**, such **Subsidiary** shall be deemed to qualify as an **Insured Organization**, but solely for a **Wrongful Act** that takes place on or after the effective date of such creation or acquisition.

2.  If, after this policy's inception date, the **Insured Organization** creates or acquires a **Subsidiary** whose assets exceed thirty five percent (35%) of the total consolidated assets of the **Insured Organization**, not including the assets of the created or acquired **Subsidiary**, such **Subsidiary** shall be deemed to qualify as an **Insured Organization**, but solely for a **Wrongful Act** that takes place within the first ninety (90) days after the date of such creation or acquisition. After this ninety (90) day period, the created or acquired **Subsidiary** shall no longer be deemed an **Insured Organization**, unless:

    a.  Written notice of the **Subsidiary's** creation or acquisition has been provided to the **Insurer** by the **Insured Organization**, as soon as practicable, and in no event later than ninety (90) days after the date of the creation or acquisition;

    b.  The **Insured Organization** has provided the **Insurer** with any additional information the **Insurer** may request;

    c.  The **Insured Organization** has agreed to the terms, conditions, exclusions and additional premium charge as may be required by the **Insurer**; and

    d.  The **Insurer**, at its sole discretion, has agreed in writing to extend the coverage of this policy to the created or acquired **Subsidiary**.

3.  If during the **Policy Period**:

    a.  The **Insured Organization** shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

    b.  Any person or entity or group of persons or entities acting in concert shall acquire an amount of more than fifty percent (50%) of the voting power for the election of directors of the **Insured Organization**;

    (either of the above events in 3. a. or b. are hereunder referred to as the "Transaction" ),

    then this policy shall continue in full force and effect for any **Wrongful Act** occurring prior to the effective time of the Transaction, but there shall be no coverage afforded by any provision of this policy for any actual or alleged **Wrongful Act** occurring after the effective time of the Transaction. This policy may not be cancelled after the effective time of the Transaction and the premium for this policy shall be deemed fully earned as of such time.

The **Insured Organization** shall give the **Insurer** written notice of the Transaction as soon as practicable, but not later than thirty (30) days after the effective date of the Transaction.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# AMENDED DEFINITION OF INSURED PERSON
# (ADDITIONAL POSITIONS)

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION III. – DEFINITIONS, **I. Insured Person** of the Common Policy Terms and Conditions Coverage Section, is amended to include Advisory Board Member.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy. Please Read It Carefully.*

# AMENDED NOTICE OF CLAIM OR CIRCUMSTANCE – SPECIFIC POSITION TRIGGER

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance of the Common Policy Terms and Conditions Coverage Section is deleted and replaced by the following:

**C. Notice of Claim or Circumstance**

1. If, during the **Policy Period** or Extended Reporting Period (if applicable), any **Claim** is first made, it shall be a condition precedent to the **Insurer's** obligation to pay, that the **Insured** give written notice of such **Claim** to the **Insurer** as soon as practicable after the **Insured's** <u>Chief Executive Officer, Chief Financial Officer, Risk Manager, or Human Resources Director</u> first becomes aware of the **Claim**, but in no event shall such notice be given later than <u>sixty</u> (<u>60</u>) days after the expiration or earlier cancellation date of this Policy.

2. If, during the **Policy Period** or Extended Reporting Period (if applicable), any **Insured** first becomes aware of any facts or circumstances which may reasonably be expected to give rise to a **Claim** against any **Insured** for any **Claim** made against the **Insured** for any **Wrongful Act** occurring prior to the end of the **Policy Period**, and as soon as practicable thereafter, but before the expiration date or any earlier cancellation date of this policy, gives to the **Insurer** written notice, of such facts or circumstances along with the full particulars described below, then any **Claim** subsequently made against any **Insured** arising out of such facts or circumstances will be deemed first made during the **Policy Period**. The written notice shall include, at a minimum:

   a. The names or identity of the potential claimants and a detailed description of the specific alleged **Wrongful Act**; and

   b. The circumstances by which the **Insured** first became aware of the specific alleged **Wrongful Act**.

Further, if any **Claim** first made after the **Policy Period** expires is nonetheless deemed to be made during the **Policy Period** pursuant to Section V.B.4., then it is a condition precedent to coverage for such **Claim** that the **Insured** report it to the **Insurer** as soon as practicable.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# AMENDED SETTLEMENT PROVISION

This endorsement modifies insurance provided under the following:

## NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY
## PRIVATE COMPANY MANAGEMENT LIABILITY POLICY

SECTION V. – CONDITIONS, A. Duty to Defend of the Common Policy Terms and Conditions Coverage Section is deleted and replaced by the following:

## A. Duty to Defend

It shall be the right and the duty of the **Insurer** to defend any **Claim** against any **Insured** for which coverage applies under this policy, and the **Insurer** shall have the right to appoint counsel of its choosing.  No **Insured** may incur any **Defense Expenses**, admit liability for or settle any **Claim** or negotiate any settlement without the **Insurer's** prior written consent; such consent not to be unreasonably withheld.  Any **Defense Expenses** incurred or settlements made without the prior written consent of the **Insurer** will not be covered under this policy.  The **Insurer** shall have the right to appoint counsel, investigate and conduct negotiations and, with the consent of the **Insured**, to enter into a settlement of any **Claim** that the **Insurer** deems appropriate.  If the **Insured** refuses to consent to a settlement acceptable to the claimant in accordance with the **Insurer's** recommendations, the **Insurer's** liability for all **Loss** on account of such **Claim** shall not exceed:

1. The amount for which the **Insurer** could have settled such **Claim** plus **Defense Expenses** incurred as of the date such settlement was proposed in writing by the **Insurer** ("Settlement Opportunity Amount"); plus

2. Eighty percent (80%) of covered **Loss** in excess of such Settlement Opportunity Amount subject to the policy's Limit of Liability.

In no event shall the **Insurer** be liable under this policy for more than the Limit of Liability shown in Item 4. of the Common Policy Declarations Page.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# COVERAGE EXTENSION – CRISIS MANAGEMENT

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION II. – COVERAGE EXTENSIONS, of the Common Policy Terms and Conditions Coverage Section:

The **Insurer** shall provide a $25,000 sublimit for **Crisis Management Expenses** the **Insured** incurs resulting directly from any **Claim** covered under this policy.  The sublimit shall be part of and not in addition to the Limit of Liability set forth in Item 4. of the Common Policy Declarations Page.

**Crisis Management Expenses** shall be defined as the reasonable and necessary cost of retaining, for a stipulated period of time with the prior approval of the **Insurer**, an independent public relations consultant and the cost of associated advertising and public relations media and activities.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy. Please Read It Carefully.*

# EXCLUSION – BIOMETRIC PRIVACY CLAIMS WITH ALLOCATION

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION IV. – EXCLUSIONS, 4. of the Common Policy Terms and Conditions Coverage Section is deleted and replaced with the following:

**4.** Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, in whole or in part, any actual or alleged violation of **Biometric Privacy Information** as defined below:

**Biometric Privacy Information** is defined as the Biometric Information Privacy Act ("BIPA"), the California Consumer Privacy Act ("CCPA"), or any federal, state, municipal or local statutory biometric privacy law or any such similar law or statute anywhere in the world that governs or relates to the collection, use, safeguarding, handling, storage, retention or destruction of biometric identifiers, biometric data or biometric information of any kind, including but not limited to retina or iris scans, fingerprints, voiceprints or scans of hand or face geometry.

Provided that, regardless of any other terms or conditions in this Policy, including any endorsements, the covered and uncovered portions of **Loss** arising from such **Claim** shall be allocated in accordance with this Policy's allocation provision.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – BROADCASTING, ADVERTISING AND PUBLISHING LIABILITY WITH ALLOCATION

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Directors and Officers Liability Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** arising out of or in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon or attributable to, directly or indirectly or in any way involving:

a.  Publishing or re-publishing;

b.  Advertising;

c.  Broadcasting or re-broadcasting;

d.  Telecasting or re-telecasting;

e.  Any actual or alleged piracy;

f.  Any actual or alleged idea misappropriation under implied contract;

g.  Any actual or alleged libel, slander, or other defamation or invasion of privacy in connection with any advertisement, publicity, article, broadcast or telecast;

h.  Any actual or alleged plagiarism, infringement of patent, copyright, trademark, title or slogan; or

i.  Any actual or alleged false arrest, false imprisonment, wrongful entry or eviction or other wrongful invasion of the right to private occupancy, wrongful detention, malicious prosecution, humiliation, defamation of character or invasion of rights of privacy.

Provided that, regardless of any other terms or conditions in this Policy, including any endorsements, the covered and uncovered portions of **Loss** arising from such **Claim** shall be allocated in accordance with this Policy's allocation provision.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy. Please Read It Carefully.*

# EXCLUSION – NETWORK SECURITY AND PRIVACY INFORMATION WITH ALLOCATION

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION IV. – EXCLUSIONS, 5. of the Common Policy Terms and Conditions Coverage Section is deleted and replaced with the following:

**5.** Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, in whole or in part, any actual or alleged violation of **Network Security and Privacy Information** as defined below:

   **a. Network Security and Privacy Information** shall mean:

   **(1)** failure to prevent the transmission of a **Computer Virus**; or

   **(2)** failure to provide any authorized user of the **Insured Organization's** website, or the **Insured Organization's** computer or communications network, with access to such website, or computer or communications network; or

   **(3)** failure to prevent unauthorized access to, or use of, data containing private or confidential information of others; or

   **(4)** failure to properly handle, manage, store, destroy or otherwise control confidential corporate or personally identifiable information; or

   **(5)** failure to provide notification of any actual or potential unauthorized access to, or use of, data containing private or confidential information of others if such notification is required by any state or federal regulation or statute.

   **b. Computer Virus** shall mean any malicious code which could destroy, alter, contaminate or degrade the integrity, quality or performance of data of any computer application software, computer network, or computer operating system or related network, upon the introduction of such malicious code through any computer, communications equipment or communications network that is owned or operated by the **Insured Organization**.

Provided that, regardless of any other terms or conditions in this Policy, including any endorsements, the covered and uncovered portions of **Loss** arising from such **Claim** shall be allocated in accordance with this Policy's allocation provision.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP703174    **Effective:** 12/14/2022

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – SEXUAL ABUSE AND SEXUAL MISCONDUCT

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Directors and Officers Liability Coverage Section and to the Employment Practices Liability Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** in connection with that portion of any **Claim** (including but not limited to any derivative or representative class actions) made against any **Insured** alleging, arising out of, based upon or attributable to, or in any way involving, in whole or in part:

   a.  Any forcible physical or sexual assault, battery or molestation, rape including statutory rape;

   b.  Any **Sexual Misconduct**, child abuse or neglect, including but not limited to the hiring, employment, supervision, reporting to the proper authorities, failure to so report or retention of any person; or

   c.  Any mental anguish and/or emotional distress arising out of a. and/or b. above;

provided that, regardless of any other terms or conditions in this Policy, including any endorsements, the covered and uncovered portions of **Loss** for **Claims** that include **Employment Practices Wrongful Acts** and **Sexual Misconduct** shall be allocated in accordance with this Policy's allocation provision.

**Sexual Misconduct** shall include both verbal and non-verbal communication and/or actual, alleged or threatened conduct, whether permitted or unpermitted by any person including but not limited to:

   a.  Physical molestation of a minor or otherwise legally incompetent person;

   b.  Sexual battery, touching, other physical sexual contact, or sexual intercourse of/with a minor or otherwise legally incompetent person;

   c.  Victimization of, exploitation of or exhibitionism or voyeurism toward any minor or otherwise legally incompetent person;

   d.  Coercion of any minor or otherwise legally incompetent person to engage in sexual activities; or

   e.  Showing, distributing to others, or requesting any text, pictures, drawings, audio, video, or digital recording of any minor or otherwise legally incompetent person.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – SPECIFIC LITIGATION

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Common Policy Terms and Conditions Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** arising out of or in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon or attributable to, directly or indirectly, in whole or in part, the following litigation:

Iron Street Advisors, Inc. Claim # 02098879

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy. Please Read It Carefully.*

# EXTENDED REPORTING PERIOD ELECTION

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to the Common Policy Terms and Conditions Coverage Section:

This policy shall terminate and this Extended Reporting Period Election Endorsement shall become effective December 27, 2022 at 12:01 A.M.

It is hereby understood and agreed that the **Insured Organization** named in Item 1. of the Declarations Page has exercised the option under the policy to purchase an Extended Reporting Period that will expire December 27, 2028 at 12:01 A.M. The **Insured Organization** shall have the right to give written notice to the **Insurer** of **Claims** first made against any **Insured** during said Extended Reporting Period for any **Wrongful Act** that occurred prior to December 27, 2022 and otherwise covered by this policy. A **Claim** alleging any **Wrongful Act** that occurred on or subsequent to December 27, 2022 shall not be a covered **Claim**.

The Limit of Liability available under the Extended Reporting Period is part of and not in addition to the Limit of Liability stated in Item 4. of the Declarations Page.

This endorsement will not take effect unless the additional premium for it, as shown above, is paid within thirty (30) days after the effective date of the policy's termination. The premium for the Extended Reporting Period Election Endorsement is fully earned as of the effective date of this Endorsement. This Endorsement is non-cancelable except for non-payment of premium.

All other terms and conditions of this policy remain unchanged.

**Premium charge for this endorsement is $79,020**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXTRADITION COVERAGE

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

A.  SECTION III. – DEFINITIONS, of the Common Policy Terms and Conditions Coverage Section is amended to include the following:

**Extradition** means any formal process by which an **Insured Person** located in any country is surrendered to any other country for trial or otherwise to answer any criminal accusation.

B.  SECTION III. – DEFINITIONS, **B. Claim**, of the Common Policy Terms and Conditions Coverage Section is amended to include the following:

**Claim** also means any official request for **Extradition** of any **Insured Person**, return of an indictment (in the case of a criminal proceeding), or receipt or filing of a notice of charges.

C.  SECTION III. – DEFINITIONS, **D. Defense Expenses**, of the Common Policy Terms and Conditions Coverage Section is amended to include the following:

**Defense Expenses** also means reasonable and necessary fees, costs and expenses incurred through legal counsel and consented to by the **Insurer** resulting from an **Insured Person** lawfully:

a.  Opposing, challenging, resisting or defending against any request for or any effort to obtain the **Extradition** of that **Insured Person**; or

b.  Appealing any order or other grant of **Extradition** of that **Insured Person**.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP703174      **Effective:** 12/14/2022

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# FINAL NON-APPEALABLE CONDUCT EXCLUSIONS

This endorsement modifies insurance provided under the following:

**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

A. SECTION IV. – EXCLUSIONS, 3. of the Directors and Officers Liability Coverage Section is deleted and replaced with the following:

Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the gaining of any profit or advantage to which an **Insured** was not legally entitled; provided, this EXCLUSION shall not apply unless a judgment or other final, non-appealable adjudication adverse to any **Insured** in the **Claim** shall establish that such **Insured** gained profit or advantage to which such **Insured** was not legally entitled;

B. SECTION IV. – EXCLUSIONS, 2. of the Directors and Officers Liability Coverage Section and 7. of the Employment Practices Liability Coverage Section are deleted and replaced with the following:

Based upon, arising out of, directly or indirectly, resulting from or in consequence of, or in any way involving any criminal or deliberate fraudulent act; provided, this EXCLUSION shall not apply unless a judgment or other final, non-appealable adjudication adverse to any **Insured** in the **Claim** shall establish that such **Insured** committed such criminal and fraudulent act;

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# FLORIDA - AMENDED DEFINITION OF LOSS –
# DEFENSE FOR ADA CLAIMS

This endorsement modifies insurance provided under the following:

### PRIVATE COMPANY MANAGEMENT LIABILITY POLICY

A.  SECTION III. – DEFINITIONS, F. of the Directors and Officers Liability Coverage Section is deleted and replaced by the following:

F.  **Loss** means damages (including back pay and front pay), settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses**.  **Loss** (other than **Defense Expenses)** shall not include:

1.  Any amount for which the **Insureds** are not financially liable or for which there is not legal recourse to the **Insureds**;

2.  Amounts owed under any employment contract, partnership, stock or other ownership agreement, or any other type of contract;

3.  Disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing employment related benefit payments;

4.  The cost of creating or reinstating employment;

5.  Any amounts owed to any **Employee** as wages or compensation previously incurred or vested without regard to any **Claim**;

6.  Civil or criminal fines or penalties;

7.  Taxes, whether owed to or by any **Insured**;

8.  Any liability, or costs incurred, due to any **Insured's** obligation to modify any building or property in order to make such building or property more accessible or accommodating to any disabled person, or any liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar;

9.  Matters that may be uninsurable under the law pursuant to which this policy shall be construed.

The DEFINITION of **Loss** shall include punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable.  For purposes of determining whether punitive or exemplary damages, or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the **Insurer** agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insured** in that regard.  In the state of Florida, coverage for punitive or exemplary damages shall solely apply to vicarious liability.

B.  SECTION III. – DEFINITIONS, G. of the Employment Practices Liability Coverage Section is deleted and replaced by the following:

G.  **Loss** means damages (including back pay and front pay), settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses**.  **Loss** (other than **Defense Expenses)** shall not include:

1.  Any amount for which the **Insureds** are not financially liable or for which there is not legal recourse to the **Insureds**;

2.  Amounts owed under any employment contract, partnership, stock or other ownership agreement, or any other type of contract;

3.  Disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing employment related benefit payments;

4. The cost of creating or reinstating employment;

5. Any amounts owed to any **Employee** as wages or compensation previously incurred or vested without regard to any **Claim**;

6. Civil or criminal fines or penalties;

7. Taxes, whether owed to or by any **Insured**;

8. Any liability, or costs incurred, due to any **Insured's** obligation to modify any building or property in order to make such building or property more accessible or accommodating to any disabled person, or any liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar relating to an **Employment Practices Claim**;

9. Matters that may be uninsurable under the law pursuant to which this policy shall be construed.

The DEFINITION of **Loss** shall include punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable. For purposes of determining whether punitive or exemplary damages, or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the **Insurer** agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insured** in that regard. In the state of Florida, coverage for punitive or exemplary damages shall solely apply to vicarious liability.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# FLORIDA - COVERAGE EXTENSION – FEDERAL IMMIGRATION & NATIONALITY ACT

This endorsement modifies insurance provided under the following:

### NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY
### PRIVATE COMPANY MANAGEMENT LIABILITY POLICY

The following is added to the Directors and Officers Liability Coverage Section and the Employment Practices Liability Coverage Section:

The amount set forth in Item 4. of the Declarations Page shall be the maximum aggregate Limit of Liability for all **Loss** under this policy.  Subject to the foregoing, the amount of $100,000 shall be the maximum aggregate Limit of Liability of the **Insurer** for **Loss** under this policy in connection with any **Claim** made against any **Insured** based upon, arising out of, or attributable to any actual or alleged violation of the Federal Immigration & Nationality Act, 8 U.S.C. Section 1101, et seq., as amended, under Section 1324a of that act ("FINA Claim"). This sublimit shall be part of and not in addition to the amount set forth in Item 4. of the Declarations Page.

A Retention in the amount of $35,000 shall apply to any **Loss** arising from a FINA **Claim.**  Such Retention shall be borne by the **Insured**, and the **Insurer** shall only be liable for the amount of **Loss** in excess of the above stated Retention amount.

Notwithstanding anything contained in this endorsement to the contrary, however, solely where coverage for any **Claim** is triggered pursuant to Insuring Agreement A of this Policy, the Retention normally applicable to Insuring Agreement A shall apply to such **Claim**, and the Retention stated here shall not apply.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy. Please Read It Carefully.*

# FLORIDA - FULL SEVERABILITY

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION V. – CONDITIONS, H. Representations of the Common Policy Terms and Conditions Coverage Section is deleted and replaced by the following:

## H. Representations

The **Insured** represents that the information, particulars, documents, representations and statements contained in the **Application** are complete, true and accurate; are deemed incorporated into and constituting part of this policy; are material to the acceptance of the risk assumed by the **Insurer** under this policy. This policy is issued in reliance upon the truth of such representations. No knowledge or information possessed by any **Insured** will be imputed to any other **Insured**. If any of the information, particulars, documents, representations and statements contained in the **Application** are untrue, this policy shall not afford coverage to any **Insured** who knew of such untruth.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# FULLY NON-RESCINDABLE COVERAGE

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to the Common Policy Terms and Conditions Coverage Section:

Notwithstanding anything contained in this policy to the contrary, the coverage provided under this policy shall be non-rescindable by the **Insurer**.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# PREDETERMINED ALLOCATION

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION V. – CONDITIONS, E. Allocation of the Common Policy Terms and Conditions Coverage Section is deleted and replaced by the following:

**E. Allocation**

Assuming that a duty to defend has been triggered in connection with a **Claim**, and except for purposes of applying any applicable sublimits, the **Insurer** shall not seek to allocate with respect to **Defense Expenses** incurred in connection with such **Claim** and shall pay One Hundred Percent (100%) of such **Defense Expenses**.

If any other **Loss** covered under this policy and loss not covered under this policy are jointly incurred, however, either because a **Claim** includes both covered and non-covered matters or covered and non-covered causes of action or because a **Claim** is made against both an **Insured** and any other parties not insured by this policy, then the **Insured** and the **Insurer** shall use their best efforts to fairly and reasonably allocate payment under this policy between covered **Loss** and non-covered loss based on the relative legal exposures of the parties with respect to covered and non-covered matters or covered and non-covered causes of action.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy. Please Read It Carefully.*

# SIX (6) YEAR BILATERAL EXTENDED REPORTING PERIOD

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION II. – COVERAGE EXTENSIONS, B. Extended Reporting Period, of the Common Policy Terms and Conditions Coverage Section is deleted and replaced with the following:

If the **Insurer** shall refuse to renew this policy or the **Insured Organization** shall cancel or refuse to renew this policy, the **Insured Organization** shall have the right, upon payment of one hundred percent (100%) of the Full Annual Premium, to a period of three hundred and sixty five (365) days following the effective date of such cancellation or non-renewal (herein referred to as the "Extended Reporting Period") in which to give written notice to the **Insurer** of any **Claim** first made against the **Insured** during said three hundred and sixty five (365) day period for any **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by this policy. As used herein, "Full Annual Premium" means the premium stated in Item 5. of the Common Policy Declarations Page and any additional premium(s) charged during the **Policy Period**.

Alternatively, the **Insured Organization** shall have the right to elect an Extended Reporting Period greater than the three hundred and sixty five (365) Days referenced above. The following alternative Extended Reporting Period options are as follows:

| Extended Reporting Period | Additional Premium |
|---|---|
| 2 Years | 125% of Full Annual Premium |
| 3 Years | 150% of Full Annual Premium |
| 4 Years | 175% of Full Annual Premium |
| 5 Years | 185% of Full Annual Premium |
| 6 Years | 200% of Full Annual Premium |

The rights contained in this clause shall terminate unless written notice of such election together with the additional premium due is received by the **Insurer** at the address shown on the Declarations Page within sixty (60) days of the effective date of cancellation or non-renewal.

The Extended Reporting Period is not cancelable and the additional premium charged shall be fully earned at the inception of the Extended Reporting Period. The Limit of Liability available under the Extended Reporting Period is part of and not in addition to the Limit of Liability stated in Item 4. of the Declarations Page.

The rights contained in this clause shall not apply in the event of cancellation resulting from non-payment of premium.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# SPECIFIC ENTITIES AND INDIVIDUALS – HIGHER RETENTION – HIGHLY COMPENSATED EMPLOYEES

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to the Common Policy Terms and Conditions Coverage Section:

Notwithstanding anything contained in this Policy to the contrary, and assuming coverage is otherwise available under the Policy, a Retention in the amount of $100,000 shall apply to **Loss** arising out of or in connection with any **Claim** made against any **Insured** which is brought in whole or in part by or on behalf of an **Employee** whose annual compensation (salary plus bonus) is $100,000 or greater at the time such **Claim** is first made.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy. Please Read It Carefully.*

# STATE AMENDATORY DISCREPANCY

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to the Common Policy Terms and Conditions Coverage Section:

In the event that there is a discrepancy between a state amendatory attached to this policy and any term or condition of this policy, then it is understood and agreed that, where permitted by law, the **Insurer** shall apply the most favorable terms in the contract to the **Insured**, whether those terms and conditions are in either the amendatory or the policy.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# WAIVER OF CHANGE IN CONTROL

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

It is agreed that with respect to EIR Partners acquisition of a controlling interest in ReviveHealth, Inc., which occurred December 23, 2022 the **Insurer** hereby waives paragraph 3.b. in Section V. – CONDITIONS, G. Merger, Consolidation or Acquisition, of the Common Policy Terms and Conditions Coverage Section.

All other terms and conditions of this policy remain unchanged.

# DIRECTORS AND OFFICERS LIABILITY
## COVERAGE SECTION (PRIVATE)
## PLEASE READ YOUR POLICY CAREFULLY

Words and phrases that appear in **bold** text have special meaning. Refer to SECTION III. – DEFINITIONS in this Coverage Section or the Common Policy Terms and Conditions.

If purchased, as indicated in Item 3. of the Common Policy Declarations Page, and in consideration of the payment of premium and in reliance upon all statements made to the **Insurer** in the **Application**, and subject to the terms, conditions, definitions, exclusions and limitations provided hereinafter or in the Common Policy Terms and Conditions, the **Insurer** agrees:

## SECTION I. - INSURING AGREEMENTS

**Directors and Officers Liability**

A. With the **Insured Person**, that if a **Claim** for a **Wrongful Act** is first made against any **Insured Person** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy, the **Insurer** will pay on behalf of such **Insured Person** all **Loss** such **Insured Person** is legally obligated to pay, except and to the extent that the **Insured Organization** is required or permitted to indemnify such **Insured Person** for such **Loss.**

B. With the **Insured Organization,** that if a **Claim** for a **Wrongful Act** is first made against any **Insured Person** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy, the **Insurer** will pay on behalf of the **Insured Organization** all **Loss** for which the **Insured Organization** is required or permitted to indemnify the **Insured Person**.

C. With the **Insured Organization,** that if a **Claim** for a **Wrongful Act** is first made against the **Insured Organization** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy, the **Insurer** will pay on behalf of the **Insured Organization** all **Loss** the **Insured Organization** is legally obligated to pay.

Notwithstanding anything contained in this policy to the contrary, the coverage provided under SECTION I. INSURING AGREEMENTS A. and B. shall be non-rescindable by the **Insurer**.

## SECTION II. – COVERAGE EXTENSIONS

**A. Outside Board Extension**

This policy shall cover **Loss** arising from an **Insured Person** having served, at the direction of and with the consent of the **Insured Organization**, as Director, Officer, or Trustee for any eleemosynary corporation or other not for profit organization where such **Insured Person** is entitled to indemnification by the **Insured Organization**.

This COVERAGE EXTENSION shall be excess of any indemnification and/or insurance that may be permitted or provided by such eleemosynary corporation or organization, regardless of payment made by or on behalf of such eleemosynary corporation or organization, including but not limited to any other Director and Officer Liability Insurance or similar insurance provided for, to, or by any such eleemosynary corporation or organization.

**B. Additional Side-A Limit of Liability**

If a limit is shown in Item 2.B of the Directors and Officers Liability Declarations, then there shall be an addition to the maximum aggregate Limit of Liability available under this Directors and Officers Coverage Section. This amount shall be in addition to the Limit of Liability as set forth in Item 2.A. of the Directors and Officers Liability Declarations Page and shall be available solely for **Loss** resulting from a **Claim** against any **Insured Persons** covered under SECTION I. INSURING AGREEMENT A. of this coverage section, and shall be subject to the following additional conditions:

(1) Any **Loss** resulting from a **Claim** against any **Insured Persons** covered under SECTION I. INSURING AGREEMENT A. of this Directors and Officers Coverage Section shall first be paid under the Limit of Liability as set forth in Item 2.A. of the Directors and Officers Liability Declarations Page, and such Limit of Liability must be completely exhausted by payment of **Loss** under SECTION I. INSURING

AGREEMENTS A., B., and/or C. of this Directors and Officers Coverage Section before **Loss** shall be paid under the additional Limit of Liability dedicated for **Insured Persons:** and

(2) The additional Limit of Liability dedicated for **Insured Persons** shall be excess of any insurance available that is specifically excess of this policy and such excess insurance must be completely exhausted by payment of **Loss** thereunder before the **Insurer** shall have any obligation to make any payment on account of the additional Limit of Liability dedicated for **Insured Persons**.

**C. Investigation Costs Sublimit of Liability**

The **Insurer's** maximum aggregate Limit of Liability for all **Loss** under this policy for all **Investigative Costs** shall be the Investigative Costs Sublimit of Liability as indicated in Item 2.C. of the Directors and Officers Liability Declarations Page. This sublimit shall be part of and not in addition to the amount set forth in Item 2.A. of the Directors and Officers Liability Declarations Page.

This policy shall cover **Loss** arising from all **Investigative Costs** which the **Insured Organization** shall become legally obligated to pay as a result of a **Shareholder Derivative Demand** first made during the **Policy Period** or Discovery Period, if applicable, against the **Insured Organization** for a **Wrongful Act** of an **Insured Person**.

**SECTION III. - DEFINITIONS**

**A. Claim**, either in the singular or the plural, means:

1. A written demand for monetary or non-monetary relief;

2. A civil, criminal, administrative, regulatory or arbitration proceeding, or arbitration demand for monetary or non-monetary relief which is commenced by:

   a. Receipt or service of a complaint or similar pleading;

   b. Return of an indictment or filing of information; or

   c. Receipt of a notice of charges;

3. A written request to an **Insured** to toll or waive a statute of limitations regarding a potential **Claim**, commenced by the receipt of such request by the **Insured**;

4. A civil, criminal, administrative or regulatory investigation of an **Insured Person** by the Securities Exchange Commission ("SEC") or similar state or foreign government authority, after the **Insured Person** is identified in a written "Wells" or other notice from the SEC or a similar state or foreign government authority that describes actual or alleged violations of laws by such **Insured Person**;

**B. Employee** means any past, present or future employee of the **Insured Organization**, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any full-time, part-time, seasonal and temporary employee of the **Insured Organization**. An individual who is leased or contracted to the **Insured Organization** shall also be an **Employee**, but only if the **Insured Organization** provides indemnification to such leased or contracted individual in the same manner as is provided to the **Insured Organization's** employees.

**C. Insured** means any **Insured Organization** and/or any **Insured Person**.

**D. Insured Person** means:

1. Any past, present or future director, officer, or **Employee**, management committee members or members of the Board of Managers of the **Insured Organization**; or

2. In the event the **Insured Organization** or a **Subsidiary** thereof operates outside the United States, then the term **Insured Person** also means those titles, positions or capacities for such foreign **Insured Organization** or **Subsidiary** that are equivalent to the positions of directors or officers in the United States.

**E. Investigative Costs** means reasonable costs, charges, fees (including attorneys' and experts' fees) and expenses incurred by the **Insured Organization**, its board of directors or any committee thereof in connection with the investigation or evaluation of any **Shareholder Derivative Demand**; provided, however, that **Investigative Costs** shall not include salaries, wages, benefits, expenses or fees of any director, officer or **Employee** of the **Insured Organization**.

**F. Loss** means damages, settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses**. **Loss** (other than **Defense Expenses**) shall not include:

1. Any amount for which the **Insureds** are not financially liable or for which there is not legal recourse to the **Insureds**;

2. Amounts owed under any contract, partnership, stock or other ownership agreement, or any other type of contract;

3. Disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing employment related benefit payments;

4. The cost of creating or reinstating employment;

5. Any amounts owed to any **Employee** as wages, compensation, severance or benefits previously incurred or vested without regard to any **Claim**;

6. Civil or criminal fines or penalties;

7. Taxes, whether owed to or by any **Insured**;

8. Amounts, including **Defense Expenses**, arising out of, based upon or attributable to actual or alleged liability or costs incurred by any **Insured** to modify any building or property in order to make such building or property more accessible or accommodating to any disabled person;

9. Matters that may be uninsurable under the law pursuant to which this policy shall be construed.

The DEFINITION of **Loss** shall include punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable. For purposes of determining whether punitive or exemplary damages, or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the **Insurer** agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insured** in that regard.

G. **Shareholder Derivative Demand** means any written demand by one or more shareholders of the **Insured Organization** made upon the board of directors of the **Insured Organization** to bring a proceeding in a court of law against any **Insured Person** for a **Wrongful Act**.

H. **Wrongful Act** means any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by:

1. An **Insured Person** acting in his or her capacity as such and on behalf of the **Insured Organization** or any matter claimed against them solely by reason of their status as an **Insured Person**; or

2. The **Insured Organization**.

## SECTION IV. - EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

1. Based upon, arising out of or attributable to any remuneration received by an **Insured**, or the granting of any remuneration to any **Insured**, without the previous approval of the stockholders or the Board of Directors, which remuneration is found to have been illegal; provided, this EXCLUSION shall not apply unless a judgment or other final adjudication adverse to any **Insured** in the **Claim** shall establish that such **Insured** received remuneration to which such **Insured** was not legally entitled;

2. Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any criminal or deliberate fraudulent act; provided, this EXCLUSION shall not apply unless a judgment or other final adjudication adverse to any **Insured** in the **Claim** shall establish that such **Insured** committed such criminal or fraudulent act;

3. Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the gaining of any profit or advantage to which an **Insured** was not legally entitled; provided, this EXCLUSION shall not apply unless a judgment or other final adjudication adverse to any **Insured** in the **Claim** shall establish that such **Insured** gained profit or advantage to which such **Insured** was not legally entitled;

4. Alleging, arising out of, based upon or attributable to, in whole or part, any litigation involving any **Insured** that was commenced or initiated prior to, or was pending on or before the date referenced in Item 4. of the Directors and Officers Liability Declarations Page, or arising out of or based upon, in whole or in part, any facts or circumstances underlying or alleged in any such prior or pending litigation;

5. Alleging, arising out of, based upon or attributable to any workers' compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law;

6. For actual or alleged bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged;

7. Alleging, arising out of, based upon or attributable to, in whole or in part, the performance or rendering of or failure to perform professional services, where such services are undertaken for others for a fee;

8. For violation of any of the responsibilities, obligations or duties imposed by: The Fair Labor Standards Act (except the Equal Pay Act) or any state or local statutory or common law, regulation or ordinance that governs payment or administration of wages, hours worked, or employee entitlements; the Employee Retirement Income Security Act of 1974; the National Labor Relations Act; the Worker Adjustment and Retraining Notification Act; the Consolidated Omnibus Budget Reconciliation Act; the Occupational Safety and Health Act; any rules or regulations of any of the foregoing promulgated thereunder and amendments thereto; or any similar provisions of any federal, state or local statutory or common law that govern the same subject matter governed by the laws referenced in this section even if particular laws have some additional or different provisions; provided, this EXCLUSION shall not apply to **Loss** arising from a **Claim** for employment related retaliation;

9. Brought by or on behalf of any **Insured**, or which is brought by any security holder of the **Insured Organization**, whether directly or derivatively, unless such **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any **Insured**. Provided, however, this EXCLUSION shall not apply to:

   a. Any **Claim** brought by an **Insured Person**, where such **Claim** is in the form of a cross-claim or a third-party claim for contribution or indemnity, which is part of and results directly from a **Claim** that is not otherwise excluded by the terms of this policy;

   b. Any **Claim** brought by the examiner, trustee, receiver, liquidator or rehabilitator (or any assignee thereof) of such **Insured Organization**, in or after any bankruptcy proceeding by or against an **Insured Organization**;

   c. Any **Claim** brought by any past director, officer, trustee, manager or equivalent executives of the **Insured Organization** who have not served as a director, officer, trustee, manager or equivalent executive for at least three (3) years prior to the date such **Claim** is first made, but only if the **Claim** is brought and maintained totally independent of and without the solicitation, assistance, active participation or intervention of the **Insured Organization** or any **Insured Person** not described in this paragraph 9.c;

   d. Any **Claim** brought by an **Employee** of the **Insured Organization** who is not or was not a director or officer of the **Insured Organization** and where such **Claim** is brought by such **Employee** only in their capacity as a stockholder and independently of assistance from **Insureds**, except those expressly as noted in section 9.c., above; or

   e. Any instigation of or involvement in any **Claim**, or solicitation, assistance, active participation or intervention by any **Insured** whistleblower under Section 806 of the Sarbanes-Oxley Act of 2002 or any rule or regulation promulgated thereunder, or under any similar whistleblower statute, rule or regulation under any other federal or state law.

   Provided further, however, that in the event that an **Insured Person** brings a cross-claim or third-party claim, as described in 9.a. above, against another **Insured Person**, then solely with respect to the **Loss** derived from a cross-claim or third-party claim, the **Insurer** shall be liable solely for **Defense Expenses**;

10. For the actual, alleged or threatened discharge, dispersal, release or escape of pollutants or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, including but not limited to **Claims** alleging damage to the **Insured Organization**;

    Pollutant includes (but is not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, whether live or inanimate, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed;

11. Alleging, arising out of, based upon or attributable to any initial public offering of securities by the **Insured Organization** or alleging the purchase or sale of such securities subsequent to such offering;

12. With respect to INSURING AGREEMENT C. of this policy, only:

    a. For actual or alleged plagiarism, misappropriation, infringement or violation of copyright, patent, trademark, secret or any other intellectual property rights;

    **b.** For actual or alleged violation of any law, whether statutory, regulatory or common law, with respect to any of the following activities: anti-trust, business competition, unfair trade practices or tortious interference in another's business or contractual relationships; or

    **c.** Alleging, arising out of, based upon or attributable to, in whole or in part, any liability under or pursuant to any contract or agreement, whether oral, written, express or implied, including the liability of others assumed by an **Insured**, unless such **Insured** would have been liable in the absence of such contract or agreement.

**13.** Alleging, arising out of, based upon or attributable to, in whole or in part, any **Employment Practices Wrongful Act**.

**14.** Alleging, arising out of, based upon or attributable to, in whole or in part, any **Third Party Discrimination** and/or **Third Party Harassment**.

**15.** Alleging, arising out of, based upon or attributable to, in whole or in part, any **Fiduciary Wrongful Act**.

The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the EXCLUSIONS set forth in SECTION IV.

**SECTION V. - CONDITIONS**

**A. Bankruptcy and Priority of Payments**

    The bankruptcy or insolvency of the **Insured Organization** or any **Subsidiary** shall not relieve the **Insurer** of any of its obligations hereunder. The coverage provided by this policy, however, is intended primarily to protect and benefit the **Insured Persons**.

    With respect to the payment of the policy proceeds, it is agreed that covered **Loss** due under this policy shall be paid by the **Insurer** in the following order of priority:

    **1.** First pay such **Loss** for which coverage is provided under INSURING AGREEMENT A. of this policy;

    **2.** With respect to any remaining amount of the Limit of Liability still available after payment of such **Loss**, pay **Loss** for which coverage is provided under INSURING AGREEMENT B. of this policy; and

    **3.** With respect to any remaining amount of the Limit of Liability still available after payment of such **Loss**, pay **Loss** for which coverage is provided under INSURING AGREEMENT C. of this policy.

    The **Insured Organization** or its representatives and the **Insurer** shall use their best efforts to agree upon the priority of payment of all **Loss** under this policy. If no agreement is reached regarding the priority of payments, then the **Insurer** and **Insured Organization** will submit the issue of such priority, and only that issue, to binding arbitration.

**In Witness Whereof**, the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the **Insurer**.

        Secretary                                    President

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION - MALPRACTICE

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Directors and Officers Liability Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** arising out of or in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon or attributable to any medical or professional malpractice, including but not limited to the rendering or failure to render any medical or professional service.

Provided that, regardless of any other terms or conditions in this Policy, including any endorsements, the covered and uncovered portions of **Loss** arising from any such **Claim** shall be allocated in accordance with this Policy's allocation provision.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# FLORIDA - REGULATORY COVERAGE

This endorsement modifies insurance provided under the following:

### NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY
### PRIVATE COMPANY MANAGEMENT LIABILITY POLICY

A.  The following is added to SECTION II. – COVERAGE EXTENSIONS, of the Directors and Officers Liability Coverage Section:

The **Insurer** will pay on behalf of the **Insured** any **Loss** from a **Regulatory Claim** first made against them during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance of the Common Policy Conditions Coverage Section, which shall be applicable to **Regulatory Claims** as it is for **Claims** generally.  The **Insurer's** maximum aggregate Limit of Liability for **Loss** under this policy in connection with **Regulatory Claims** made against all **Insureds** shall be $250,000. This sublimit shall be part of and not in addition to the amount set forth in Item 2.A of the Directors and Officers Liability Declarations Page.

A Retention in the amount of $100,000 shall apply to any **Loss** arising from a **Regulatory Claim**.  Such Retention shall be borne by the **Insured**, and the **Insurer** shall only be liable for the amount of **Loss** arising from a **Regulatory Claim** which is in excess of the above stated Retention amount.

Notwithstanding anything contained in this endorsement to the contrary, however, solely where coverage for any **Claim** is triggered as "Side A", or non-indemnifiable or non-indemnified **Loss** in keeping with Policy terms and conditions, the Retention normally applicable in such situations shall apply to such **Claim**, and the Retention stated here shall not apply.

B.  The following are added to SECTION III. – DEFINITIONS, of the Directors and Officers Liability Coverage Section:

1.  **Regulatory Claim** shall mean:

    (a)  a written demand for monetary damages or non-monetary relief;

    (b)  a search warrant, subpoena, notice of investigation, or contact letter;

    (c)  a civil proceeding commenced by the service of a complaint or similar pleading;

    (d)  a criminal proceeding commenced by the return of an indictment or information;

    (e)  a civil administrative or civil regulatory proceeding commenced by the filing of a demand or notice of charges; or

    (f)  a qui tam action or a relator lawsuit commenced by the service of a complaint or similar pleading,

    brought by or on behalf of a federal, state or local governmental, regulatory or administrative agency or entity against an **Insured** for a **Regulatory Wrongful Act**, including any appeal therefrom.

    **Regulatory Claim** shall not include any customary or routine audit or reconciliation involving an **Insured** by any federal, state or local governmental, regulatory or administrative agency or entity.

    A **Regulatory Claim** will be deemed to have first been made when, with respect to any civil, criminal, or civil administrative or civil regulatory proceeding or qui tam action or relator lawsuit described in (c) - (f) above, such **Regulatory Claim** is commenced as set forth in this definition or, in the case of any written demand, search warrant, subpoena, notice of investigation, or contact letter described in (a) or (b) above, when such demand is first received by an **Insured**.

2.  **Regulatory Wrongful Act** shall mean any actual or alleged violation by an **Insured** of the responsibilities, obligations or duties imposed by the Federal False Claims Act or any similar federal, state, or local statutory law or common law anywhere in the world, any federal, state, or local anti-kickback, self-referral or healthcare fraud and abuse law anywhere in the world, or amendments to or

regulations promulgated under any such law; provided that a **Regulatory Wrongful Act** shall not include any actual or alleged **Retaliation**.

**Retaliation** shall mean retaliatory treatment against any **Insured Person** on account of such individual:

(a) exercising his or her rights under law;

(b) refusing to violate any law;

(c) opposing any unlawful practice;

(d) disclosing or threatening to disclose to a superior or to any governmental agency alleged violations of law; or

(e) having assisted or testified in or cooperated with a proceeding or investigation regarding alleged violations of law by the **Insured Entity**.

C. Solely with respect to coverage afforded by this endorsement, the term **Loss**, as defined in SECTION III. - DEFINITIONS of the Directors and Officers Liability Coverage Section, is amended to include the amount that any **Insured** shall become legally obligated to pay on account of any covered **Regulatory Claim**, including but not limited to:

(a) damages;

(b) judgments;

(c) settlements; and

(d) pre-judgment and post-judgment interest.

D. Solely with respect to coverage afforded by this endorsement, the term **Loss**, as defined in SECTION III. - DEFINITIONS of the Directors and Officers Liability Coverage Section shall not include:

(a) any bond or surety requirement;

(b) any amount of overpayment or restitution that is identified as such in any document or instrument effecting any settlement;

(c) fees, profits, or other revenue lost, or any costs incurred, by an **Insured** in connection with the termination, suspension, or limitation of such **Insured's** right to participate in any program of a federal, state or local governmental, regulatory or administrative agency or entity; or

(d) the cost of any compliance program, or the cost of complying with any integrity agreement made as part of, or in anticipation or expectation of, or otherwise in connection with any such settlement.

E. If any **Regulatory Claim** is filed under seal, the **Insured** shall, as a condition precedent to exercising any right to coverage under this policy, immediately upon becoming aware of such **Regulatory Claim** petition the applicable court, agency, or entity to allow such sealed information be provided to the **Insurer**.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy. Please Read It Carefully.*

# MODIFIED INSURED VS. INSURED EXCLUSION

This endorsement modifies insurance provided under the following:

## PRIVATE COMPANY MANAGEMENT LIABILITY POLICY

SECTION IV. – EXCLUSIONS, 9. of the Directors and Officers Liability Coverage Section is deleted and replaced by the following:

9. Brought by or on behalf of any **Insured**, or which is brought by any security holder of the **Insured Organization**, whether directly or derivatively, unless such **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any **Insured**. Provided, however, this EXCLUSION shall not apply to:

   a. Any **Claim** brought by an **Insured Person**, where such **Claim** is in the form of a cross-claim or a third-party claim for contribution or indemnity, which is part of and results directly from a **Claim** that is not otherwise excluded by the terms of this policy;

   b. Any **Claim** brought by the examiner, trustee, receiver, liquidator, creditors committee (or any assignee thereof) or rehabilitator (or any assignee thereof) of such **Insured Organization**, in or after any bankruptcy proceeding by or against an **Insured Organization**;

   c. Any **Claim** brought by any past director, officer, trustee, manager or equivalent executives of the **Insured Organization** who have not served as a director, officer, trustee, manager or equivalent executive for at least three (3) years prior to the date such **Claim** is first made, and if the **Claim** is brought and maintained totally independent of and without the solicitation, assistance, active participation or intervention of the **Insured Organization** or any **Insured Person** not described in this paragraph 9.c;

   d. Any **Claim** brought by an **Employee** of the **Insured Organization** who is not or was not a director or officer of the **Insured Organization** and where such **Claim** is brought by such **Employee** only in their capacity as a stockholder and independently of assistance from **Insureds** expressly as noted in section 9.c., above; or

   e. To any instigation of or involvement in any **Claim** by, or solicitation, assistance, active participation or intervention of any **Insured** whistleblower under Section 806 of the Sarbanes-Oxley Act of 2002 or any rule or regulation promulgated thereunder, or under any similar whistleblower statute, rule or regulation under any other federal or state law;

   f. (1) by an individual director of a foreign subsidiary against a director of the same Foreign Subsidiary in his or her capacity as such; (2) which is commenced solely due to the request of a shareholder(s) of said foreign subsidiary and not at the instigation or solicitation of the Company or any other **Insured**; (3) because a statutory law in such Foreign Jurisdiction prohibits shareholders from bringing such a **Claim** whether in the form of a class, derivative or direct action.

   Notwithstanding the foregoing, the above paragraph shall only apply to a **Claim(s):** (1) brought in the Foreign Jurisdiction in which such Foreign Subsidiary is formed or incorporated; and (2) alleging a violation of law (common or statutory, including breaches of fiduciary duty) of such Foreign Jurisdiction.

   Provided further, however, that in the event that an **Insured Person** brings a cross-claim or third-party claim, as described in 9.a. above, against another **Insured Person**, then solely with respect to the **Loss** derived from a cross-claim or third-party claim, the **Insurer** shall be liable solely for **Defense Expenses**.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy. Please Read It Carefully.*

# SUBLIMIT - ANTI-TRUST CLAIM

This endorsement modifies insurance provided under the following:

**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

A. SECTION IV. – EXCLUSIONS, 12.b. of the Directors and Officers Liability Coverage Section is deleted in its entirety.

B. The following is added to the Directors and Officers Liability Coverage Section:

The amount set forth in Item 4. of the Common Policy Declarations Page shall be the maximum aggregate Limit of Liability for all **Loss** under this policy. Subject to the foregoing, the amount of $1,000,000 shall be the maximum aggregate Limit of Liability of the **Insurer** for **Loss** under this policy in connection with any **Anti-Trust Claim** made against any **Insured**. This sublimit shall be part of and not in addition to the amount set forth in Item 2.A. of the Directors and Officers Liability Declarations Page.

**Anti-Trust Claim** shall mean any **Claim** arising out of, based upon, or attributable to any actual or alleged violation of any law, whether statutory, regulatory or common law, involving:

a. Anti-trust, monopolization, price fixing, price discrimination, predatory pricing or restraint of trade, including, but not limited to, any actual or alleged violation of the Federal Trade Commission Act, the Sherman Act, the Clayton Act, any rules or regulations promulgated under or in connection with the foregoing, or any similar provision of any federal, state or local statutory law or common law; or

b. Unfair business competition, unfair trade practices or tortious interference in another's business or contractual relationships.

A Retention in the amount of $ 100,000 shall apply to any **Loss** arising from an **Anti-Trust Claim**. Such Retention shall be borne by the **Insured**, and the **Insurer** shall only be liable for the amount of **Loss** arising from an **Anti-Trust Claim** which is in excess of the above stated Retention amount.

Notwithstanding anything contained in this endorsement to the contrary, however, solely where coverage for any **Anti-Trust Claim** is triggered as "Side A", or non-indemnifiable or non-indemnified **Loss** in keeping with Policy terms and conditions, the Retention normally applicable in such situations shall apply to such **Anti-Trust Claim**, and the Retention stated here shall not apply.

All other terms and conditions of this policy remain unchanged.

# EMPLOYMENT PRACTICES LIABILITY
# COVERAGE SECTION (PRIVATE)
# PLEASE READ YOUR POLICY CAREFULLY

Words and phrases that appear in **bold** text have special meaning.  Refer to SECTION III. – DEFINITIONS in this Coverage Section or the Common Policy Terms and Conditions.

If purchased, as indicated in Item 3. of the Common Policy Declarations Page, and in consideration of the payment of premium and in reliance upon all statements made to the **Insurer** in the **Application**, and subject to the terms, conditions, definitions, exclusions and limitations provided hereinafter or in the Common Policy Terms and Conditions, the **Insurer** agrees:

## SECTION I. - INSURING AGREEMENTS

### A. Employment Practices Liability

The **Insurer** shall pay **Loss** up to the limit of liability applicable to this **Coverage Section** on behalf of the **Insured** in connection With any **Employment Practices Claim** first made against any **Insured** during the **Policy Period** and reported in accordance With SECTION q. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy**.**

### B. Third Party Liability Coverage

The **Insurer** shall pay for **Loss** up to the limit of liability applicable to this **Coverage Section** arising out of or in connection With any **Claim** for **Third Party Discrimination** and/or **Third Party Harassment** first made against any **Insured** during the **Policy Period** and reported in accordance With SECTION q. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy.

## SECTION II. – COVERAGE EXTENSIONS

### Workplace Violence Expenses Sublimit

If a sublimit is shoVn in Item 2.M of the Employment Practices liability Declarations Page, the **Insurer** shall provide coverage for **Workplace Violence Expense** the **Insured Organization** incurs resulting directly from any **Workplace Violence**.  This sublimit shall be part of and not in addition to the limit of liability set forth in Item 2.A. of the Employment Practices liability Declarations Page.

No Retention shall apply to the **Workplace Violence Expense** Coverage.

## SECTION III. - DEFINITIONS

### A. Claim, for purposes of this Coverage Section shall be an Employment Practices Claim, Vhich means:

A Vritten demand for monetary or nonBmonetary relief solely Vhere alleging an **Employment Practices Wrongful Act**, including:

1. A civil, criminal, administrative, regulatory or arbitration proceeding or arbitration demand for monetary or nonBmonetary relief Vhich is commenced by:

   a. Receipt or service of a complaint or similar pleading-

   b. Return of an indictment or filing of information- or

   c. Receipt of a notice of charges-

2. A Vritten rezuest to an **Insured** to toll or Vaive a statute of limitations regarding a potential **Claim**, commenced by the receipt of such rezuest by the **Insured**-

3. An administrative or regulatory investigation Vhen conducted by the Ezual Employment Opportunity Commission XEEOCL( or ezuivalent state, local or foreign agency, Vhich is commenced by the filing of a notice of charges, service of a complaint or similar document of Vhich notice has been given to the **Insured**.

Provided, such **Employment Practices Claim** shall not include any internal or external labor or grievance proceeding Vhich is pursuant to a collective bargaining agreement.

### B. Employee means any past, present or future employee of the Insured Organization, Vhether such

employee is in a supervisory, coB/or) er or subordinate position or otherVise, including any fullBime, partB time, seasonal and temporary employee of the **Insured Organization**.  An individual Vho is leased or

contracted to the **Insured Organization** shall also be an **Employee**, but only if the **Insured Organization** provides indemnification to such leased or contracted individual in the same manner as is provided to the **Insured Organization's** employees.

C. **Employment Practices Claim** means any **Claim** for an **Employment Practices Wrongful Act**.

D. **Employment Practices Wrongful Act** means any actual or alleged:

1. Wrongful dismissal, discharge or termination Xeither actual or constructive( of employment, including breach of an implied employment contract-

2. Employment related harassment Xncluding but not limited to sexual harassment(-

3. Employment related discrimination Xncluding but not limited to discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy or disability(-

4. Employment Belated retaliation-

5. Employment Belated misrepresentation to an **Employee** or applicant for employment Vith the **Insured Organization**-

6. Employment Belated libel, slander, humiliation, defamation and Uor invasion of privacy-

7. Wrongful failure to employ or promote-

8. Wrongful deprivation of career opportunity, Vrongful demotion or negligent **Employee** evaluation, including the giving of defamatory statements in connection Vith an **Employee** reference-

9. Employment related Vrongful discipline-

10. Failure to grant tenure or practice privileges-

11. Failure to provide or enforce adezuate or consistent organikation policies or procedures relating to employment performance-

12. qiolations of the folloVing federal laVs Xas amended( including all regulations promulgated thereunder:

    a. Family and ; edical weave Act of 1""3-

    b. Americans Vith Disabilities Act of 1""2 XADA(-

    c. Civil Rights Act of 1""1-

    d. Age Discrimination in Employment Act of 1"" ' XADEA(, including the Older Wor)ers Menefit Protection Act of 1""0- or

    e. Title qII of the Civil Rights waV of 1""4 Xas amended( and 42 9.S.C. Section 1"73, as Vell as the Pregnancy Discrimination Act of 1"' 7-

13. qiolation of an **Insured Person's** civil rights relating to any of the above- or

14. Negligent hiring, retention, training or supervision, infliction of emotional distress, or violation of an individual s civil rights, Vhen alleged in conjunction Vith any of the foregoing items 1. through 13.,

Vhether such **Employment Practices Wrongful Act** as described in 1B4 above is committed directly, indirectly, intentionally or unintentionally, but only if the **Employment Practices Wrongful Act** actually or allegedly pertains to acts committed by an **Insured** and are alleged against an **Insured** by an **Insured Person** or applicant for employment Vith the **Insured Organization**.

E. **Insured** means any **Insured Organization** and Uor any **Insured Person**.

F. **Insured Person** means:

1. Any past, present or future director, officer, or **Employee**, management committee members or members of the Mboard of ; anagers of the **Insured Organization**- or

2. In the event the **Insured Organization** or a **Subsidiary** thereof operates outside the 9nited States, then the term **Insured Person** also means those titles, positions or capacities for such foreign **Insured Organization** or **Subsidiary** that are ezuivalent to the positions of directors or officers in the 9nited States.

G. **Loss** means damages Xncluding bac) pay and front pay(, settlements, judgments Xncluding preBand postB judgment interest on a covered judgment( and **Defense Expenses**.  **Loss** Xother than **Defense Expenses**( shall not include:

1. Any amount for Vhich the **Insureds** are not financially liable or for Vhich there is not legal recourse to the **Insureds**-

2. Amounts oVed under any employment contract, partnership, stoc) or other oVnership agreement, or any other type of contract-

3. Disability, social security, Vor)ers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing employment related benefit payments-

4. The cost of creating or reinstating employment-

5. Any amounts oVed to any **Employee** as Vages or compensation previously incurred or vested Vithout regard to any **Claim**-

6. Civil or criminal fines or penalties-

7. Taxes, Vhether oVed to or by any **Insured**-

8. Amounts, including **Defense Expenses**, arising out of, based upon or attributable to actual or alleged liability or costs incurred by any **Insured** to modify any building or property in order to ma)e such building or property more accessible or accommodating to any disabled person, or any actual or alleged liability or costs incurred in connection Vith any educational, sensitivity or other corporate program, policy or seminar relating to an **Employment Practices Claim**-

9. ; atters that may be uninsurable under the laV pursuant to Vhich this policy shall be construed.

The DEFINITION of **Loss** shall include punitive or exemplary damages and the multiplied portion of any multiplied damage aVard, if and Vhere insurable.  For purposes of determining Vhether punitive or exemplary damages, or the multiplied portion of any multiplied damage aVard arising from any **Claim** shall be insurable by laV, the **Insurer** agrees to abide by the laV of Vhichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insured** in that regard.

H. **Premises** means the buildings, facilities or properties occupied by the **Insured Organization** in conducting its business.

I. **Third Party** means any personXs( Vith Vhom an **Insured** interacts.

J. **Third Party Discrimination** means any discrimination by an **Insured** in his or her capacity as such against a **Third Party** based on such **Third Party's** race, color, creed, religion, age, gender, national origin, sexual orientation or preference, disability, pregnancy or other protected status that is protected pursuant to any applicable federal, state or local statute or ordinance.

K. **Third Party Harassment** means any type of sexual or gender harassment as Vell as racial, religious, sexual orientation, pregnancy, disability, age, or national originBbased harassment that is by an **Insured** to a **Third Party**.

L. **Workplace Violence** means any intentional and unlaVful act:

1. of deadly force involving the use of lethal Veapon- or

2. the threat of deadly force involving the display of a lethal Veapon,

Vhich occurs on or in the **Premises** and Vhich did or could result in bodily injury or death to an **Insured Person**.

M. **Workplace Violence Expense** means the reasonable fees and expenses, or cost of:

1. an independent security consultant for ninety X 0( days folloVing the date **Workplace Violence** occurs-

2. an independent public relations consultant for ninety X 0( days folloVing the date **Workplace Violence** occurs-

3. a counseling seminar for all **Employees** conducted by an independent consultant folloVing **Workplace Violence**-

4. independent security guard services for up to fifteen X15( days- and

5. an independent forensic analyst.

## SECTION IV. - EXCLUSIONS

The **Insurer** shall not be liable to ma)e any payment for **Loss** in connection Vith any **Claim** made against any **Insured**:

1. Alleging, arising out of, based upon or attributable to, in Vhole or in part, any litigation involving any **Insured** that Vas commenced or initiated prior to, or Vas pending on or before the date referenced in Item 4. of the Employment Practices Viability Declarations Page, or arising out of or based upon, in Vhole or in part, any facts or circumstances underlying or alleged in any such prior or pending litigation-

2. For actual or alleged bodily injury, sic)ness, disease or death of any person, mental anguish or emotional distress- damage to or destruction of any tangible property, including loss of use thereof, Vhether or not such property is physically damaged- provided, this E8Cw9SION shall not apply to allegations of mental anguish or emotional distress made solely in connection Vith an **Employment Practices Claim**-

   The **Insurer** shall not be liable to ma)e any payment, and shall have no duty to defend or pay **Loss** of any sort, in connection Vith any **Workplace Violence**:

   a. Vhich occurs at any location other than the **Insured Organization's Premises**-

   b. arising from declared or undeclared Var, civil Var, insurrection, riot, civil commotion, rebellion or revolution, military, naval or usurped poVer, governmental intervention, expropriation or nationalikation-

   c. that reflects legal costs, judgments and settlements incurred as the result of any **Claim**, suit or judicial action brought against an **Insured Organization** in connection Vith **Workplace Violence**- or

   d. resulting from the use or threat of force or violence occurring on the **Premises** for the purpose of demanding money, securities or property.

3. For the actual, alleged or threatened discharge, dispersal, release or escape of pollutants or any direction or rezuest to test for, monitor, clean up, remove, contain, treat, detoxify or neutralike pollutants, including but not limited to **Claims** alleging damage to the **Insured Organization**-

   Pollutant includes Xbut is not limited to( any solid, lizuid, gaseous or thermal irritant or contaminant, Vhether live or inanimate, including smo)e, vapor, soot, fumes, acids, al)alis, chemicals and Vaste. Waste includes Xbut is not limited to( materials to be recycled, reconditioned or reclaimed-

4. For violation of any of the responsibilities, obligations or duties imposed by: The Fair Vabor Standards Act Xexcept the Ezual Pay Act( or any state or local statutory or common laV, regulation or ordinance that governs payment or administration of Vages, hours Vor)ed, or employee entitlements- the Employee Retirement Income Security Act of 1" ' 4- the National Vabor Relations Act- the Wor)er Adjustment and Retraining Notification Act- the Consolidated Omnibus Mudget Reconciliation Act- the Occupational Safety and 6ealth Act- any rules or regulations of any of the foregoing promulgated thereunder and amendments thereto- or any similar provisions of any federal, state or local statutory or common laV that govern the same subject matter governed by the laVs referenced in this section even if particular laVs have some additional or different provisions- provided, this E8Cw9SION shall not apply to **Loss** arising from a **Claim** for employment related retaliation-

5. Alleging, arising out of, based upon or attributable to, in Vhole or in part, any liability under or pursuant to any contract or agreement, Vhether oral, Vritten, express or implied, including the liability of others assumed by an **Insured**, unless such **Insured** Vould have been liable in the absence of such contract or agreement- provided this E8Cw9SION shall not apply to **Defense Expenses** in connection Vith an **Employment Practices Claim**-

6. Alleging, arising out of, based upon or attributable to any Vor)ersHcompensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar laV- provided, this E8Cw9SION shall not apply to **Loss** arising from a **Claim** for employment related retaliation-

7. Alleging, arising out of, based upon, directly or indirectly resulting from or in consezuence of, or in any Vay involving any criminal or deliberate fraudulent act- provided this E8Cw9SION shall not apply unless a judgment or other final adjudication adverse to any **Insured** in the **Claim** shall establish that such Insured committed such criminal or fraudulent act.

The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the E8Cw9SIONS set forth in SECTION Iq.

**In Witness Whereof**, the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authoriked agent of the **Insurer**.

Secretary

President

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# SUBLIMIT-DEFENSE EXPENSES – WAGE AND HOUR CLAIMS

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION II. – COVERAGE EXTENSIONS, of the Employment Practices Liability Coverage Section:

The amount set forth in Item 4. of the Common Policy Declarations Page shall be the maximum aggregate Limit of Liability for all **Loss** under this policy.  Subject to the foregoing, this Policy shall allow up to $100,000 solely for **Defense Expenses** in connection with **Claims** made against any **Insured** for violation of the Fair Labor Standards Act or any similar state or local law or regulation specifically governing the payment of wages or hours worked ("**Wage and Hour Claim**").  This sublimit shall be part of and not in addition to the amount set forth in Item 2.A. of the Employment Practices Liability Declarations Page, and shall not act to create coverage for any form of relief sought or available in any **Wage and Hour Claim**.

A Retention in the amount of $35,000 shall apply to any **Wage and Hour Claim**.  Such Retention shall be borne by the **Insured**, and the **Insurer** shall only be liable for the amount of **Defense Expenses** in excess of the above stated Retention amount.

Notwithstanding anything contained in this endorsement to the contrary, however, solely where coverage for any **Claim** is triggered as "Side A", or non-indemnifiable or non-indemnified **Loss** in keeping with Policy terms and conditions, the Retention normally applicable in such situations shall apply to such **Claim**, and the Retention stated here shall not apply.

All other terms and conditions of this policy remain unchanged.



**Northwest Professional Center**
227 US Hwy 206, Suite 302
Flanders, NJ 07836-9174
Tel: (973) 252-5141 / (800) 689-2550
Fax: (973) 252-5146 / (800) 689-2839
www.ERiskServices.com
email: application@ERiskServices.com

# Renewal Application for
# Business and Management (BAM)
# Indemnity Insurance

**NOTICE: THE CLAIMS MADE AND REPORTED LIABILITY COVERAGE SECTIONS OR PROVISIONS OF THIS POLICY FOR WHICH THIS APPLICATION IS BEING MADE, WHICHEVER ARE APPLICABLE, COVER ONLY CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR, IF APPLICABLE, ANY DISCOVERY PERIOD AND REPORTED TO THE INSURER PURSUANT TO THE TERMS OF THE POLICY. THE AMOUNTS INCURRED TO DEFEND A CLAIM REDUCE THE APPLICABLE LIMIT OF LIABILITY AND ARE SUBJECT TO THE APPLICABLE RETENTION OR DEDUCTIBLE.**

**Instructions:** Please read carefully and answer all questions. If a question is not applicable, so state. This Application and all exhibits shall be held in confidence. Please read the Policy for which application for coverage is made (the "Policy") prior to completing this Application. The terms as used herein shall have the meanings as defined in the Policy.

==**Applicant** means all corporations, organizations or other entities set forth in Question 1. of the **General Information** section of this **Application**, including any subsidiaries, proposed for this insurance.==

---

**I. General Information**    Expiring Policy Number:  EKI3358149

1. Name of **Applicant**:  ReviveHealth, Inc

   Address:  5000 Sawgrass Village Circle, Ste. 4
               (Number)                     (Street)
     Ponte Vedra Beach          FL           32082
            (City)               (State)       (Zip Code)

2. North American Industry Classification System Code (NAICS):  541990

3. Nature of Operations:    Digital telehealth services company providing subscription based

   access to primary and urgent virtual care , medications, mental

   health, wellness and financial wellness solutions

   *Note – please include description of all **Applicants**, including any subsidiaries.

4. Website:  www.revive.health

5. Has the **Applicant** been in business longer than three (3) years? ☐ Yes ☒ No

6. Is the **Applicant** publicly-held or a public reporting company under the Securities Exchange Act of 1934, as amended? ☐ Yes ☒ No

7. Has the **Applicant** been involved with, negotiated, attempted or transacted any merger, acquisition, asset sale or divestment in the past eighteen (18) months where such merger, acquisition, asset sale or divestment involved more than twenty five percent (25%) of the total assets or securities of the **Applicant**? If yes, please provide details on a separate page. ☐ Yes ☒ No

8. Does the **Applicant** contemplate transacting any merger, acquisition, asset sale or divestment in the next twelve (12) months where such merger, acquisition, asset sale or divestment would involve more than fifty percent (50%) of the total assets or securities of the **Applicant**? If yes, please provide details on a separate page. ☐ Yes ☒ No

## II. Financial Information

1. Describe the following financial information of the **Applicant** for the most recent fiscal year-end.

   **Total Assets:** $ 268,421.00    **Gross Revenues:** $ 13,444.00

   **Net income /Net loss:** $ (1,841,891.00)    **Cash flow from operating activities:** $ -1,757,331.00

2. Do the current liabilities exceed current assets? If yes, please provide details on a separate page. ☒ Yes ☐ No
   Trade payables and accrued expenses exceed cash on hand and accounts receivable

3. Do long-term liabilities exceed seventy five percent (75%) of total assets? If yes, please provide details on a separate page. ☐ Yes ☒ No

4. Will more than fifty percent (50%) of the total long-term liabilities mature within the next eighteen (18) months? If yes, please provide details on a separate page. ☐ Yes ☒ No

5. Is the **Applicant** currently in default or anticipate in the next twelve (12) months to be in default of any debt covenants? If yes, please provide details on a separate page. ☐ Yes ☒ No

6. Does the **Applicant** anticipate in the next twelve (12) months or has the **Applicant** transacted in the last twenty four (24) months any restructuring or legal or financial reorganization or filing for corporate bankruptcy? If yes, please provide details on a separate page. ☐ Yes ☒ No

7. Does any person or entity who owns or controls fifty percent (50%) or more of the outstanding securities of the **Applicant** anticipate in the next twelve (12) months filing for or has any such person or entity within in the last twenty four (24) months filed for personal or corporate bankruptcy? If yes, please provide details on a separate page. ☐ Yes ☒ No

8. Does the **Applicant** have any actual or potential earn-out or other contingent payment obligation in the next twenty four (24) months to any person or entity where such payment obligation exceeds $500,000? If yes, please provide details on a separate page. ☒ Yes ☐ No
   Recent acquisition of assets of an urgent care company has an earnout provision that could result in greater than $500,000 over the next four years if certain revenue and new business milestones are met. Earnout would only be paid out of the incremental revenue

## III. False Information

**FRAUD WARNING:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties. **(Not applicable to Oregon).**

**NOTICE TO ALABAMA APPLICANTS:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

**NOTICE TO COLORADO APPLICANTS:** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policy holder or claimant for the purpose of defrauding or attempting to defraud the policy holder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**WARNING TO DISTRICT OF COLUMBIA APPLICANTS:** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

**NOTICE TO FLORIDA APPLICANTS:** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**NOTICE TO LOUISIANA APPLICANTS:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**NOTICE TO MAINE APPLICANTS:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**NOTICE TO MARYLAND APPLICANTS:** Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**NOTICE TO MINNESOTA APPLICANTS:** A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

**NOTICE TO OHIO APPLICANTS:** Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**NOTICE TO OKLAHOMA APPLICANTS:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**NOTICE TO RHODE ISLAND APPLICANTS:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**FRAUD WARNING (APPLICABLE IN VERMONT, NEBRASKA AND OREGON):** Any person who intentionally presents a materially false statement in an application for insurance may be guilty of a criminal offense and subject to penalties under state law.

**FRAUD WARNING (APPLICABLE IN TENNESSEE, VIRGINIA AND WASHINGTON):** It is a crime to knowingly provide false, incomplete, or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines, and denial of insurance benefits.

**NEW YORK FRAUD WARNING:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to civil penalty not to exceed five thousand dollars and the stated value of the claim for each such

violation.

**IV. Other Information**

1. The undersigned declares that to the best of his/her knowledge the statements herein are true. Signing of this Application does not bind the undersigned to complete the insurance, but it is agreed that this Application shall be the basis of the contract should a Policy be issued, and this application will be attached to and become a part of such Policy, if issued. The Insurer hereby is authorized to make any investigation and inquiry in connection with this Application as they may deem necessary.

2. It is represented that the particulars and statements contained in the Application for the proposed Policy and any materials submitted herewith (which shall be retained on files by Insurer and which shall be deemed attached hereto, as if physically attached hereto), are the basis for the proposed Policy and are to be considered as incorporated into and constituting a part of the proposed Policy.

3. It is agreed that in the event there is any material change in the answers to the questions contained herein prior to the effective date of the Policy, the **Applicant** will notify the Insurer and, at the sole discretion of Insurer, any outstanding quotations or binders may be modified or withdrawn.

4. It is agreed that in the event of any misstatement, omission, or untruth in this Application or any material submitted along with or contained herein, the Insurer has the right to exclude from coverage any claim based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving such misstatement, omission or untruth.

Signed: _____*Steve Lerch*_____ Date: ___12/01/2022_____

(must be signed by an Executive Officer of the **Applicant**)

**For purposes of creating a binding contract of insurance by this application or in determining the rights and obligations under such contract in any court of law, the parties acknowledge that a signature reproduced by either digital signature, electronic signature, facsimile or photocopy shall have the same force and effect as an original signature and that the original and any such copies shall be deemed one and the same document.**

## Please fully complete and attach the Information for the Coverage Section(s) being sought or bound.

**Any coverage part information section(s) of this Application are deemed signed and dated by the signatory in this section IV. of the Application, unless otherwise specifically signed and dated.**

**Employment Practices Coverage Section Information**

Is the **Applicant** seeking Employment Practices coverage? ☒ Yes ☐ No

If yes, please answer the following questions.

1. **Employee and employment compensation information:**

Full Time: _35_   Part Time: _0_   Seasonal: _0_   Contracted (leased, independent or otherwise): _5_

    a. Estimated annual remuneration of all employees, including officers, owners, or partners:    $ $3,044,000.00

    b. Number of employees with estimated annual remuneration exceeding $100,000:    11

    \* **Note: Remuneration above includes salary, commissions, bonuses and other incentives and does not include any dividends or security based distributions.**

2. Have more than twenty five percent (25%) of the officers or management voluntarily left the employ of the **Applicant** or had employment with the **Applicant** terminated within the last eighteen (18) months? If yes, please provide details on a separate page.    ☐ Yes ☒ No

3. Does the **Applicant** anticipate in the next twelve (12) months, or has the **Applicant** transacted in the last twelve (12) months, any plant, facility, branch or office closing, consolidations or layoffs affecting twenty percent (20%) or more of the employees of the **Applicant**? If yes, please provide details on a separate page.    ☐ Yes ☒ No

4. Describe the internal controls the **Applicant** maintains for Employment Practices.

    a. Have all management staff and officers attended training and education programs on sexual harassment within the last eighteen (18) months?    ☐ Yes ☒ No

    b. Does labor relations counsel review the employment policies/procedures at least annually?    ☐ Yes ☒ No

    c. Is there a separate Human Resources Department?    ☒ Yes ☐ No

    d. Does the **Applicant** publish and distribute an employee handbook to every employee?    ☒ Yes ☐ No

    e. Are there written procedures for handling employee complaints of discrimination or sexual harassment?    ☒ Yes ☐ No

    f. Are there written procedures for handling employee grievances or complaints?    ☒ Yes ☐ No

    g. Does the **Applicant** compensate all interns?    ☐ Yes ☒ No

    h. Has the **Applicant** had in place for the past three years or since formation, whichever is the shorter time period, written procedures and guidelines to classify the status of each employee as Non-Exempt or Exempt under the rules and regulations of the Fair Labor Standards Act of 1938, as amended?    ☒ Yes ☐ No

**Contact information for EPL risk management services**

Name: Maureen Fonda, Human Resources   Email: mfonda@revive.health   Phone: 904 229-7807   Fax: none

**This coverage part information section of the Application is deemed signed by an Executive Officer of the Applicant and dated as of the date set forth in section IV. of this Application.**

**Directors & Officers and Company Coverage Section Information**

Is the **Applicant** seeking Directors & Officers and Company coverage?　　　　☒ Yes ☐ No

If yes, please answer the following questions.

1. Are more than ten percent (10%) of the outstanding securities, voting rights, or controlling interests of the **Applicant**, directly or indirectly, owned by any of the following:

    a. an entity or organization NOT under the direct control of a director or officer of the **Applicant** ?　　☐ Yes ☒ No

    b. a person who is NOT a current or former director or officer of the **Applicant**?　　☐ Yes ☒ No

    If yes, please provide details on a separate page.

2. Within the next eighteen (18) months does the **Applicant** anticipate any public offering or sale of securities through any means, including any public offering of securities under the JOBS Act, as amended? If yes, please provide details on a separate page.　　☐ Yes ☒ No

3. Does the **Applicant** anticipate transacting in the next eighteen (18) months or has the **Applicant** transacted in the last eighteen (18) months any:

    a. private debt or equity offering or sale of securities through the use of an offering prospectus, memorandum, circular or similar document?　　☐ Yes ☒ No

    b. direct sale of securities to a person or entity through any means other than the use of an offering prospectus, memorandum circular or similar document?　　☒ Yes ☐ No
    <small>Privately placed preferred stock and certain investments in common stock by friends and employees</small>

    c. sale of securities, services, goods or products for the purpose of funding **Applicant** operations or capital through social networking, crowdfunding, crowdsourcing or any similar mechanism?　　☐ Yes ☒ No

    If yes, please provide details on a separate page.

4. Does the **Applicant**, directly or indirectly:

    a. render any services for others for a fee or other consideration?　　☒ Yes ☐ No
    <small>Enrolled members pay a monthly subscription fee for access to telemedicine based primary and urgent care, mental health, prescription medications, etc.</small>

    b. act as a general partner, manager, or managing member in any partnership or limited liability company?　　☐ Yes ☒ No

    c. have any insurance operations?　　☐ Yes ☒ No

    d. offer, sell, advertise or market any dietary supplement or any therapeutic or medical product, device or process where such product, device or process does NOT require approval for use from the U.S. Food and Drug Administration (FDA)?　　☐ Yes ☒ No

    e. offer, sell, advertise, market, or solicit any product or service employing any automatic/robo dialing, mobile phone texting, faxing, or any other type of communications based mechanism or strategy governed under the rules and regulations of the Telephone Consumer Protection Act of 1991 (TCPA), as amended?　　☐ Yes ☒ No

    f. perform, engage in, facilitate or promote the downloading, sharing, or streaming of any copyrighted media content, including music, video or any other type of entertainment content?　　☐ Yes ☒ No

    If yes, please provide details on a separate page.

5. Has the **Applicant**, in any year within the last five (5) years, annually derived more than ten percent (10%) of its revenues or funding from federal, state, local, foreign or other governmental or quasi-governmental sources? If yes, please provide details on a separate page.　　☐ Yes ☒ No

**This coverage part information section of the Application is deemed signed by an Executive Officer of the Applicant and dated as of the date set forth in section IV. of this Application.**

**Fiduciary Coverage Section Information**

Is the **Applicant** seeking Fiduciary Liability coverage?　　　　　　　　　　　❏ Yes ☒ No

If yes, please answer the following questions.

1. **Indicate the type of plans to be insured:**

   ___ 401(k)　　___ Pension　　___ Welfare Benefit　　___ Profit Sharing　　___ Employee Stock Ownership

2. Does the **Applicant** have more than five (5) plans to be covered under the proposed insurance? If yes,
   please provide details on a separate page.　　　　　　　　　　　　　　❏ Yes ❏ No

3. Total number of employees currently enrolled in all plans:　　　　　　　_____

4. Total asset value of all plans combined for the most recent fiscal year:　　　$ _____

5. Do all of the plans conform to the standards of eligibility, participation, vesting and other provisions
   of the Employee Retirement Income Security Act of 1974, as amended?　　　❏ Yes ❏ No

6. Are the plans reviewed at least annually to assure that there are no violations of any plan trust
   agreements, prohibited transactions or party in interest rules?　　　　　　❏ Yes ❏ No

7. Are any of the plans under funded by more than thirty percent (30%)? If yes, please provide details
   on a separate page.　　　　　　　　　　　　　　　　　　　　　❏ Yes ❏ No

8. Does the **Applicant** have any delinquent contributions to any plan? If yes, please provide details on a
   separate page.　　　　　　　　　　　　　　　　　　　　　　　❏ Yes ❏ No

9. Have any plans been terminated, suspended, merged or dissolved within the last twenty four (24)
   months? If yes, please provide details on a separate page.　　　　　　　　❏ Yes ❏ No

10. Does the **Applicant** anticipate terminating, suspending, merging or dissolving any plans within the
    next eighteen (18) months? If yes, please provide details on a separate page.　❏ Yes ❏ No

11. Are more than ten percent (10%) of the assets of any plan, other than an Employee Stock Ownership
    Plan, invested in any securities of or loan to the **Applicant**? If yes, please provide details on a
    separate page.　　　　　　　　　　　　　　　　　　　　　　　❏ Yes ❏ No

**This coverage part information section of the Application is deemed signed by an Executive Officer of the Applicant
and dated as of the date set forth in section IV. of this Application.**

**Crime Coverage Section Information**

Is the **Applicant** seeking Crime coverage?                                                    ❑ Yes ☒ No

If yes, please answer the following questions.

1.  Total number of employees:                                                              _____

2.  Number of officers and employees who handle, have custody or maintain records of
    money, securities or other property:                                                   _____

3.  Is there an annual audit or review performed by an independent certified public accountant (CPA) on
    the books and accounts, including a complete verification of all securities and bank balances?     ❑ Yes ❑ No

4.  Are bank accounts reconciled by someone not authorized to deposit or withdraw from those accounts?   ❑ Yes ❑ No

5.  Is counter signature of checks required?                                                ❑ Yes ❑ No

6.  Is the **Applicant** seeking Employee Benefit Plan Crime coverage?                      ❑ Yes ❑ No

7.  Are pre-authorized controls maintained for all programmers and operators?              ❑ Yes ❑ No

8.  Do audit practices include tests to detect unauthorized programming changes?           ❑ Yes ❑ No

9.  Are computerized check writing operations segregated from departments that authorize checks?   ❑ Yes ❑ No

**This coverage part information section of the Application is deemed signed by an Executive Officer of the Applicant and dated as of the date set forth in section IV. of this Application.**

## Cyber, Media and Technology Security Services Coverage Section Information

1. Please list the gross revenues of **Applicant** for the most recent fiscal year-end:  $ $13,444.00

2. Approximate number of physical or electronic records containing personally identifiable information the **Applicant**, directly or through a third party, has stored over the last twelve months:  100

3. Does the **Applicant** store, directly or through a third party, any health information records that are governed or regulated under the Health Insurance Portability and Accountability Act (HIPAA)?  ❏ Yes ☒ No

   If yes, does the **Applicant** have procedures and audit practices in place to ensure compliance under the rules and regulations of HIPAA, including the encryption of any electronically transmitted records?  Yes ❏ No ❏ N/A

4. Does the **Applicant** use regularly updated anti-virus software and firewall configurations for computers and networks used in business operations?  ☒ Yes ❏ No

5. Does the **Applicant** store any personally identifiable information on unencrypted portable devices, including laptops or external memory devices?  ❏ Yes ☒ No

6. Is the critical business data of the **Applicant** backed-up at least once a week and stored in a secure location?  ☒ Yes ❏ No

7. Does any person to be insured have knowledge or information of any act, error, omission, fact, circumstance or situation which might reasonably be expected to give rise to a claim or loss under this proposed Cyber coverage?  If yes, please provide details on a separate page.  ❏ Yes ☒ No

8. Within the last five (5) years has the **Applicant** been subject to or suffered any losses or litigation from any:  ❏ Yes ☒ No

   a. Breaches of security?

   b. Unauthorized acquisition, access, use, identity theft, mysterious disappearance, or disclosure of personally identifiable information?  ❏ Yes ☒ No

   c. Violation of any privacy law, rule or regulation?  ❏ Yes ☒ No

   d. Technology, ransomware or extortion threats?  ❏ Yes ☒ No
   If yes, please provide details on a separate page.

9. Has any insurer made any payments, taken notice of a claim or loss or a potential claim or loss or non-renewed any cyber liability or similar insurance at any time in the last three (3) years?  If yes, please provide details on a separate page.  ❏ Yes ☒ No

**This coverage part information section of the Application is deemed signed by an Executive Officer of the Applicant and dated as of the date set forth in section IV. of this Application.**

**Technology, Media & Professional Services Coverage Section Information**

Is the **Applicant** seeking Technology, Media & Professional Services coverage?　　　❑ Yes ☒ No

If yes, please answer the following questions.

1. Describe in detail the professional services for which coverage is desired:

    _____

    _____

    _____

2. Date established: _____

3. Is the **Applicant** engaged in any business other than as described in question 1.?　　　❑ Yes ❑ No
   If yes, please attach an explanation and estimated receipts.

4. What percentage of the **Applicant's** business involves subcontracting work to others?　　_____%

5. List the total gross receipts for the past year, which were derived from the services, listed in question
   1. In addition, please provide the projected receipts for the current and next year in which insurance
   coverage is desired.

    a. Gross receipts for the **next** year:　　　　　　　　　　　$ _____

    b. Gross receipts for the **current** year:　　　　　　　　　$ _____

    c. Gross receipts for the **prior** year:　　　　　　　　　　$ _____

6. What industries are the professional services described in question 1. provided (e.g., government,
   banking, medical, aviation, etc.)?

    _____

    _____

    _____

7. Is the **Applicant** controlled or owned by, or associated or affiliated with, or does it own, any other
   firm or business enterprise?  If yes, please attach an explanation.　　　　　　❑ Yes ❑ No

8. Are any significant changes in the nature or size of the **Applicant's** business anticipated over the next
   twelve (12) months?  Or have there been any such changes in the past twelve (12) months?  If yes,
   please attach an explanation (change in size of less than twenty five percent (25%) need not be　　❑ Yes ❑ No
   explained.)

9. Staffing Information.

    a. What is the number of all principals, partners, officers and professional employees
       directly engaged in providing services to clients:　　　　　　　　　　_____

    b. Average years of experience for the above mentioned for services requesting coverage:　_____

    c. Number of all non-professional employees (clerks, secretaries, etc.):　　　_____

10. Are any staff members considered "Licensed Professionals" or do any staff members hold any
    professional designations or belong to any professional societies/associations?  If yes, attach
    individuals name and designated affiliation.　　　　　　　　　　　　❑ Yes ❑ No

11. Describe **Applicant's** five (5) largest jobs or projects during the past three (3) years.

| Client Name | Services Provided | Total Gross Billing |
|---|---|---|
| Not applicable | | $ $0.00 |
| N/A | | $ $0.00 |
| N/A | | $ $0.00 |
| N/A | | $ $0.00 |
| N/A | | $ $0.00 |

12. Does the **Applicant** have a written contract or agreement for every project?  If yes, please attach a sample copy.  ❏ Yes ❏ No

    a.  Provide the percentage of the **Applicant's** revenue where a written contract is not secured: _____%

    b.  Please check below if the **Applicant's** contracts contain any of the following:

        ❏ hold harmless or indemnification clauses in your favor?
        ❏ hold harmless or indemnification clause in your client's favor?
        ❏ guarantees or warranties?
        ❏ specific description of the services you will provide?
        ❏ payment terms?
        ❏ ownership of materials/products developed terms?

13. Describe steps taken to minimize/manage business risks:

_____

_____

_____

14. Please provide the following information on **Applicant's** professional liability insurance for the past three (3) years:

| Name of Insurer | Limits of Liability | Deductible | Policy Period | Premium | Retro Date |
|---|---|---|---|---|---|
| General Star Indemnity Co. | 1,000,000/3,000,000 | $5,000.00 | 3/22/22-3/22/23 | $16,012.50 | |
| N/A | | $0.00 | | | |
| N/A | | $0.00 | | | |

15. Please provide the following:

    a.  Standard contract(s) used.

    b.  Descriptive or promotional brochures.

    c.  Website address: www_____

16. Prior to publishing content or releasing packaged or custom software/hardware, do you have an attorney facilitate a patent/copyright/trademark search?  If yes, please give name of the attorney's firm:_____  ❏ Yes ❏ No

17. Describe the **Applicant's** policies and procedures for removing controversial or potentially infringing material:

_____

_____

18. Do you have a safety procedure in place to prevent the transmission of viruses?  ❑ Yes  ❑ No
    If yes, please explain

    _____

    _____

19. Are all of your computers equipped with anti-virus software?  ❑ Yes  ❑ No
    If yes, what brand?
    _____

20. Are firewalls in place as a part of your security system?  ❑ Yes  ❑ No

    a.  What firewall security do you employ? _____

    b.  Was it configured by professional personnel?  ❑ Yes  ❑ No

    c.  Did you alter it in any way before installing it?  ❑ Yes  ❑ No

21. What kind of safeguards do you have in place to prevent unauthorized persons from accessing your
    Web Sites or On-Line Service database?

    _____

    _____

    _____

22. Have any principals, partners, officers or professional employees ever been the subject of any
    reprimand or disciplinary or criminal actions by authorities as a result of their professional activities?
    If yes, please attach details.  ❑ Yes  ❑ No

23. Does any person to be insured have knowledge or information of any act, error or omission, which
    might reasonably be expected to give rise to a claim against him or his predecessors in business?  If
    yes, please attach details.  ❑ Yes  ❑ No

24. Have any errors and omissions claims been made against any proposed insured(s)?  If yes, please
    attach details.  ❑ Yes  ❑ No

25. Has the **Applicant** been a party to any lawsuit or other legal proceedings within the past five (5) years?
    If yes, please attach details.  ❑ Yes  ❑ No

**This coverage part information section of the Application is deemed signed by an Executive Officer of the
Applicant and dated as of the date set forth in section IV. of this Application.**

**Miscellaneous Professional Services Coverage Section Information**

Is the **Applicant** seeking Miscellaneous Professional Services coverage?               ❑ Yes  ☒ No

If yes, please answer the following questions.

1. Describe in detail the professional services for which coverage is desired:

   _____

   _____

   _____

2. Date established: _____

3. Is the **Applicant** engaged in any business other than as described in question 1.?           ❑ Yes  ❑ No
   If yes, please attach an explanation and estimated receipts.

4. What percentage of the **Applicant's** business involves subcontracting work to others?        _____%

5. List the total gross receipts for the past year, which were derived from the services, listed in question
   1. In addition, please provide the projected receipts for the current and next year in which insurance
   coverage is desired.

   a. Gross receipts for the **next** year:                          $ _____

   b. Gross receipts for the **current** year:                       $ _____

   c. Gross receipts for the **prior** year:                         $ _____

6. What industries are the professional services described in question 1. provided (e.g., government,
   banking, medical, aviation, etc.)?

   _____

   _____

   _____

7. Is the **Applicant** controlled or owned by, or associated or affiliated with, or does it own, any other
   firm or business enterprise?  If yes, please attach an explanation.                              ❑ Yes  ❑ No

8. Are any significant changes in the nature or size of the **Applicant's** business anticipated over the next
   twelve (12) months?  Or have there been any such changes in the past twelve (12) months?  If yes,
   please attach an explanation (change in size of less than twenty five percent (25%) need not be          ❑ Yes  ❑ No
   explained.)

9. Staffing Information.

   a. What is the number of all principals, partners, officers and professional employees
      directly engaged in providing services to clients:                            _____

   b. Average years of experience for the above mentioned for services requesting coverage:   _____

   c. Number of all non-professional employees (clerks, secretaries, etc.):         _____

10. Are any staff members considered "Licensed Professionals" or do any staff members hold any
    professional designations or belong to any professional societies/associations?  If yes, attach
    individuals name and designated affiliation.                                                    ❑ Yes  ❑ No

11. Describe **Applicant's** five (5) largest jobs or projects during the past three (3) years.

| Client Name | Services Provided | Total Gross Billing |
|---|---|---|
| N/A | | $ $0.00 |
| N/A | | $ $0.00 |
| N/A | | $ $0.00 |
| N/A | | $ $0.00 |
| N/A | | $ $0.00 |

12. Does the **Applicant** have a written contract or agreement for every project?  If yes, please attach a sample copy.  ❑ Yes ❑ No

    a.  Provide the percentage of the **Applicant's** revenue where a written contract is not secured: _____%

    b.  Please check below if the **Applicant's** contracts contain any of the following:

        ❑ hold harmless or indemnification clauses in your favor?
        ❑ hold harmless or indemnification clause in your client's favor?
        ❑ guarantees or warranties?
        ❑ specific description of the services you will provide?
        ❑ payment terms?
        ❑ ownership of materials/products developed terms?

13. Describe steps taken to minimize/manage business risks:

_____

_____

_____

14. Please provide the following information on **Applicant's** professional liability insurance for the past three (3) years:

| Name of Insurer | Limits of Liability | Deductible | Policy Period | Premium | Retro Date |
|---|---|---|---|---|---|
| General Star Indemnity Co. | 1,000,000/3,000,000 | $5,000.00 | 3/22/22-3/22/23 | $16,012.50 | |
| N/A | | $0.00 | | | |
| N/A | | $0.00 | | | |

15. Please provide the following:

    a.  Standard contract(s) used.

    b.  Descriptive or promotional brochures.

    c.  Website address: www_____

16. Have any principals, partners, officers or professional employees ever been the subject of any reprimand or disciplinary or criminal actions by authorities as a result of their professional activities?  If yes, please attach details.  ❑ Yes ❑ No

17. Does any person to be insured have knowledge or information of any act, error or omission which might reasonably be expected to give rise to a claim against him or his predecessors in business? If yes, please provide details on a separate page.  ❑ Yes ❑ No

18. Have any professional liability claims ever been made against any proposed insured(s)? If yes, please provide details on a separate page.  ❑ Yes ❑ No

**This coverage part information section of the Application is deemed signed by an Executive Officer of the Applicant and dated as of the date set forth in section IV. of this Application.**



### EMPLOYMENT PRACTICES RISK MANAGEMENT SERVICES

E-Risk Services, LLC is proud and excited to now offer a state-of-the-art **EPL Risk Management service** that provides Insureds the ability to ask specific human resource and employment law questions directly to employment **law attorneys**, access to an **Online Resource Portal** and more.

Below please find information on the ***E-Risk EPL HELPLINE*** or go to

**www.eriskeplhelpline.com**

---

<div align="center"><em>Why the E-Risk EPL HELPLINE?</em></div>

---

As employers, your organization faces changing employment laws and ongoing employee issues.   You have questions about <u>Wage/Hour</u>, <u>Workers' Compensation</u>, <u>Discrimination</u>, <u>Wrongful Termination</u>, <u>Benefits</u>, <u>ADA</u> and more.

**E-Risk Services, LLC** recognizes these challenges and provides the ***E-Risk EPL HELPLINE*** to deliver best practice advice and counsel on many of the human resource and employment law issues that our clients face.  **Access** to employment law **attorneys** and a state-of-the-art Online Portal is available **as often as needed**.

The ***E-Risk EPL HELPLINE*** attorneys are from a **national law firm**. They are experts on both basic and complex human resource and employment law issues and will respond to users' inquiries no later than the end of the next business day. Their responses are documented and always kept strictly **confidential**.

---

<div align="center"><em>What is the E-Risk EPL HELPLINE?</em></div>

---

The ***E-Risk EPL HELPLINE*** is a value-add and loss reduction service package which is automatically included with all BAM® policies.  The service includes the following features for each insured.

- **Employer HELPLINE**
  - Unlimited phone and email access to personalized advice & best practices counsel on over <u>50 different human resources and employment law issues</u> from a national law firm.

  - Real, documented, confidential answers to an insured's *specific* questions and detailed and confidential responses by the end of the next business day.

- **The E-Risk EPL HELPLINE Online Portal**
  - Daily updated Federal & State HR and employment law news and regulation changes, Regulation Comparison Charts, over 75 job descriptions, over 90 customizable model policies, forms and posters and much more…

- **Monthly HR *Express* Updates**
  - Users can stay current with information sent directly to an email inbox. Each HR *Express* Update includes a Question of the Month, Case Digest of the Month and periodic HR Alerts.

HELPLINE responds to over 50 different human resource and employment law issues. Listed below are some examples of questions asked.

**Note: These services are utilized by organizations of all sizes and in all states... small, large or anywhere in between, employers see the value of HELPLINE. All employers have questions and we provide the answers.**

1. What are the major laws and restrictions that limit your right to fire?

2. Do I have to pay overtime?

3. Does my organization have to comply with the Family & Medical Leave Act (FMLA)?

4. How do you confront a troubled employee?

5. Do you have to pay an exempt employee for sick days?

## *50 Different HR Issues*

| | |
|---|---|
| Affirmative Action Plans | Payroll |
| Age Discrimination (ADEA) | Performance Management |
| Americans with Disabilities Act (ADA) | Personnel Files (Content & Handling) |
| Background and Employment Screening | Physical Appearance Issues |
| Benefit Continuation (COBRA) | Policies & Procedures |
| Compensation | Pregnancy |
| Disability Claims and Issues | Privacy (General and HIPAA Issues) |
| Discrimination | Progressive Discipline |
| Drug Testing | Racial Issues |
| Employee Benefits | Recognition Programs |
| Employee Handbooks | Regulatory Compliance (State & Federal) |
| Employee Turnover | Religious Issues |
| Exempt/Non-Exempt | Retaliation |
| Facility Closure | Safety Procedures & Practices |
| Family and Medical Leave Laws (FMLA) | Sexual Harassment |
| Fraud/Theft/Shrinkage | Sexual Preference & Orientation Issues |
| Gender Issues | Termination & Discharge |
| General Harassment | Training |
| Hiring Practices | Unemployment Compensation |
| Immigration Laws and Issues | Union Relations - General Inquiries |
| Interviewing | Wage/Hour (Federal)-Fair Labor Standards Act (FSLA) |
| Layoffs | Wage/Hour (State) |
| Management & Employee Development | Workers Compensation |
| Marital Status | Workplace Violence |
| Military Leave (USERRA) | |
| National Origin and Language Issues | |

Insureds who use the HELPLINE range in size from small organizations with under 10 employees to medium-sized organizations with human resource departments all the way to large organizations with in-house legal resources and many employees. Access to the attorneys for initial guidance or second opinions is always unlimited and included in the *E-Risk EPL HELPLINE*.

Primary employer questions are typically "crisis" situations requiring immediate attention. The HELPLINE attorneys will provide documented advice **no later than the end of the next business day** to support insureds in these situations.  Beyond these types of issues, we encourage users to be proactive and ask questions before problems arise.  By using the HELPLINE for advice and counsel, insureds can **save thousands of dollars** in legal fees!

Large, or small, or somewhere in between, insureds can use the *E-Risk EPL HELPLINE* as often as they have questions.

**Why small organizations?**

- Small employers typically don't have HR expertise on staff and need somewhere to turn for initial guidance

**What about a mid-size organization?**

- Busy HR professionals use HELPLINE to save time and get a legal (second) opinion

**Large organizations, too?**

- Yes! HELPLINE's attorneys are specialized in the field of Employment & Labor Law so even when an organization has HR expertise and their own General Counsel on staff the *E-Risk EPL HELPLINE* allows for time savings and gives second opinions in this specific area of law.

Find out more at **www.eriskeplhelpline.com**

**Please make sure to include your contact information in the Employment Practices Coverage Section Information section of the BAM Application so our representatives can reach out to you and you can benefit from our state-of-the art EPL Risk Management Services.**

# APPENDIX

**Do you have an employee handbook?** Yes



# Certificate of Completion

## Summary

| | |
|---|---|
| Title | BAM E-Risk Private Company Renewal (New Version Available) |
| File name | BAM E-Risk Private Company Renewal (New Version Available).pdf |
| Status | Completed |
| Document guid: | uM3GEmI5IQ0ISnZQxEQlGLDouCgu0dEF |

## Document History

| | |
|---|---|
| 2022-12-01 02:03:17 PM EST | Signed by Steve Lerch (slerch@revive.health) IP 73.224.209.155 |

# EXHIBIT B

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| Daniel Lascano, Daniel Lascano 2012 Family Trust, The Samaritan Project Inc., Pacific Premier Trust, Custodian FBO Daniel 'R' Lascano, IRA, Edward Nahem, Joyce Storm, Pacific Premier Trust, Custodian FBO Jake Foley III, IRA, Pacific Premier Trust, Custodian FBO Emil Costa, Roth IRA, John Troubh, Christopher Stuart Barton, Pacific Premier Trust, Custodian FBO Suleman Lunat, IRA, and Robert O'Donnell, <br><br> *Plaintiffs,* <br><br> v. <br><br> Howard Buff, Jeff Bernhard, Stephen Lerch, Revive Holding Company, Inc., Eir RH Midco, LLC, Eir RH SPV, LLC, Eir Partners Capital, LLC, and Brett S. Carlson, <br><br> *Defendants.* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> C.A. No. _____ |

## COMPLAINT

Plaintiffs Daniel Lascano, Daniel Lascano 2012 Family Trust, The Samaritan Project Inc., Pacific Premier Trust, Custodian FBO Daniel 'R' Lascano, IRA (the first four plaintiffs together, the "Lascano Plaintiffs"), Edward Nahem, Joyce Storm, Pacific Premier Trust, Custodian FBO Jake Foley III, IRA, Pacific Premier Trust, Custodian FBO Emil Costa, Roth IRA, John Troubh, Christopher Stuart Barton, Pacific Premier Trust, Custodian FBO Suleman Lunat, IRA, and

Robert O'Donnell (together, "Plaintiffs") hereby bring this Complaint against defendants Howard Buff, Jeff Bernhard, Stephen Lerch, Revive Holding Company, Inc., Eir RH Midco, LLC, Eir RH SPV, LLC, Eir Partners Capital, LLC, and Brett S. Carlson (together, "Defendants") as set forth below:

## INTRODUCTION

1.     Revive Holding Company, Inc. ("Revive Holdco") acquired control of Advanced Pharmacy Concepts, LLC d/b/a Manifest Pharmacy ("ManifestRx") in July of 2022 (the "ManifestRx Transaction").  Plaintiffs became stockholders in Revive Holdco in that transaction; the Lascano Defendants paid $1.5M in connection with it.

2.     Plaintiffs had positive expectations for Revive Holdco given personal assurances by defendant Howard Buff.  Buff was Revive Holdco's controlling stockholder; he was also a director and its Executive Chairman.  He assured Plaintiffs that Revive Holdco had closed significant preferred stock investments providing it with sufficient near-term capital.  He also assured them that, in any event, there was also no reason for concern because Buff was wealthy and was willing to fund Revive Holdco himself.

3. Shortly after the ManifestRx Transaction, Revive Holdco management reported problems with getting bills paid notwithstanding these representations.

4. Plaintiff Daniel Lascano, concerned at the prompt violation of Buff's representations, sought books and records from Revive Holdco. Revive Holdco did not cooperate to alleviate concern; rather, it rebuffed Lascano with purported technical arguments and provided not a single document.

5. In December of 2022 – barely five months after the ManifestRx Transaction – another transaction was announced (the "Eir Transaction") in which Plaintiffs were deprived of their shares of Revive Holdco. This transaction personally benefitted Buff as well as defendants Jeff Bernhard and Stephen Lerch (officers and the other two Revive Holdco directors) but massively diluted Plaintiffs (Buff, Bernhard, and Lerch, the "Director Defendants").

6. In the Eir Transaction, a subsidiary of private equity company Eir Partners Capital, LLC ("Eir Partners"), Eir RH Midco, LLC ("Eir Midco"), acquired all of the stock in Revive Holdco. Eir Midco also acquired Telemedicine Management, Inc. d/b/a SwiftMD ("SwiftMD"), for which Eir Partners paid $23M.

7. Unlike *any* other Revive Holdco stockholder (preferred or common), Buff received almost one million preferred units in Eir Midco. The only other preferred units are owned by another subsidiary of Eir Partners, Eir RH SPV, LLC

("Eir SPV" and, together with Eir Midco, Eir Partners, and Brett S. Carlson, CEO of Eir Partners, the "Eir Defendants"). But while Eir Partners paid a total of almost $28M, Buff paid *nothing* in the Eir Transaction. The other Director Defendants, CEO Bernhard and CFO Lerch, kept their management positions as to the new entity, Eir Midco.

8. Bernhard told Revive Holdco's stockholders including Plaintiffs in a letter that they were "required" to sign a release (the "Release") of all pre-merger claims against Revive Holdco and its directors and officers. In fact, the Release was not required by the Eir Transaction merger agreement (the "Merger Agreement") and therefore void as without consideration under established Delaware law.

9. Moreover, the Director Defendants attempted to defraud Plaintiffs by omitting an exhibit to the already-closed Eir Transaction papers disclosing that Buff had received preferred units for no consideration paid in that transaction. They did so to attempt to deceive Plaintiffs into signing the Release and going along with the Eir Transaction without knowing about Buff's self-interested reward. Defendants even continued to conceal this grant of preferred units in the face of Plaintiffs' questioning, only disclosing it almost one month after first asking Plaintiffs to sign the Release.

10. Additionally, the Director Defendants have admitted that the Eir Transaction triggered Plaintiffs' preemptive rights but have refused to comply with them.

11. The Director Defendants violated their fiduciary duties to Plaintiffs by approving the Eir Transaction for self-interested reasons, thereby damaging Plaintiffs. The Eir Defendants aided and abetted this breach as they agreed to Buff receiving extra preferred units in Eir Midco knowing he had paid no consideration in the Eir Transaction.

12. Plaintiffs seek an award of damages for the Director Defendants' breach of fiduciary duty, as aided and abetted by the Eir Defendants. Plaintiffs also seek a declaration that the Release is unlawful and invalid and an injunction providing Plaintiffs with their preemptive rights.

## THE PARTIES

13. Plaintiffs Daniel Lascano, Daniel Lascano 2012 Family Trust, The Samaritan Project Inc., Pacific Premier Trust, Custodian FBO Daniel 'R' Lascano, IRA, Edward Nahem, Joyce Storm, Pacific Premier Trust, Custodian FBO Jake Foley III, IRA, Pacific Premier Trust, Custodian FBO Emil Costa, Roth IRA, John Troubh, Christopher Stuart Barton, Pacific Premier Trust, Custodian FBO Suleman Lunat, IRA, and Robert O'Donnell are and/or were stockholders in Revive Holdco.

14.     Defendant Howard Buff is and/or was a director, Executive Chairman, and a substantial and controlling stockholder of Revive Holdco.

15.     Defendant Jeff Bernhard is and/or was a director and Chief Executive Officer of Revive Holdco.

16.     Defendant Stephen Lerch is and/or was a director and Chief Financial Officer of Revive Holdco.

17.     Defendant Revive Holding Company, Inc. ("Revive Holdco") is a Delaware corporation.

18.     Defendant Eir RH Midco, LLC ("Eir Midco") is a Delaware limited liability company.

19.     Defendant Eir RH SPV, LLC ("Eir SPV") is a Delaware limited liability company and a member of Eir Midco.

20.     Defendant Eir Partners Capital, LLC ("Eir Partners") is a Delaware limited liability company and the Manager of Eir SPV.

21.     Defendant Brett S. Carlson is Founder and Chief Executive Officer of Eir Partners; and Manager of Eir Midco.

## JURISDICTION

22.     This Court has personal jurisdiction over Revive Holdco as it is organized under Delaware law.  8 *Del. C.* § 321(a).

23. This Court has personal jurisdiction over the Director Defendants under 10 *Del. C.* § 3114(a) as they are and/or were directors of Delaware corporation Revive Holdco.

24. This Court has personal jurisdiction over Eir Midco, Eir SPV, and Eir Partners as they are each Delaware limited liability companies. 6 *Del. C.* § 18-105.

25. This Court has personal jurisdiction over Brett S. Carlson as manager of Eir Midco, a Delaware limited liability company. 6 *Del. C.* § 18-109.

26. Given that this is a proceeding asserting a claim of breach of fiduciary duty by directors of Revive Holdco, Article XII of the Certificate of Incorporation of Revive Holdco, dated July 13, 2022 (the "Revive Holdco Charter"), effective at the time of that service, vests exclusive jurisdiction in the Court of Chancery in the State of Delaware.

27. Plaintiffs assert a claim for breach of fiduciary duty, an equitable claim over which this Court has subject matter jurisdiction.

28. In Section 8.13 of the Merger Agreement, the parties to that agreement, including Eir Midco, Revive Holdco, Buff, and Bernhard, agreed to the exclusive jurisdiction of a state court located in Wilmington Delaware, such as this Court of Chancery, for claims which are related to the Merger Agreement such as these.

## FACTUAL ALLEGATIONS

### A. Buff Solicits Investments And A Transaction With ManifestRx In The Summer of 2022 With Funding Representations.

29.    In the summer of 2022, Buff was soliciting support for and additional investors in a transaction (the "ManifestRx Transaction") by which ReviveHealth Inc. would acquire Advanced Pharmacy Concepts, LLC d/b/a Manifest Pharmacy ("ManifestRx").

30.    Buff held at least two meetings in late June 2022 with potential and existing investors.

31.    One of the meetings was a video call on June 23.  Plaintiffs Lascano and Foley attended, along with other ManifestRx members.  Also in attendance were each of the Director Defendants – Buff, Bernhard and Lerch.

32.    Another meeting occurred on June 27 that included Lascano, Foley, and Buff (both meetings, the "June 2022 Meetings").

33.    At the June 2022 Meetings, Buff stated that a round of investment in A-2 Preferred stock (the "A-2 Round") for Revive Holdco was fully funded.

34.    He stated that because of the A-2 Round, Revive Holdco was solvent and that there would be no need of fundraising or capital raises for the near future.

35.    Buff was asked if there could be additional subscriptions to the A-2 round.  Buff replied negatively, stating that the A-2 Round was fully funded and there was no equity.

36.     Buff also assured Lascano and Foley that funding would be no problem because he was wealthy and would provide necessary funding as a backstop.

**B.     Revive Holdco Acquires ManifestRx.**

37.     The ManifestRx Transaction occurred in July 2022.   In that transaction, existing members of ManifestRx, as well as new investors such as the Lascano Plaintiffs, received shares of stock in Revive Holdco.

**C.     Post-Transaction, Contrary to Buff's Representations, Revive Holdco Operations Were Not Funded.**

38.     Shortly after the ManifestRx Transaction, it was reported by former ManifestRx executive, Hunter Lipton, who was involved in Revive Holdco subsequently, that Revive Holdco was not paying bills or vendors.

**D.     Revive Holdco Tells Stockholders The A-2 Round Did Not Fund.**

39.     On October 27, 2022, certain Revive Holdco stockholders received an update regarding Revive Holdco and the A-2 Round.  It was reported at that time that A-2 preferred stockholders never in fact invested any money.  This angered Plaintiffs including Lascano and Foley, who were previously told it had fully funded.

40.     A follow-up call was scheduled involving, among others, Buff, Lascano, Foley, Bernhard, Lerch, and Lipton.  It was scheduled for November 2, then rescheduled for November 22.

41.     On the November 22 call, it was disclosed that Revive Holdco had not in fact received committed funds from – or even closed on – the A-2 Round.

**E.     Lascano Seeks Books and Records; Revive Holdco Uses Technical Objections To Refuse To Provide Any Documents.**

42.     Lascano through counsel made a demand on or about December 9, 2022, to Revive Holdco under Delaware law seeking books and records. Documents he requested included Revive Holdco's current capitalization  table and balance sheet, share purchase commitment documents regarding the supposedly closed A-2 investment, and documents sufficient to show when any such commitments fell through.

43.     Revive Holdco denied the demand on technical grounds, including demanding that any stockholder "not a record holder" provide "documentary evidence of beneficial ownership of the stock".  It did so despite the fact that the Lascano Plaintiffs had just acquired their stock five months before.  Revive Holdco refused to provide any documents even after further correspondence.

**F.     The Eir Defendants Purportedly Acquire Revive Holdco.**

44.     Pursuant to an Agreement and Plan of Merger (the "Merger Agreement") dated as of December 27, 2022, a stock-for-stock merger was caused to occur (the "Eir Transaction") in which a subsidiary of private equity company Eir Partners Capital, LLC ("Eir Partners"), Eir RH Midco, LLC ("Eir Midco"), acquired Revive Holdco as a subsidiary.

45.     In the transaction, a subsidiary of Revive Holdco acquired Telemedicine Management, Inc. d/b/a SwiftMD ("SwiftMD").  Section 1.01(b) of the Merger Agreement provides that Eir Midco would pay $23M to be used to acquire SwiftMD; and that it would also pay an additional $4.9M, less closing expenses above $150,000, as additional cash consideration.

46.     Page one of the Merger Agreement states that the board of directors of Revive Holdco (the "Board") approved and adopted the Merger Agreement and recommended it to the stockholders.  Neither any Eir Transaction documents sent to Plaintiffs stockholders, nor a December 29, 2022 letter to stockholders regarding the transaction  (the "Stockholders Letter"), disclose the directors that voted on the Merger Agreement or were on the Board at that time.  On information and belief, the Board consisted of defendants Buff, Bernhard, and Lerch.

47.     The Merger Agreement provided for Plaintiffs' stock in Revive Holdco to be cancelled and, provided Plaintiffs fulfilled certain conditions, replaced with units in Eir Midco.

48.     Defendant Carlson signed the Merger Agreement as Manager of Eir Midco.  Eir Midco's controlling member is Eir RH SPV, LLC ("Eir SPV").  On information and belief, Eir SPV is owned by Eir Partners.  Carlson is also Eir Partners' Founder and CEO.

**G.     The Merger Agreement Violates Plaintiffs' Preemptive Rights.**

49.     In connection with the ManifestRx Transaction, Revive Holdco stockholders signed a joinder to the Revive Holdco stockholders agreement (the "Revive Holdco Stockholders Agreement").

50.     Section 3 of the Stockholders Agreement provides all Revive Holdco stockholders with the right to receive their respective allotment of any additional securities Revive Holdco issues.

51.     Section 1.02(c) of the Merger Agreement provides for Revive Holdco to newly issue common stock.  The Merger Agreement provides for no ability for Plaintiffs to receive their respective allotment of such newly issued stock, thereby violating the Stockholders Agreement.

**H.     Bernhard States Plaintiffs Are "Required" To Sign A Bogus Release.**

52.     On December 29, 2022, the Stockholders Letter from Bernhard was sent to only certain of Revive Holdco stockholders.

53.     That same day, Dorsey & Whitney LLP ("Dorsey") circulated certain documents pertaining to the Eir Transaction for Plaintiffs to review and sign (together, the "December Documents") on behalf of Defendants.  Dorsey was Revive Holdco's counsel according to the Stockholders Letter.

54.     The December Documents, on information and belief, included certain documents related to the Eir Transaction such as the Merger Agreement,

but not certain appendices or exhibits. The December Documents were circulated via DocuSign; since then, however, Defendants have deleted them so that they are unavailable.

55. Bernhard states in the Stockholders Letter that "all Revive Holdco stockholders are required to execute" among other things an Acknowledgment and Release (the "Release") included with the December Documents which "acknowledges the consummation of the transaction and gives a release".

56. The December Documents also included a joinder to an amended LLC agreement for Eir Midco (the "LLC Agreement"). The December Documents did not include Exhibit A to the LLC Agreement, which was the Membership Ledger of Eir Midco. Ex. 1. The Membership Ledger reports that, "As of December 27, 2022," Buff owned 931,593.73 preferred units in Eir Midco. *Id.*

57. The Release states that Eir Midco and stockholder "agree that the acknowledgment, release and other agreements herein are good and valuable consideration for the Units." The Release states that Plaintiffs agree to release Revive Holdco and each of its "Personnel, Representatives, . . . stockholders, . . . and Affiliates" from any claims arising out or relating to Plaintiffs' capacity as a Revive Holdco stockholder prior to the Eir Transaction.

58. Section 1.03(a) of the Merger Agreement states that stockholders in Revive Holdco would be entitled to receive their units upon "the execution of"

certain documents. The Merger Agreement does not, however, require Plaintiffs to sign any release.

59. The Release is therefore invalid under Delaware law, including for lack of consideration as it was not referenced specifically in the Merger Agreement. *Cigna Health & Life Ins. Co. v. Audaxx Health Solutions, Inc.*, 107 A.3d 1082, 1091 (Del. Ch. 2014). This precedent is well known among M&A practitioners and available upon a simple internet search of the issue.

60. Dorsey, which describes itself as to its M&A practice as "An International Leader in M&A", was on information and belief aware of *Cigna* and advised Director Defendants that such a release was invalid. dorsey.com/services/mergers_acquisitions (accessed June 12, 2023).

61. Director Defendants nevertheless purported to require Plaintiffs to sign it anyway, knowing it was invalid. They did so to personally benefit by eliminating legal claims against themselves, and to deceive Plaintiffs into signing it thinking it was "required" when it was not.

62. Indeed, Bernhard had Dorsey send the "DocuSign" for the documents Bernhard was requesting stockholders sign, including the Release Bernhard incorrectly told stockholders was "required".

63. At the time Bernhard sent the letter, Revive Holdco had been acquired by Eir Midco, which was controlled by Eir SPV, Eir Partners, and Carlson (the

"Eir Defendants"). Therefore, on information and belief the Eir Defendants approved the Stockholders Letter. The Eir Defendants on information and belief were represented by Ice Miller LLP, which bills its own mergers & acquisitions practice as "one of the most experienced and recognized firms in the united States in structuring, negotiating and documenting business transactions". https://www.icemiller.com/practices/business-transactions-mergers-and-acquisitions/ (accessed June 19, 2023). On information and belief, therefore, Ice Miller also knew that the release was invalid and informed the Eir of Defendants that, but the Eir Defendants approved and/or acquiesced to the Stockholders Letter regardless.

64.     The Release is further evidence of defendants' bad faith in connection with the Eir Transaction, and desire to avoid liability stemming from Revive Holdco, whether in regards to the circumstances referenced herein or otherwise.

I.     **Plaintiffs Ultimately Discover That Buff Received Almost One Million Extra Preferred Units In The Eir Transaction.**

65.     The Membership Ledger, which was not provided to Plaintiffs until January 25, 2023, lists Buff as receiving 931,593.71 preferred units in Eir Midco. Ex. 1.  Buff is the only person or entity to receive any preferred units other than Eir SPV.

66.     This document lists Eir Midco as having contributed $28M in "capital contributions," of which as much as $27,900,000 is documented as merger consideration in Section 1.01(b) of the Merger Agreement.

67.     The Membership Ledger, however, purports that Buff provided $1M in "capital contributions". The Merger Agreement does not provide for Buff providing any consideration, whether cash or otherwise.

68.     The Membership Ledger lists all other Eir Midco members as providing $0.

69.     Buff therefore received preferred units in Eir Midco despite paying $0 in cash or assets in the Eir Transaction. Buff was the only Revive Holdco stockholder, indeed the only preferred stockholder, to receive preferred units in the new entity.

**J.      The Director Defendants Initially Conceal And Do Not Disclose Buff's Extra Preferred Units And The Violation of Plaintiffs' Preemptive Rights.**

70.     Neither the Membership Ledger nor the Eir Midco issuance of preferred units to Buff were disclosed to Plaintiffs in December of 2022. Rather, defendants attempted to procure Plaintiffs' signature of the Release and cooperation with the Eir Transaction without knowledge of such issuance.

71. The Shareholder Letter incorrectly states that Eir made an investment of $29M in Eir Midco. In fact, on information Eir invested less than $28M, while Buff was treated as if he had paid $1M transaction (he paid nothing).

72. Neither the Shareholder Letter nor the December Documents disclose the Eir Transaction triggering Plaintiffs' preemptive rights or that such rights would be complied with, or expressly state that Plaintiffs were being asked to waive such rights.

**K. Under Pressure From Plaintiffs, The Director Defendants Admit Plaintiffs Preemptive Rights Are Triggered But Continue To Actively Conceal The Extra Preferred Units Going To Buff.**

73. In early January 2023, Plaintiff Chris Barton became concerned about the incompleteness of the December Documents and the questions he had regarding the Eir Transaction.

74. Dorsey again asked for signatures on January 2, 2023, and again on January 6.

75. Early in the morning of January 8, Bernhard again asked Barton to sign, stating if Barton signed, "we can ensure all is taking [sic] care of."

76. Later that morning, Barton emailed Bernhard regarding the transaction:

- Barton asked Bernhard to "please send all appendices and exhibits completed including cap table", as at least the Membership Ledger and the closing balance sheet (the "Balance Sheet") (and possibly other exhibits) were missing.

- Barton noted that in a prior communication, Bernhard had "indicated pre-emptive rights are maintained for shareholders if I want to buy up for anti dilution". Barton asked how the Merger Agreement preserved preemptive rights and how he could exercise them.

77. That afternoon, Barton began coordinating with other Plaintiffs regarding their common and growing concerns about the Eir Transaction.

78. On January 9, an email from Bernhard to Revive Holdco stockholders was sent, copying Lerch. Bernhard again asked for stockholders' signature notwithstanding that he knew the December Documents were incomplete. He responded to the fact that "[s]everal of you have reached out with questions" by referencing the attached Stockholders Letter that had previously been sent. Bernhard knew, however, that the Stockholders Letter did not answer Barton's questions. Instead, Bernhard (inauspiciously) requested signatures by "Friday, January 13."

79. Later that afternoon, Barton responded to the email, again asking questions and proposing a group call with other stockholders he had spoken with.

80. That evening, Lerch responded to certain of Barton's questions:

- On the missing exhibits, Lerch replied "not sure what's missing but I will check".

- As to preemptive rights, Lerch stated, "Refer to Section 4.6 [of the Merger Agreement]; Common units retain their preemptive rights on future unit issuances; the waiver relates only to Step one of this transaction".

81. Thus, while Director Defendants continued to admit Plaintiffs' preemptive rights were triggered, now Director Defendants' position was that they were requesting Plaintiffs to provide a "waiver" as to them in the Eir Transaction.

82. Lerch also disclosed that while Eir Partners would invest "$28 million" resulting in "51% ownership on a fully diluted basis," "Total preferred" would be "52.8%". This was the first disclosure that the Eir Defendants would not own all the preferred units. Lerch, however, was still concealing that the other preferred units would go to Buff.

83. As to Barton's request for "Balance sheets/FS prior to merger," Lerch wrote, "not currently available." The Balance Sheet, however, was Exhibit D to the Merger Agreement, and the Eir Transaction had already closed.

84. The morning of January 11, Dorsey once again requested signatures despite the fact that the Director Defendants had been put on notice that the December Documents were incomplete.

85. That morning, Barton emailed Lerch, Buff, and Bernhard to "reiterate that I cannot sign the paperwork in its present form as it is incomplete". He wrote,

"I am sure an unaudited FS has been agreed to with EIR", and again requested a "cap table".

86.     Late that day, Barton had a telephone call with defendant Lerch regarding the Eir Transaction.

87.     Shortly before the call, Lerch emailed him "the cap table". Ex. 2. Lerch did not at this time, however, provide either the table listing Revive Holdco stockholders as of the Eir Transaction (Ex. 4) or the Membership Ledger for Eir Midco, both of which should have been, but were not, included with the December Documents.

88.     Rather, this "Post Close Capitalization Table," purportedly dated "12/27/22", lists the same total number of preferred units and value as the Membership List.   However, it does not break out the number of "Units" or "Ownership" as between Buff and Eir, simply listing them in both categories as "- ".   This was yet another attempt to conceal that Buff was receiving almost one million extra self-interested preferred units and thereby facilitate getting signatures and releases from Plaintiffs ignorant of that circumstance.

89.     On Barton's call with Lerch, Lerch stated he did not know that a capitalization table was not attached to the December Documents and stated words to the effect that Dorsey had made a mistake by not attaching it.   He also stated that the Eir Transaction closed in December 2022 for Eir Defendants' tax purposes.

**L.  Defendants Do Not Provide Documents Disclosing Buff's Extra Preferred Units Until January 25.**

90.  On January 24, 2023, the Eir Transaction was announced via press release.

91.  On January 25, Dorsey sent a new batch of documents for stockholders to review and sign, along with a mailing from Bernhard. Bernhard claimed that the new mailing included "all final schedules and exhibits," and that the delay was "due to certain post-transaction cleanup matters". Once again Bernhard incorrectly claimed that stockholders were required to sign an "Acknowledgment and Release".

92.  Bernhard's claim that the delay was due to "post-transaction cleanup" is unbelievable, including because the withheld Membership Ledger expressly states it is "As of December 27, 2022". Ex. 1.

93.  The Membership Ledger, first provided to Plaintiffs on January 25, was the first disclosure that Buff would be receiving preferred units in Eir Midco.

94.  Also provided with these documents was Exhibit A to the Merger Agreement, a chart of stockholder ownership of Revive Holdco immediately prior to the Eir Transaction (the "Revive Holdco Stockholder Chart"). Ex. 4. The Revive Holdco Stockholder Chart disclosed that stockholder totals had changed from that immediately before the ManifestRx Transaction. Among other changes, Buff had received 810,000 more shares of stock, while Bernhard had received

250,000 more shares. *Compare* Ex. 3 (list of Revive Holdco stockholders immediately prior to the ManifestRx Transaction) *with* Ex. 4. It is unknown to Plaintiffs why both Buff and Bernhard received hundreds of thousands more shares of stock in the few months between the ManifestRx and Eir Transactions.

**M.** **The Director Defendants Intentionally Concealed Buff's Preferred Units In Eir Midco To Defraud Plaintiffs Into Supporting The Eir Transaction.**

95. The Director Defendants intentionally concealed that Buff would be receiving preferred units in the Eir Transaction, even in the face of persistent questioning by Plaintiffs including Barton. They did so to defraud Plaintiffs into signing the Release and otherwise supporting the Eir Transaction.

96. This conclusion is supported by many facts:

- The Merger Agreement, dated December 27, 2022, references and incorporates the LLC Agreement, Exhibit A to which is the Membership Ledger which documented the units going to Buff.

- Director Defendants knew that revealing that almost one million preferred units were going to Buff would make Plaintiffs less likely to sign the Release or otherwise support the Eir Transaction because it was therefore a self-dealing transaction and because Buff had enticed Plaintiffs into participating in the ManifestRx Transaction on the basis of his financial support of the entity.

- Long before the Membership Ledger was provided to Plaintiffs, Director Defendants revealed that there were additional capital contributions above what Eir was contributing, and additional preferred units beyond what Eir would receive. On information and belief, those capital contributions and preferred units were intended to be Buff's.

- Director Defendants' shifting and unbelievable explanations and targets for blame, including their own counsel.

- Buff's and Director Defendants' past pattern of misrepresentation and statements leading to fraud allegations, both as to Revive Holdco and (as set forth below) otherwise.

N.    **Director Defendants Bernhard And Lerch Keep Their Jobs.**

97.    The January 24, 2023 press release announcing the Eir Transaction ("Press Release") demonstrates makes it clear that Eir Midco would keep the services existing Revive Holdco management – most prominently Director Defendants Lerch and Bernhard.

98.    That press release referred to Buff as "ReviveHealth Executive Chairman" and Bernhard as "ReviveHealth CEO," leading to the inference that they would continue to function as such post-transaction.

99.    Presumably, then, director Lerch, ReviveHealth Chief Financial Officer, was to be treated the same. In the Stockholders Letter, Bernhard stated

that stockholders were to "direct" any questions to "Lerch", suggesting that he also would continue.

100. In the Press Release, Brett Carlson of Eir Partners stated that "we believe we have the leadership . . . to execute on our ambitious vision," excluding Eir Midco finding other outside "leadership" to replace Bernhard or Lerch.

101. Section 7.1(a) of the Eir Midco LLC Agreement references Bernhard as one of its initial managers along with Buff.

## O. The Eir Transaction Was At An Unfair Price As To Plaintiffs.

102. The Eir Transaction was at an unfair price for Plaintiffs as to their prior shares of stock in Revive Holdco. Buff expropriated stock for himself that, at worst, should instead have gone to all Revive Holdco stockholders. Moreover, barely five months previously, the Lascano Plaintiffs paid $1.5M for 15M shares. Yet the Eir Transaction massively diluted such shares. Eir SPV was given more than 26M preferred units in Eir Midco, which consisted approximately 97% of all preferred units (Buff received the rest) and 53.09% of the total units.

## P. Each Director Defendant Was Interested And/or Not Independent.

103. As to the Eir Transaction, each Director Defendant was interested and/or not independent of Buff.

104. **Howard Buff** – Buff was personally interested in the Eir Transaction. Unlike any other stockholder, even any other preferred stockholder, Buff was to

get preferred units in Eir Midco without (unlike the Eir Defendants) putting any additional money in Eir Midco. Moreover, he was to use the Eir Transaction to attempt to escape liability in connection with Revive Holdco by virtue of the unlawful Release.

105. **Jeff Bernhard** – Bernhard was interested as the Eir Transaction ensured he would keep his job as an executive in Eir Midco, and because the proposed Release would eliminate his liability for Revive Holdco's business activities in the Fall of 2022 that violated Buff's representations to stockholders given at the June 23, 2022 meeting Bernhard attended. He was also not independent of Buff, as he relied upon his support to keep his job, not having significant voting stock holdings himself.

106. **Stephen Lerch** – Lerch was interested as the Eir Transaction ensured he would continue to have employment as to the new business, and because the proposed Release would eliminate his liability for Revive Holdco's business activities in the Fall of 2022 that violated Buff's representations to stockholders given at the June 23, 2022 meeting Lerch attended. He was also not independent of Buff, as he relied upon his support to keep his job, not having any stock holdings himself.

**Q.** **Buff Was Revive Holdco's Controlling Stockholder.**

107.    Pursuant to Article IV of the Revive Holdco Charter, while Revive Holdco had two classes each of Common and Preferred stock, generally only the A Common and A-1 Preferred had voting rights.

108.    As of the ManifestRx Transaction, the following stockholders had voting power:

| Name | A Common | A-1 Preferred | TOTAL | Percentage |
|------|----------|---------------|-------|------------|
| Howard Buff | 2,500,000 | 271,958 | 2,771,958 | **31.6%** |
| John Walker | 3,000,000 | 381,958 | 3,381,958 | **38.6%** |
| Mark Dumoff | 2,500,000 | 61,958 | 2,561,958 | **29.2%** |
| Jeff Bernhard | 0 | 50,000 | 50,000 | **0.6%** |
| **TOTAL** | **8,000,000** | **765,874** | **8,765,874** | |

109.    As of the Eir Transaction, Buff was Revive Holdco's controlling stockholder.

110.    He was Revive Holdco's Executive Chairman.  He presented himself as being Revive Holdco's controlling stockholder before the Eir Transaction even without a formal officer role, providing assurances and representations on behalf of himself and Revive Holdco in the June 2022 Meetings.

111. Given his stock holdings, he only needed to persuade one of stockholders John Walker and Mark Dumoff to have an absolute majority of Revive Holdco's stock.

112. Walker was not independent of Buff. Walker previously worked for BuffCo Holdings, whose Managing Partner is Buff, until December of 2020. He is also associated with Buff in the litigation involving S&S Healthcare Strategies, Ltd. ("S&S Healthcare") discussed below. He became Chief Medical Officer of S&S Healthcare, under Buff as sole Manager and Chief Executive Officer. Walker thus needed to stay in Buff's good graces if he was to continue at S&S Healthcare. Moreover, as someone who had often previously worked with Buff and presumably wished to preserve future opportunities with Buff and/or his network, he would not be in a position to vote down the Eir Transaction that personally benefitted Buff.

113. Dumoff was also not independent of Buff. Dumoff was a co-Founder of Revive Holdco's predecessor. As someone who had previously worked with Buff and presumably wished to preserve future opportunities with Buff and/or his network, he would not be in a position to vote down such a transaction that personally benefitted Buff.

114. For reasons as set forth above, Buff should be treated as if he controlled Walker's and Dumoff's votes, as he effectively did.

**R.**   **Buff Is Building A Track Record Of Deal Litigation.**

115.   This is, unfortunately, not the first litigation or serious legal disputes regarding an M&A transaction Buff has been involved in.

116.   A May 2020 pleading in *S&S Healthcare Strategies, Ltd. v. S&S Holdco, Inc.*, Case No. 1:20-cv-00198, in federal District Court in Ohio, alleged fraud in the inducement against Buff (the "Pleading").

117.   Third party plaintiffs (the "S&S Healthcare Sellers") in that case entered into an August 2018 purchase agreement pursuant to which they sold their business to a group lead by Buff.

118.   The Pleading alleges at paragraph 30 that "Buff . . . made a series of verbal commitments regarding post-Closing operation of the Company . . . which (i) Buff acknowledged were necessary for the successful operation of the Company post-Closing; and (ii) were necessary in order for [Seller Complainants] to sell their ownership of the Company (*i.e.*, enter into the Purchase Agreement)."

119.   S&S Healthcare Sellers alleged a claim of "FRAUD IN THE INDUCEMENT" against Buff, alleging among other things that Buff had made "false and misleading representations" to them "with actual knowledge that they were false and misleading" or "with reckless disregard for the truth."   Pleading ¶ 185-93.   They "would not have entered into" the deal if they had known the representations were false and misleading at the time.  *Id.*

120. Another third-party defendant in this litigation was John Walker, who participated in running the company post-transaction along with Buff. Pleading ¶ 62. Walker was a significant stockholder in Revive Holdco as set forth above.

121. In March 2021 the action was settled and dismissed.

122. On or about August 10, 2022, immediately after the ManifestRx Transaction, Revive Holdco acquired iSelectMD (the "iSelectMD"). The former President of iSelectMD was Michael P. Iaquinta. Plaintiffs were not aware of the pendency of the iSelectMD transaction before it occurred.

123. Plaintiffs understand that Iaquinta subsequently retained counsel with regard to an issue with Buff and Revive Holdco concerning the iSelectMD transaction agreements. Plaintiffs understand the dispute was settled out-of-court and a public complaint was never filed.

**S.    The Eir Defendants Knowingly Aided The Director Defendants In Their Wrongdoing.**

124. The Eir Defendants knew of wrongdoing set forth above but agreed to the Eir Transaction regardless in an attempt to profit at Plaintiffs' expense.

125. Defendant Carlson is not only Founder and CEO of Eir Partners, but also Manager of Eir Midco, and as such personally signed the Merger Agreement.

126. In the January 24, 2023 press release announcing the Eir Transaction, Carlson displayed his intimate knowledge of the deal:

"It is a massive opportunity and unmet need in the market to deliver a truly disruptive employee healthcare experience," said Brett Carlson, Managing Member at Eir Partners. "We can do much better in this country and we believe we have the leadership, solution set, and mission to execute on or ambitious vision."

127. The "leadership" and "mission" he referenced referred largely or entirely to Revive Holdco, while the "solution set" referenced Revive Holdco plus SwiftMD. Carlson boasted about acquiring a valuable business, yet he knew he had paid no cash for that business to its stockholders, but rather had massively diluted them.

128. Also, as set forth above:

a. The Stockholders Letter was sent out on behalf of an entity, Revive Holdco, which Eir Defendants at that time controlled; therefore they knew and approved of or acquiesced to the attempt to require Plaintiffs to sign a bogus release.

b. The Eir Defendants knew that Buff did not in fact pay any "Contribution" in the Eir Transaction. Defendant Carlson nevertheless signed the Merger Agreement that treated Buff differently than any other Revive Holdco stockholder.

## COUNT I – DECLARATORY JUDGMENT

### (Against All Defendants)

129. Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

130. The Merger Agreement does not require Plaintiffs to sign any release to receive any units in the Eir Transaction.

131. 8 *Del. C.* 251(b)(5) requires the Merger Agreement to set forth the consideration that stockholders are entitled to receive upon the cancellation of their shares.

132. Eir Holdco purported to require Plaintiffs to sign the Release before receiving any units or other consideration in the Eir Transaction.

133. The Release is invalid for lack of consideration.

134. There is a ripe controversy between Plaintiffs and Defendants, parties with real and adverse interests, warranting a declaratory judgment pursuant to 10 *Del. C.* § 6501 *et seq.*

135. Plaintiffs are therefore entitled to a declaratory judgment that the Release is (a) invalid and (b) unnecessary for Revive Holdco unitholders to sign to receive units pursuant to the Merger Agreement.

## COUNT II – VIOLATION OF PREEMPTIVE RIGHTS

### (Against Revive Holdco and Eir Midco)

136. Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

137. Section 3 of the Stockholders Agreement provides all Revive Holdco stockholders with the right to receive their respective allotment of any additional securities Revive Holdco issues.

138. In the Merger Agreement, Revive Holdco newly issues common stock. The Merger Agreement provides for no ability for Plaintiffs to receive their respective allotment of such newly issued stock, thereby violating the Stockholders Agreement.

139. Plaintiffs are entitled to injunctive relief providing to them their preemptive rights that were violated; or alternatively damages for such violation.

## COUNT III – BREACH OF FIDUCIARY DUTY

### (Against the Director Defendants)

140. Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

141. The Director Defendants have and at all relevant times had fiduciary duties to Revive Holdco and its stockholders.

142. The Director Defendants knowingly, recklessly, and in bad faith breached their fiduciary duties of loyalty and good faith by approving the Eir Transaction.

143. Entire fairness review applies to the Eir Transaction because:

   a. Buff as controlling stockholder stood on both sides of the Eir Transaction.

   b. Buff was a conflicted controller, one stockholder who received greater and different consideration than any other stockholder.

   c. Each director on the Board that voted to approve the Eir Transaction was conflicted based upon self-interest and/or lack of independence.

   d. The Director Defendants acted in bad faith, including by awarding extra shares to Buff for no transaction consideration, by attempting to defraud Plaintiffs into supporting the Eir Transaction without knowing that Buff was to receive almost one million preferred units in Eir Midco, and by attempting to use the Eir Transaction in order for Plaintiffs to sign the Release releasing them from legal liability in connection with Revive Holdco deceive stockholders including Plaintiffs despite knowing such Release was invalid for lack of consideration.

144. The Director Defendants voted in favor of the Eir Transaction for self-interested reasons, including to protect themselves from liability in connection with Revive Holdco, to provide Buff with preferred equity in a new entity for no consideration, and to give themselves future employment at an expanded company that included SwiftMD.

145. The Eir Transaction was and is not entirely fair to Plaintiffs.

146. Plaintiffs have no adequate remedy at law.

## COUNT IV – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### (Against the Eir Defendants)

147. Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

148. The Director Defendants by virtue of being directors to Revive Holdco had a fiduciary duty to Revive Holdco and its stockholders, including Plaintiffs.

149. The Individual Defendants breached that duty, as alleged above.

150. The Eir Defendants knowingly participated in that breach, including but not limited to because they knew that the Release demanded was invalid but nevertheless approved and/or acquiesced to demanding it; because they profited from the Eir Transaction at the expense of Plaintiffs; and because they agreed to

give Buff close to one million preferred units in Eir Midco knowing he had not contributed cash or assets in the Eir Transaction.

151. Plaintiffs were damaged by the concerted actions of the Director Defendants and the Eir Defendants, including by Plaintiffs' receipt of unfair consideration in the Eir Transaction.

## PRAYER FOR RELIEF

Wherefore Plaintiffs respectfully requests that this Court enter an order:

1. Declaring that the Director Defendants breached their fiduciary duties owed to Revive Holdco and Plaintiffs;

2. Declaring that the Eir Defendants aided and abetted breaches of fiduciary duty owed to Plaintiffs;

3. Declaring that the Release is (a) invalid and (b) unnecessary for Revive Holdco unitholders to sign to receive units pursuant to the Merger Agreement;

4. Injunctive relief allowing Plaintiffs to exercise their preemptive rights;

5. Awarding damages or equivalent equitable relief to Plaintiffs, including as to assets improperly received by the Director Defendants as a result of their breaches of fiduciary duty and for the violation of Plaintiff's preemptive rights;

6.     Awarding pre- and post-judgment interest;

7.     Awarding Plaintiffs their costs; and

8.     Granting such other relief as the Court deems proper.

<div style="margin-left:40%">

*/s/ Evan Williford*

Evan O. Williford (#4162)
The Williford Firm LLC
1007 N. Orange Street, Ste. 235
Wilmington, DE 19801
 *Attorney for Plaintiffs*

</div>

DATED: July 25, 2023

# EXHIBIT C



*Alan S. Wachs*
*Direct Tel: 904-598-6110*
*Direct Fax: 904-598-6210*
*awachs@sgrlaw.com*

September 12, 2023

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

**VIA E-MAIL – REPORTCLAIMS@RSUI.COM**

RSUI Group, Inc.
945 East Paces Ferry Rd., Suite 1800
Atlanta, GA 30326-1160

> Re:    Notice of Directors and Officers Liability Claim
>          RSUI Indemnity Company ("RSUI"); Policy No. PP703174
>
>          *Daniel Lascano, et al. v. Howard Buff, et al.* Case No.: 2023-0758

To Whom it May Concern:

I am writing you on behalf of all of the Defendants in the above styled action, to wit: Howard Buff, Jeff Bernhard, Stephen Lerch, Revive Holding Company, Inc., Eir RH Midco, LLC, Eir RH SPV, LLC, Eir Partners Capital, LLC, and Brett S. Carlson. I enclose a duplicate of the Complaint which has been served on these Defendants within the last couple of weeks. Each of the individual Defendants is either an insured entity or a current or former officer or director of the insured entities otherwise entitled to indemnification from the insured entities for the allegations within the Complaint. It further appears from a review of the allegations of the Complaint that coverage under the above referenced policy has been triggered. We therefore ask that RSUI either agree to advance/reimburse Defendants for their defense costs or approve the retention of the law firms set forth below to defend this matter.

Presently, this firm represents Howard Buff, Jeff Bernhard, Stephen Lerch, and Revive Holding Company. We have procured local counsel, Rebecca Butcher of Landis Rath & Cobb, LLP, who has secured an extension of time to respond to the Complaint. We currently anticipate the filing of a motion to dismiss. Additionally, Defendants, Eir RH Midco, LLC, Eir RH SPV, LLC, Eir Partners Capital, LLC, and Brett S. Carlson, are currently represented by George Gasper of Ice Miller.

They too have obtained an extension through their local counsel, Catherine Gaul at Ashby & Geddes, and anticipate filing a comparable motion to dismiss.

Very truly yours,

/s/ *Alan S. Wachs*

Alan S. Wachs

ASW/tcg

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| Daniel Lascano, Daniel Lascano 2012 Family Trust, The Samaritan Project Inc., Pacific Premier Trust, Custodian FBO Daniel 'R' Lascano, IRA, Edward Nahem, Joyce Storm, Pacific Premier Trust, Custodian FBO Jake Foley III, IRA, Pacific Premier Trust, Custodian FBO Emil Costa, Roth IRA, John Troubh, Christopher Stuart Barton, Pacific Premier Trust, Custodian FBO Suleman Lunat, IRA, and Robert O'Donnell, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | C.A. No. _____ |
| Howard Buff, Jeff Bernhard, Stephen Lerch, Revive Holding Company, Inc., Eir RH Midco, LLC, Eir RH SPV, LLC, Eir Partners Capital, LLC, and Brett S. Carlson, | ) ) ) ) ) ) | |
| *Defendants.* | ) | |

## COMPLAINT

Plaintiffs Daniel Lascano, Daniel Lascano 2012 Family Trust, The Samaritan Project Inc., Pacific Premier Trust, Custodian FBO Daniel 'R' Lascano, IRA (the first four plaintiffs together, the "Lascano Plaintiffs"), Edward Nahem, Joyce Storm, Pacific Premier Trust, Custodian FBO Jake Foley III, IRA, Pacific Premier Trust, Custodian FBO Emil Costa, Roth IRA, John Troubh, Christopher Stuart Barton, Pacific Premier Trust, Custodian FBO Suleman Lunat, IRA, and

Robert O'Donnell (together, "Plaintiffs") hereby bring this Complaint against defendants Howard Buff, Jeff Bernhard, Stephen Lerch, Revive Holding Company, Inc., Eir RH Midco, LLC, Eir RH SPV, LLC, Eir Partners Capital, LLC, and Brett S. Carlson (together, "Defendants") as set forth below:

## INTRODUCTION

1.  Revive Holding Company, Inc. ("Revive Holdco") acquired control of Advanced Pharmacy Concepts, LLC d/b/a Manifest Pharmacy ("ManifestRx") in July of 2022 (the "ManifestRx Transaction"). Plaintiffs became stockholders in Revive Holdco in that transaction; the Lascano Defendants paid $1.5M in connection with it.

2.  Plaintiffs had positive expectations for Revive Holdco given personal assurances by defendant Howard Buff. Buff was Revive Holdco's controlling stockholder; he was also a director and its Executive Chairman. He assured Plaintiffs that Revive Holdco had closed significant preferred stock investments providing it with sufficient near-term capital. He also assured them that, in any event, there was also no reason for concern because Buff was wealthy and was willing to fund Revive Holdco himself.

3.     Shortly after the ManifestRx Transaction, Revive Holdco management reported problems with getting bills paid notwithstanding these representations.

4.     Plaintiff Daniel Lascano, concerned at the prompt violation of Buff's representations, sought books and records from Revive Holdco.  Revive Holdco did not cooperate to alleviate concern; rather, it rebuffed Lascano with purported technical arguments and provided not a single document.

5.     In December of 2022 – barely five months after the ManifestRx Transaction – another transaction was announced (the "Eir Transaction") in which Plaintiffs were deprived of their shares of Revive Holdco.  This transaction personally benefitted Buff as well as defendants Jeff Bernhard and Stephen Lerch (officers and the other two Revive Holdco directors) but massively diluted Plaintiffs (Buff, Bernhard, and Lerch, the "Director Defendants").

6.     In the Eir Transaction, a subsidiary of private equity company Eir Partners Capital, LLC ("Eir Partners"), Eir RH Midco, LLC ("Eir Midco"), acquired all of the stock in Revive Holdco.  Eir Midco also acquired Telemedicine Management, Inc. d/b/a SwiftMD ("SwiftMD"), for which Eir Partners paid $23M.

7.     Unlike *any* other Revive Holdco stockholder (preferred or common), Buff received almost one million preferred units in Eir Midco.  The only other preferred units are owned by another subsidiary of Eir Partners, Eir RH SPV, LLC

("Eir SPV" and, together with Eir Midco, Eir Partners, and Brett S. Carlson, CEO of Eir Partners, the "Eir Defendants"). But while Eir Partners paid a total of almost $28M, Buff paid **nothing** in the Eir Transaction. The other Director Defendants, CEO Bernhard and CFO Lerch, kept their management positions as to the new entity, Eir Midco.

8. Bernhard told Revive Holdco's stockholders including Plaintiffs in a letter that they were "required" to sign a release (the "Release") of all pre-merger claims against Revive Holdco and its directors and officers. In fact, the Release was not required by the Eir Transaction merger agreement (the "Merger Agreement") and therefore void as without consideration under established Delaware law.

9. Moreover, the Director Defendants attempted to defraud Plaintiffs by omitting an exhibit to the already-closed Eir Transaction papers disclosing that Buff had received preferred units for no consideration paid in that transaction. They did so to attempt to deceive Plaintiffs into signing the Release and going along with the Eir Transaction without knowing about Buff's self-interested reward. Defendants even continued to conceal this grant of preferred units in the face of Plaintiffs' questioning, only disclosing it almost one month after first asking Plaintiffs to sign the Release.

10.     Additionally, the Director Defendants have admitted that the Eir Transaction triggered Plaintiffs' preemptive rights but have refused to comply with them.

11.     The Director Defendants violated their fiduciary duties to Plaintiffs by approving the Eir Transaction for self-interested reasons, thereby damaging Plaintiffs.  The Eir Defendants aided and abetted this breach as they agreed to Buff receiving extra preferred units in Eir Midco knowing he had paid no consideration in the Eir Transaction.

12.     Plaintiffs seek an award of damages for the Director Defendants' breach of fiduciary duty, as aided and abetted by the Eir Defendants.  Plaintiffs also seek a declaration that the Release is unlawful and invalid and an injunction providing Plaintiffs with their preemptive rights.

## THE PARTIES

13.     Plaintiffs Daniel Lascano, Daniel Lascano 2012 Family Trust, The Samaritan Project Inc., Pacific Premier Trust, Custodian FBO Daniel 'R' Lascano, IRA, Edward Nahem, Joyce Storm, Pacific Premier Trust, Custodian FBO Jake Foley III, IRA, Pacific Premier Trust, Custodian FBO Emil Costa, Roth IRA, John Troubh, Christopher Stuart Barton, Pacific Premier Trust, Custodian FBO Suleman Lunat, IRA, and Robert O'Donnell are and/or were stockholders in Revive Holdco.

14. Defendant Howard Buff is and/or was a director, Executive Chairman, and a substantial and controlling stockholder of Revive Holdco.

15. Defendant Jeff Bernhard is and/or was a director and Chief Executive Officer of Revive Holdco.

16. Defendant Stephen Lerch is and/or was a director and Chief Financial Officer of Revive Holdco.

17. Defendant Revive Holding Company, Inc. ("Revive Holdco") is a Delaware corporation.

18. Defendant Eir RH Midco, LLC ("Eir Midco") is a Delaware limited liability company.

19. Defendant Eir RH SPV, LLC ("Eir SPV") is a Delaware limited liability company and a member of Eir Midco.

20. Defendant Eir Partners Capital, LLC ("Eir Partners") is a Delaware limited liability company and the Manager of Eir SPV.

21. Defendant Brett S. Carlson is Founder and Chief Executive Officer of Eir Partners; and Manager of Eir Midco.

## JURISDICTION

22. This Court has personal jurisdiction over Revive Holdco as it is organized under Delaware law. 8 *Del. C.* § 321(a).

23. This Court has personal jurisdiction over the Director Defendants under 10 *Del. C.* § 3114(a) as they are and/or were directors of Delaware corporation Revive Holdco.

24. This Court has personal jurisdiction over Eir Midco, Eir SPV, and Eir Partners as they are each Delaware limited liability companies. 6 *Del. C.* § 18-105.

25. This Court has personal jurisdiction over Brett S. Carlson as manager of Eir Midco, a Delaware limited liability company. 6 *Del. C.* § 18-109.

26. Given that this is a proceeding asserting a claim of breach of fiduciary duty by directors of Revive Holdco, Article XII of the Certificate of Incorporation of Revive Holdco, dated July 13, 2022 (the "Revive Holdco Charter"), effective at the time of that service, vests exclusive jurisdiction in the Court of Chancery in the State of Delaware.

27. Plaintiffs assert a claim for breach of fiduciary duty, an equitable claim over which this Court has subject matter jurisdiction.

28. In Section 8.13 of the Merger Agreement, the parties to that agreement, including Eir Midco, Revive Holdco, Buff, and Bernhard, agreed to the exclusive jurisdiction of a state court located in Wilmington Delaware, such as this Court of Chancery, for claims which are related to the Merger Agreement such as these.

# FACTUAL ALLEGATIONS

## A. Buff Solicits Investments And A Transaction With ManifestRx In The Summer of 2022 With Funding Representations.

29. In the summer of 2022, Buff was soliciting support for and additional investors in a transaction (the "ManifestRx Transaction") by which ReviveHealth Inc. would acquire Advanced Pharmacy Concepts, LLC d/b/a Manifest Pharmacy ("ManifestRx").

30. Buff held at least two meetings in late June 2022 with potential and existing investors.

31. One of the meetings was a video call on June 23. Plaintiffs Lascano and Foley attended, along with other ManifestRx members. Also in attendance were each of the Director Defendants – Buff, Bernhard and Lerch.

32. Another meeting occurred on June 27 that included Lascano, Foley, and Buff (both meetings, the "June 2022 Meetings").

33. At the June 2022 Meetings, Buff stated that a round of investment in A-2 Preferred stock (the "A-2 Round") for Revive Holdco was fully funded.

34. He stated that because of the A-2 Round, Revive Holdco was solvent and that there would be no need of fundraising or capital raises for the near future.

35. Buff was asked if there could be additional subscriptions to the A-2 round. Buff replied negatively, stating that the A-2 Round was fully funded and there was no equity.

36. Buff also assured Lascano and Foley that funding would be no problem because he was wealthy and would provide necessary funding as a backstop.

**B.** **Revive Holdco Acquires ManifestRx.**

37. The ManifestRx Transaction occurred in July 2022. In that transaction, existing members of ManifestRx, as well as new investors such as the Lascano Plaintiffs, received shares of stock in Revive Holdco.

**C.** **Post-Transaction, Contrary to Buff's Representations, Revive Holdco Operations Were Not Funded.**

38. Shortly after the ManifestRx Transaction, it was reported by former ManifestRx executive, Hunter Lipton, who was involved in Revive Holdco subsequently, that Revive Holdco was not paying bills or vendors.

**D.** **Revive Holdco Tells Stockholders The A-2 Round Did Not Fund.**

39. On October 27, 2022, certain Revive Holdco stockholders received an update regarding Revive Holdco and the A-2 Round. It was reported at that time that A-2 preferred stockholders never in fact invested any money. This angered Plaintiffs including Lascano and Foley, who were previously told it had fully funded.

40. A follow-up call was scheduled involving, among others, Buff, Lascano, Foley, Bernhard, Lerch, and Lipton. It was scheduled for November 2, then rescheduled for November 22.

41.     On the November 22 call, it was disclosed that Revive Holdco had not in fact received committed funds from – or even closed on – the A-2 Round.

**E.     Lascano Seeks Books and Records; Revive Holdco Uses Technical Objections To Refuse To Provide Any Documents.**

42.     Lascano through counsel made a demand on or about December 9, 2022, to Revive Holdco under Delaware law seeking books and records. Documents he requested included Revive Holdco's current capitalization table and balance sheet, share purchase commitment documents regarding the supposedly closed A-2 investment, and documents sufficient to show when any such commitments fell through.

43.     Revive Holdco denied the demand on technical grounds, including demanding that any stockholder "not a record holder" provide "documentary evidence of beneficial ownership of the stock". It did so despite the fact that the Lascano Plaintiffs had just acquired their stock five months before. Revive Holdco refused to provide any documents even after further correspondence.

**F.     The Eir Defendants Purportedly Acquire Revive Holdco.**

44.     Pursuant to an Agreement and Plan of Merger (the "Merger Agreement") dated as of December 27, 2022, a stock-for-stock merger was caused to occur (the "Eir Transaction") in which a subsidiary of private equity company Eir Partners Capital, LLC ("Eir Partners"), Eir RH Midco, LLC ("Eir Midco"), acquired Revive Holdco as a subsidiary.

45. In the transaction, a subsidiary of Revive Holdco acquired Telemedicine Management, Inc. d/b/a SwiftMD ("SwiftMD"). Section 1.01(b) of the Merger Agreement provides that Eir Midco would pay $23M to be used to acquire SwiftMD; and that it would also pay an additional $4.9M, less closing expenses above $150,000, as additional cash consideration.

46. Page one of the Merger Agreement states that the board of directors of Revive Holdco (the "Board") approved and adopted the Merger Agreement and recommended it to the stockholders. Neither any Eir Transaction documents sent to Plaintiffs stockholders, nor a December 29, 2022 letter to stockholders regarding the transaction (the "Stockholders Letter"), disclose the directors that voted on the Merger Agreement or were on the Board at that time. On information and belief, the Board consisted of defendants Buff, Bernhard, and Lerch.

47. The Merger Agreement provided for Plaintiffs' stock in Revive Holdco to be cancelled and, provided Plaintiffs fulfilled certain conditions, replaced with units in Eir Midco.

48. Defendant Carlson signed the Merger Agreement as Manager of Eir Midco. Eir Midco's controlling member is Eir RH SPV, LLC ("Eir SPV"). On information and belief, Eir SPV is owned by Eir Partners. Carlson is also Eir Partners' Founder and CEO.

**G.**   **The Merger Agreement Violates Plaintiffs' Preemptive Rights.**

49.   In connection with the ManifestRx Transaction, Revive Holdco stockholders signed a joinder to the Revive Holdco stockholders agreement (the "Revive Holdco Stockholders Agreement").

50.   Section 3 of the Stockholders Agreement provides all Revive Holdco stockholders with the right to receive their respective allotment of any additional securities Revive Holdco issues.

51.   Section 1.02(c) of the Merger Agreement provides for Revive Holdco to newly issue common stock.  The Merger Agreement provides for no ability for Plaintiffs to receive their respective allotment of such newly issued stock, thereby violating the Stockholders Agreement.

**H.**   **Bernhard States Plaintiffs Are "Required" To Sign A Bogus Release.**

52.   On December 29, 2022, the Stockholders Letter from Bernhard was sent to only certain of Revive Holdco stockholders.

53.   That same day, Dorsey & Whitney LLP ("Dorsey") circulated certain documents pertaining to the Eir Transaction for Plaintiffs to review and sign (together, the "December Documents") on behalf of Defendants.  Dorsey was Revive Holdco's counsel according to the Stockholders Letter.

54.   The December Documents, on information and belief, included certain documents related to the Eir Transaction such as the Merger Agreement,

but not certain appendices or exhibits. The December Documents were circulated via DocuSign; since then, however, Defendants have deleted them so that they are unavailable.

55. Bernhard states in the Stockholders Letter that "all Revive Holdco stockholders are required to execute" among other things an Acknowledgment and Release (the "Release") included with the December Documents which "acknowledges the consummation of the transaction and gives a release".

56. The December Documents also included a joinder to an amended LLC agreement for Eir Midco (the "LLC Agreement"). The December Documents did not include Exhibit A to the LLC Agreement, which was the Membership Ledger of Eir Midco. Ex. 1. The Membership Ledger reports that, "As of December 27, 2022," Buff owned 931,593.73 preferred units in Eir Midco. *Id.*

57. The Release states that Eir Midco and stockholder "agree that the acknowledgment, release and other agreements herein are good and valuable consideration for the Units." The Release states that Plaintiffs agree to release Revive Holdco and each of its "Personnel, Representatives, . . . stockholders, . . . and Affiliates" from any claims arising out or relating to Plaintiffs' capacity as a Revive Holdco stockholder prior to the Eir Transaction.

58. Section 1.03(a) of the Merger Agreement states that stockholders in Revive Holdco would be entitled to receive their units upon "the execution of"

certain documents. The Merger Agreement does not, however, require Plaintiffs to sign any release.

59.     The Release is therefore invalid under Delaware law, including for lack of consideration as it was not referenced specifically in the Merger Agreement. *Cigna Health & Life Ins. Co. v. Audaxx Health Solutions, Inc.*, 107 A.3d 1082, 1091 (Del. Ch. 2014). This precedent is well known among M&A practitioners and available upon a simple internet search of the issue.

60.     Dorsey, which describes itself as to its M&A practice as "An International Leader in M&A", was on information and belief aware of *Cigna* and advised Director Defendants that such a release was invalid. dorsey.com/services/mergers_acquisitions (accessed June 12, 2023).

61.     Director Defendants nevertheless purported to require Plaintiffs to sign it anyway, knowing it was invalid. They did so to personally benefit by eliminating legal claims against themselves, and to deceive Plaintiffs into signing it thinking it was "required" when it was not.

62.     Indeed, Bernhard had Dorsey send the "DocuSign" for the documents Bernhard was requesting stockholders sign, including the Release Bernhard incorrectly told stockholders was "required".

63.     At the time Bernhard sent the letter, Revive Holdco had been acquired by Eir Midco, which was controlled by Eir SPV, Eir Partners, and Carlson (the

"Eir Defendants"). Therefore, on information and belief the Eir Defendants approved the Stockholders Letter. The Eir Defendants on information and belief were represented by Ice Miller LLP, which bills its own mergers & acquisitions practice as "one of the most experienced and recognized firms in the united States in structuring, negotiating and documenting business transactions". https://www.icemiller.com/practices/business-transactions-mergers-and-acquisitions/ (accessed June 19, 2023). On information and belief, therefore, Ice Miller also knew that the release was invalid and informed the Eir of Defendants that, but the Eir Defendants approved and/or acquiesced to the Stockholders Letter regardless.

64.     The Release is further evidence of defendants' bad faith in connection with the Eir Transaction, and desire to avoid liability stemming from Revive Holdco, whether in regards to the circumstances referenced herein or otherwise.

## I.     Plaintiffs Ultimately Discover That Buff Received Almost One Million Extra Preferred Units In The Eir Transaction.

65.     The Membership Ledger, which was not provided to Plaintiffs until January 25, 2023, lists Buff as receiving 931,593.71 preferred units in Eir Midco. Ex. 1.  Buff is the only person or entity to receive any preferred units other than Eir SPV.

66. This document lists Eir Midco as having contributed $28M in "capital contributions," of which as much as $27,900,000 is documented as merger consideration in Section 1.01(b) of the Merger Agreement.

67. The Membership Ledger, however, purports that Buff provided $1M in "capital contributions". The Merger Agreement does not provide for Buff providing any consideration, whether cash or otherwise.

68. The Membership Ledger lists all other Eir Midco members as providing $0.

69. Buff therefore received preferred units in Eir Midco despite paying $0 in cash or assets in the Eir Transaction. Buff was the only Revive Holdco stockholder, indeed the only preferred stockholder, to receive preferred units in the new entity.

**J.  The Director Defendants Initially Conceal And Do Not Disclose Buff's Extra Preferred Units And The Violation of Plaintiffs' Preemptive Rights.**

70. Neither the Membership Ledger nor the Eir Midco issuance of preferred units to Buff were disclosed to Plaintiffs in December of 2022. Rather, defendants attempted to procure Plaintiffs' signature of the Release and cooperation with the Eir Transaction without knowledge of such issuance.

71.     The Shareholder Letter incorrectly states that Eir made an investment of $29M in Eir Midco.  In fact, on information Eir invested less than $28M, while Buff was treated as if he had paid $1M transaction (he paid nothing).

72.     Neither the Shareholder Letter nor the December Documents disclose the Eir Transaction triggering Plaintiffs' preemptive rights or that such rights would be complied with, or expressly state that Plaintiffs were being asked to waive such rights.

**K.    Under Pressure From Plaintiffs, The Director Defendants Admit Plaintiffs Preemptive Rights Are Triggered But Continue To Actively Conceal The Extra Preferred Units Going To Buff.**

73.     In early January 2023, Plaintiff Chris Barton became concerned about the incompleteness of the December Documents and the questions he had regarding the Eir Transaction.

74.     Dorsey again asked for signatures on January 2, 2023, and again on January 6.

75.     Early in the morning of January 8, Bernhard again asked Barton to sign, stating if Barton signed, "we can ensure all is taking [sic] care of."

76.     Later that morning, Barton emailed Bernhard regarding the transaction:

- Barton asked Bernhard to "please send all appendices and exhibits completed including cap table", as at least the Membership Ledger and the closing balance sheet (the "Balance Sheet") (and possibly other exhibits) were missing.

- Barton noted that in a prior communication, Bernhard had "indicated pre-emptive rights are maintained for shareholders if I want to buy up for anti dilution". Barton asked how the Merger Agreement preserved preemptive rights and how he could exercise them.

77. That afternoon, Barton began coordinating with other Plaintiffs regarding their common and growing concerns about the Eir Transaction.

78. On January 9, an email from Bernhard to Revive Holdco stockholders was sent, copying Lerch. Bernhard again asked for stockholders' signature notwithstanding that he knew the December Documents were incomplete. He responded to the fact that "[s]everal of you have reached out with questions" by referencing the attached Stockholders Letter that had previously been sent. Bernhard knew, however, that the Stockholders Letter did not answer Barton's questions. Instead, Bernhard (inauspiciously) requested signatures by "Friday, January 13."

79. Later that afternoon, Barton responded to the email, again asking questions and proposing a group call with other stockholders he had spoken with.

80. That evening, Lerch responded to certain of Barton's questions:

- On the missing exhibits, Lerch replied "not sure what's missing but I will check".

- As to preemptive rights, Lerch stated, "Refer to Section 4.6 [of the Merger Agreement]; Common units retain their preemptive rights on future unit issuances; the waiver relates only to Step one of this transaction".

81. Thus, while Director Defendants continued to admit Plaintiffs' preemptive rights were triggered, now Director Defendants' position was that they were requesting Plaintiffs to provide a "waiver" as to them in the Eir Transaction.

82. Lerch also disclosed that while Eir Partners would invest "$28 million" resulting in "51% ownership on a fully diluted basis," "Total preferred" would be "52.8%". This was the first disclosure that the Eir Defendants would not own all the preferred units. Lerch, however, was still concealing that the other preferred units would go to Buff.

83. As to Barton's request for "Balance sheets/FS prior to merger," Lerch wrote, "not currently available." The Balance Sheet, however, was Exhibit D to the Merger Agreement, and the Eir Transaction had already closed.

84. The morning of January 11, Dorsey once again requested signatures despite the fact that the Director Defendants had been put on notice that the December Documents were incomplete.

85. That morning, Barton emailed Lerch, Buff, and Bernhard to "reiterate that I cannot sign the paperwork in its present form as it is incomplete". He wrote,

"I am sure an unaudited FS has been agreed to with EIR", and again requested a "cap table".

86.     Late that day, Barton had a telephone call with defendant Lerch regarding the Eir Transaction.

87.     Shortly before the call, Lerch emailed him "the cap table". Ex. 2. Lerch did not at this time, however, provide either the table listing Revive Holdco stockholders as of the Eir Transaction (Ex. 4) or the Membership Ledger for Eir Midco, both of which should have been, but were not, included with the December Documents.

88.     Rather, this "Post Close Capitalization Table," purportedly dated "12/27/22", lists the same total number of preferred units and value as the Membership List. However, it does not break out the number of "Units" or "Ownership" as between Buff and Eir, simply listing them in both categories as "-". This was yet another attempt to conceal that Buff was receiving almost one million extra self-interested preferred units and thereby facilitate getting signatures and releases from Plaintiffs ignorant of that circumstance.

89.     On Barton's call with Lerch, Lerch stated he did not know that a capitalization table was not attached to the December Documents and stated words to the effect that Dorsey had made a mistake by not attaching it. He also stated that the Eir Transaction closed in December 2022 for Eir Defendants' tax purposes.

**L.  Defendants Do Not Provide Documents Disclosing Buff's Extra Preferred Units Until January 25.**

90.  On January 24, 2023, the Eir Transaction was announced via press release.

91.  On January 25, Dorsey sent a new batch of documents for stockholders to review and sign, along with a mailing from Bernhard. Bernhard claimed that the new mailing included "all final schedules and exhibits," and that the delay was "due to certain post-transaction cleanup matters". Once again Bernhard incorrectly claimed that stockholders were required to sign an "Acknowledgment and Release".

92.  Bernhard's claim that the delay was due to "post-transaction cleanup" is unbelievable, including because the withheld Membership Ledger expressly states it is "As of December 27, 2022". Ex. 1.

93.  The Membership Ledger, first provided to Plaintiffs on January 25, was the first disclosure that Buff would be receiving preferred units in Eir Midco.

94.  Also provided with these documents was Exhibit A to the Merger Agreement, a chart of stockholder ownership of Revive Holdco immediately prior to the Eir Transaction (the "Revive Holdco Stockholder Chart"). Ex. 4. The Revive Holdco Stockholder Chart disclosed that stockholder totals had changed from that immediately before the ManifestRx Transaction. Among other changes, Buff had received 810,000 more shares of stock, while Bernhard had received

250,000 more shares. *Compare* Ex. 3 (list of Revive Holdco stockholders immediately prior to the ManifestRx Transaction) *with* Ex. 4. It is unknown to Plaintiffs why both Buff and Bernhard received hundreds of thousands more shares of stock in the few months between the ManifestRx and Eir Transactions.

**M.** **The Director Defendants Intentionally Concealed Buff's Preferred Units In Eir Midco To Defraud Plaintiffs Into Supporting The Eir Transaction.**

95. The Director Defendants intentionally concealed that Buff would be receiving preferred units in the Eir Transaction, even in the face of persistent questioning by Plaintiffs including Barton. They did so to defraud Plaintiffs into signing the Release and otherwise supporting the Eir Transaction.

96. This conclusion is supported by many facts:

- The Merger Agreement, dated December 27, 2022, references and incorporates the LLC Agreement, Exhibit A to which is the Membership Ledger which documented the units going to Buff.

- Director Defendants knew that revealing that almost one million preferred units were going to Buff would make Plaintiffs less likely to sign the Release or otherwise support the Eir Transaction because it was therefore a self-dealing transaction and because Buff had enticed Plaintiffs into participating in the ManifestRx Transaction on the basis of his financial support of the entity.

- Long before the Membership Ledger was provided to Plaintiffs, Director Defendants revealed that there were additional capital contributions above what Eir was contributing, and additional preferred units beyond what Eir would receive. On information and belief, those capital contributions and preferred units were intended to be Buff's.

- Director Defendants' shifting and unbelievable explanations and targets for blame, including their own counsel.

- Buff's and Director Defendants' past pattern of misrepresentation and statements leading to fraud allegations, both as to Revive Holdco and (as set forth below) otherwise.

**N.** **Director Defendants Bernhard And Lerch Keep Their Jobs.**

97. The January 24, 2023 press release announcing the Eir Transaction ("Press Release") demonstrates makes it clear that Eir Midco would keep the services existing Revive Holdco management – most prominently Director Defendants Lerch and Bernhard.

98. That press release referred to Buff as "ReviveHealth Executive Chairman" and Bernhard as "ReviveHealth CEO," leading to the inference that they would continue to function as such post-transaction.

99. Presumably, then, director Lerch, ReviveHealth Chief Financial Officer, was to be treated the same. In the Stockholders Letter, Bernhard stated

that stockholders were to "direct" any questions to "Lerch", suggesting that he also would continue.

100. In the Press Release, Brett Carlson of Eir Partners stated that "we believe we have the leadership . . . to execute on our ambitious vision," excluding Eir Midco finding other outside "leadership" to replace Bernhard or Lerch.

101. Section 7.1(a) of the Eir Midco LLC Agreement references Bernhard as one of its initial managers along with Buff.

**O.    The Eir Transaction Was At An Unfair Price As To Plaintiffs.**

102. The Eir Transaction was at an unfair price for Plaintiffs as to their prior shares of stock in Revive Holdco. Buff expropriated stock for himself that, at worst, should instead have gone to all Revive Holdco stockholders. Moreover, barely five months previously, the Lascano Plaintiffs paid $1.5M for 15M shares. Yet the Eir Transaction massively diluted such shares. Eir SPV was given more than 26M preferred units in Eir Midco, which consisted approximately 97% of all preferred units (Buff received the rest) and 53.09% of the total units.

**P.    Each Director Defendant Was Interested And/or Not Independent.**

103. As to the Eir Transaction, each Director Defendant was interested and/or not independent of Buff.

104. **Howard Buff** – Buff was personally interested in the Eir Transaction. Unlike any other stockholder, even any other preferred stockholder, Buff was to

get preferred units in Eir Midco without (unlike the Eir Defendants) putting any additional money in Eir Midco. Moreover, he was to use the Eir Transaction to attempt to escape liability in connection with Revive Holdco by virtue of the unlawful Release.

105. **Jeff Bernhard** – Bernhard was interested as the Eir Transaction ensured he would keep his job as an executive in Eir Midco, and because the proposed Release would eliminate his liability for Revive Holdco's business activities in the Fall of 2022 that violated Buff's representations to stockholders given at the June 23, 2022 meeting Bernhard attended. He was also not independent of Buff, as he relied upon his support to keep his job, not having significant voting stock holdings himself.

106. **Stephen Lerch** – Lerch was interested as the Eir Transaction ensured he would continue to have employment as to the new business, and because the proposed Release would eliminate his liability for Revive Holdco's business activities in the Fall of 2022 that violated Buff's representations to stockholders given at the June 23, 2022 meeting Lerch attended. He was also not independent of Buff, as he relied upon his support to keep his job, not having any stock holdings himself.

**Q.** **Buff Was Revive Holdco's Controlling Stockholder.**

107.    Pursuant to Article IV of the Revive Holdco Charter, while Revive Holdco had two classes each of Common and Preferred stock, generally only the A Common and A-1 Preferred had voting rights.

108.    As of the ManifestRx Transaction, the following stockholders had voting power:

| Name | A Common | A-1 Preferred | TOTAL | Percentage |
|---|---|---|---|---|
| Howard Buff | 2,500,000 | 271,958 | 2,771,958 | **31.6%** |
| John Walker | 3,000,000 | 381,958 | 3,381,958 | **38.6%** |
| Mark Dumoff | 2,500,000 | 61,958 | 2,561,958 | **29.2%** |
| Jeff Bernhard | 0 | 50,000 | 50,000 | **0.6%** |
| **TOTAL** | **8,000,000** | **765,874** | **8,765,874** | |

109.    As of the Eir Transaction, Buff was Revive Holdco's controlling stockholder.

110.    He was Revive Holdco's Executive Chairman.  He presented himself as being Revive Holdco's controlling stockholder before the Eir Transaction even without a formal officer role, providing assurances and representations on behalf of himself and Revive Holdco in the June 2022 Meetings.

111. Given his stock holdings, he only needed to persuade one of stockholders John Walker and Mark Dumoff to have an absolute majority of Revive Holdco's stock.

112. Walker was not independent of Buff. Walker previously worked for BuffCo Holdings, whose Managing Partner is Buff, until December of 2020. He is also associated with Buff in the litigation involving S&S Healthcare Strategies, Ltd. ("S&S Healthcare") discussed below. He became Chief Medical Officer of S&S Healthcare, under Buff as sole Manager and Chief Executive Officer. Walker thus needed to stay in Buff's good graces if he was to continue at S&S Healthcare. Moreover, as someone who had often previously worked with Buff and presumably wished to preserve future opportunities with Buff and/or his network, he would not be in a position to vote down the Eir Transaction that personally benefitted Buff.

113. Dumoff was also not independent of Buff. Dumoff was a co-Founder of Revive Holdco's predecessor. As someone who had previously worked with Buff and presumably wished to preserve future opportunities with Buff and/or his network, he would not be in a position to vote down such a transaction that personally benefitted Buff.

114. For reasons as set forth above, Buff should be treated as if he controlled Walker's and Dumoff's votes, as he effectively did.

**R.  Buff Is Building A Track Record Of Deal Litigation.**

115.  This is, unfortunately, not the first litigation or serious legal disputes regarding an M&A transaction Buff has been involved in.

116.  A May 2020 pleading in *S&S Healthcare Strategies, Ltd. v. S&S Holdco, Inc.*, Case No. 1:20-cv-00198, in federal District Court in Ohio, alleged fraud in the inducement against Buff (the "Pleading").

117.  Third party plaintiffs (the "S&S Healthcare Sellers") in that case entered into an August 2018 purchase agreement pursuant to which they sold their business to a group lead by Buff.

118.  The Pleading alleges at paragraph 30 that "Buff . . . made a series of verbal commitments regarding post-Closing operation of the Company . . . which (i) Buff acknowledged were necessary for the successful operation of the Company post-Closing; and (ii) were necessary in order for [Seller Complainants] to sell their ownership of the Company (*i.e.*, enter into the Purchase Agreement)."

119.  S&S Healthcare Sellers alleged a claim of "FRAUD IN THE INDUCEMENT" against Buff, alleging among other things that Buff had made "false and misleading representations" to them "with actual knowledge that they were false and misleading" or "with reckless disregard for the truth."  Pleading ¶ 185-93.  They "would not have entered into" the deal if they had known the representations were false and misleading at the time.  *Id.*

120.     Another third-party defendant in this litigation was John Walker, who participated in running the company post-transaction along with Buff.   Pleading ¶ 62.   Walker was a significant stockholder in Revive Holdco as set forth above.

121.     In March 2021 the action was settled and dismissed.

122.     On or about August 10, 2022, immediately after the ManifestRx Transaction, Revive Holdco acquired iSelectMD (the "iSelectMD").   The former President of iSelectMD was Michael P. Iaquinta.   Plaintiffs were not aware of the pendency of the iSelectMD transaction before it occurred.

123.     Plaintiffs understand that Iaquinta subsequently retained counsel with regard to an issue with Buff and Revive Holdco concerning the iSelectMD transaction agreements.   Plaintiffs understand the dispute was settled out-of-court and a public complaint was never filed.

**S.     The Eir Defendants Knowingly Aided The Director Defendants In Their Wrongdoing.**

124.     The Eir Defendants knew of wrongdoing set forth above but agreed to the Eir Transaction regardless in an attempt to profit at Plaintiffs' expense.

125.     Defendant Carlson is not only Founder and CEO of Eir Partners, but also Manager of Eir Midco, and as such personally signed the Merger Agreement.

126.     In the January 24, 2023 press release announcing the Eir Transaction, Carlson displayed his intimate knowledge of the deal:

"It is a massive opportunity and unmet need in the market to deliver a truly disruptive employee healthcare experience," said Brett Carlson, Managing Member at Eir Partners. "We can do much better in this country and we believe we have the leadership, solution set, and mission to execute on or ambitious vision."

127. The "leadership" and "mission" he referenced referred largely or entirely to Revive Holdco, while the "solution set" referenced Revive Holdco plus SwiftMD. Carlson boasted about acquiring a valuable business, yet he knew he had paid no cash for that business to its stockholders, but rather had massively diluted them.

128. Also, as set forth above:

a. The Stockholders Letter was sent out on behalf of an entity, Revive Holdco, which Eir Defendants at that time controlled; therefore they knew and approved of or acquiesced to the attempt to require Plaintiffs to sign a bogus release.

b. The Eir Defendants knew that Buff did not in fact pay any "Contribution" in the Eir Transaction. Defendant Carlson nevertheless signed the Merger Agreement that treated Buff differently than any other Revive Holdco stockholder.

## COUNT I – DECLARATORY JUDGMENT

### (Against All Defendants)

129.    Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

130.    The Merger Agreement does not require Plaintiffs to sign any release to receive any units in the Eir Transaction.

131.    8 *Del. C.* 251(b)(5) requires the Merger Agreement to set forth the consideration that stockholders are entitled to receive upon the cancellation of their shares.

132.    Eir Holdco purported to require Plaintiffs to sign the Release before receiving any units or other consideration in the Eir Transaction.

133.    The Release is invalid for lack of consideration.

134.    There is a ripe controversy between Plaintiffs and Defendants, parties with real and adverse interests, warranting a declaratory judgment pursuant to 10 *Del. C.* § 6501 *et seq.*

135.    Plaintiffs are therefore entitled to a declaratory judgment that the Release is (a) invalid and (b) unnecessary for Revive Holdco unitholders to sign to receive units pursuant to the Merger Agreement.

## COUNT II – VIOLATION OF PREEMPTIVE RIGHTS

### (Against Revive Holdco and Eir Midco)

136. Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

137. Section 3 of the Stockholders Agreement provides all Revive Holdco stockholders with the right to receive their respective allotment of any additional securities Revive Holdco issues.

138. In the Merger Agreement, Revive Holdco newly issues common stock. The Merger Agreement provides for no ability for Plaintiffs to receive their respective allotment of such newly issued stock, thereby violating the Stockholders Agreement.

139. Plaintiffs are entitled to injunctive relief providing to them their preemptive rights that were violated; or alternatively damages for such violation.

## COUNT III – BREACH OF FIDUCIARY DUTY

### (Against the Director Defendants)

140. Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

141. The Director Defendants have and at all relevant times had fiduciary duties to Revive Holdco and its stockholders.

142. The Director Defendants knowingly, recklessly, and in bad faith breached their fiduciary duties of loyalty and good faith by approving the Eir Transaction.

143. Entire fairness review applies to the Eir Transaction because:

a. Buff as controlling stockholder stood on both sides of the Eir Transaction.

b. Buff was a conflicted controller, one stockholder who received greater and different consideration than any other stockholder.

c. Each director on the Board that voted to approve the Eir Transaction was conflicted based upon self-interest and/or lack of independence.

d. The Director Defendants acted in bad faith, including by awarding extra shares to Buff for no transaction consideration, by attempting to defraud Plaintiffs into supporting the Eir Transaction without knowing that Buff was to receive almost one million preferred units in Eir Midco, and by attempting to use the Eir Transaction in order for Plaintiffs to sign the Release releasing them from legal liability in connection with Revive Holdco deceive stockholders including Plaintiffs despite knowing such Release was invalid for lack of consideration.

144. The Director Defendants voted in favor of the Eir Transaction for self-interested reasons, including to protect themselves from liability in connection with Revive Holdco, to provide Buff with preferred equity in a new entity for no consideration, and to give themselves future employment at an expanded company that included SwiftMD.

145. The Eir Transaction was and is not entirely fair to Plaintiffs.

146. Plaintiffs have no adequate remedy at law.

## COUNT IV – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against the Eir Defendants)

147. Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

148. The Director Defendants by virtue of being directors to Revive Holdco had a fiduciary duty to Revive Holdco and its stockholders, including Plaintiffs.

149. The Individual Defendants breached that duty, as alleged above.

150. The Eir Defendants knowingly participated in that breach, including but not limited to because they knew that the Release demanded was invalid but nevertheless approved and/or acquiesced to demanding it; because they profited from the Eir Transaction at the expense of Plaintiffs; and because they agreed to

give Buff close to one million preferred units in Eir Midco knowing he had not contributed cash or assets in the Eir Transaction.

151. Plaintiffs were damaged by the concerted actions of the Director Defendants and the Eir Defendants, including by Plaintiffs' receipt of unfair consideration in the Eir Transaction.

## PRAYER FOR RELIEF

Wherefore Plaintiffs respectfully requests that this Court enter an order:

1. Declaring that the Director Defendants breached their fiduciary duties owed to Revive Holdco and Plaintiffs;

2. Declaring that the Eir Defendants aided and abetted breaches of fiduciary duty owed to Plaintiffs;

3. Declaring that the Release is (a) invalid and (b) unnecessary for Revive Holdco unitholders to sign to receive units pursuant to the Merger Agreement;

4. Injunctive relief allowing Plaintiffs to exercise their preemptive rights;

5. Awarding damages or equivalent equitable relief to Plaintiffs, including as to assets improperly received by the Director Defendants as a result of their breaches of fiduciary duty and for the violation of Plaintiff's preemptive rights;

6.    Awarding pre- and post-judgment interest;

7.    Awarding Plaintiffs their costs; and

8.    Granting such other relief as the Court deems proper.


*/s/ Evan Williford*
Evan O. Williford (#4162)
The Williford Firm LLC
1007 N. Orange Street, Ste. 235
Wilmington, DE  19801
*Attorney for Plaintiffs*

DATED:  July 25, 2023

# Exhibit 1

# MEMBERSHIIP LEDGER

(As of December 27, 2022)

| Member Name & Address | Amount of Capital Contribution | Number of Preferred Units | Pro-rata Percentage of Preferred Units | Number of Common Units | Pro-rata Percentage of Common Units | Number of Earnout Units | Pro-rata Percentage of Earnout Units | Total Company Percentage | Management Member |
|---|---|---|---|---|---|---|---|---|---|
| Eir RH SPV, LLC c/o Eir Partners Capital, LLC 801 Brickell Avenue, Suite 800 Miami, FL 33131 Attention: Brett Carlson E-mail: bcarlson@eirpartners.com | $28,000,000.00 | 26,084,623.87 | 96.55% | 0 | 0% | 0 | 0% | 53.09% | No |
| Howard Buff | $1,000,000.00 | 931,593.71 | 3.45% | 3,581,958.00 | 16.20% | 3,581,958.00 | 19.48% | 9.19% | Yes |
| John Walker | 0 | 0 | 0% | 3,301,958.00 | 14.93% | 3,301,958.00 | 17.96% | 6.72% | Yes |
| Mark Dumoff | 0 | 0 | 0% | 2,660,000.00 | 12.03% | 2,660,000.00 | 14.47% | 5.41% | Yes |
| Jeff Bernhard | 0 | 0 | 0% | 300,000.00 | 1.36% | 300,000.00 | 1.63% | 0.61% | Yes |
| L. Andrew Eskew | 0 | 0 | 0% | 525,000.00 | 2.37% | 525,000.00 | 2.86% | 1.07% | Yes |
| Anthony Atala | 0 | 0 | 0% | 275,000.00 | 1.24% | 275,000.00 | 1.50% | 0.56% | No |
| Troy Hilbert and Marie Reid Hilbert | 0 | 0 | 0% | 300,000.00 | 1.36% | 300,000.00 | 1.63% | 0.61% | No |
| Anthony Sedberry | 0 | 0 | 0% | 150,000.00 | 0.68% | 150,000.00 | 0.82% | 0.31% | No |
| Robin Handy | 0 | 0 | 0% | 250,000.00 | 1.13% | 250,000.00 | 1.36% | 0.51% | Yes |
| Elisabeth Stambaugh and Peter Sojka | 0 | 0 | 0% | 75,000.00 | 0.34% | 75,000.00 | 0.41% | 0.15% | No |
| Scot Disch | 0 | 0 | 0% | 10,000.00 | 0.05% | 10,000.00 | 0.05% | 0.02% | Yes |
| Karen Pollard | 0 | 0 | 0% | 4,000.00 | 0.02% | 4,000.00 | 0.02% | 0.01% | Yes |
| Brian Moorman | 0 | 0 | 0% | 250,000.00 | 1.13% | 250,000.00 | 1.36% | 0.51% | No |
| Pat Loughren | 0 | 0 | 0% | 100,000.00 | 0.45% | 100,000.00 | 0.54% | 0.20% | No |
| Matt Bernhard | 0 | 0 | 0% | 50,000.00 | 0.23% | 50,000.00 | 0.27% | 0.10% | No |
| Lisa Soucy | 0 | 0 | 0% | 100,000.00 | 0.45% | 100,000.00 | 0.54% | 0.20% | Yes |
| Adam Leggette | 0 | 0 | 0% | 50,000.00 | 0.23% | 50,000.00 | 0.27% | 0.10% | Yes |

| Name | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Greg Licata | 0 | 0% | 25,000.00 | 25,000.00 | 0.11% | 0.14% | 0.05% | Yes |
| Apero Med, LLC | 0 | 0% | 764,973.00 | 764,973.00 | 3.46% | 4.16% | 1.56% | Yes |
| Discidium Capital, LLC | 0 | 0% | 1,137,390.00 | 1,137,390.00 | 5.14% | 6.19% | 2.32% | Yes |
| Joyce Storm | 0 | 0% | 28,885.00 | 28,885.00 | 0.13% | 0.16% | 0.06% | No |
| Daniel Lascano | 0 | 0% | 61,312.00 | 61,312.00 | 0.28% | 0.33% | 0.12% | No |
| Daniel Lascano 2012 Family Trust | 0 | 0% | 72,484.00 | 72,484.00 | 0.33% | 0.39% | 0.15% | No |
| The Samaritan Project, Inc. | 0 | 0% | 100,715.00 | 100,715.00 | 0.46% | 0.55% | 0.20% | No |
| Pacific Premier Trust, Custodian FBO Daniel 'R' Lascano, IRA | 0 | 0% | 40,439.00 | 40,439.00 | 0.18% | 0.22% | 0.08% | No |
| Pacific Premier Trust, Custodian FBO Emil Costa, ROTH IRA | 0 | 0% | 7,630.00 | 7,630.00 | 0.03% | 0.04% | 0.02% | No |
| Pacific Premier Trust, Custodian FBO Suleman Lunat, IRA | 0 | 0% | 3,815.00 | 3,815.00 | 0.02% | 0.02% | 0.01% | No |
| Pacific Premier Trust, Custodian FBO Jake Foley III, IRA | 0 | 0% | 15,260.00 | 15,260.00 | 0.07% | 0.08% | 0.03% | No |
| Christopher Stuart Barton | 0 | 0% | 15,260.00 | 15,260.00 | 0.07% | 0.08% | 0.03% | Yes |
| Michael J. Dubilier | 0 | 0% | 15,260.00 | 15,260.00 | 0.07% | 0.08% | 0.03% | Yes |
| Mail Venture Partners, LLC | 0 | 0% | 15,260.00 | 15,260.00 | 0.07% | 0.08% | 0.03% | Yes |
| John Troubh | 0 | 0% | 38,150.00 | 38,150.00 | 0.17% | 0.21% | 0.08% | No |
| Edward Nahem | 0 | 0% | 15,260.00 | 15,260.00 | 0.07% | 0.08% | 0.03% | No |
| Chadwick S. Lange, Jr 1993 Irrevocable Trust | 0 | 0% | 7,630.00 | 7,630.00 | 0.03% | 0.04% | 0.02% | No |
| Bob O'Donnell | 0 | 0% | 15,260.00 | 15,260.00 | 0.07% | 0.08% | 0.03% | No |
| ISREVIVEINVESCO, LLC | 0 | 0% | 1,500,000.00 | 1,500,000.00 | 6.78% | 8.16% | 3.05% | No |
| Hill Creek – Revive SPV, LLC | 0 | 0% | 1,850,000.00 | 1,850,000.00 | 8.37% | 10.06% | 3.77% | No |
| Ken Goulet | 0 | 0% | 350,000.00 | 350,000.00 | 1.58% | 1.90% | 0.71% | No |
| EQV Capital | 0 | 0% | 325,000.00 | 325,000.00 | 1.47% | 1.77% | 0.66% | Yes |
| Ajbani, Keyur | 0 | 0% | 5,619.00 | 5,619.00 | 0.03% | 0% | 0.01% | No |
| Algozzine, Keith | 0 | 0% | 20,972.00 | 20,972.00 | 0.09% | 0% | 0.04% | No |
| Andrew Marteloff, Trustee Marteloff Family Trust, U/A 12/23/93 | 0 | 0% | 8,247.00 | 8,247.00 | 0.04% | 0% | 0.02% | No |

| Name | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Ashar, Tom | 0 | 0% | 15,025.00 | 0.07% | 0 | 0% | 0.03% | No |
| Bachman, Michael C. | 0 | 0% | 6,770.00 | 0.03% | 0 | 0% | 0.01% | No |
| Bianciella-Thomas, Mary Ann | 0 | 0% | 3,552.00 | 0.02% | 0 | 0% | 0.01% | No |
| Bibighaus, Michael | 0 | 0% | 29,757.00 | 0.13% | 0 | 0% | 0.06% | No |
| Brown, Bruce | 0 | 0% | 157,157.00 | 0.71% | 0 | 0% | 0.32% | No |
| Butterfass, Andrew | 0 | 0% | 2,312.00 | 0.01% | 0 | 0% | 0.00% | No |
| Caputo, Amy Wray | 0 | 0% | 1,076,283.00 | 4.87% | 0 | 0% | 2.19% | Yes |
| Collin, Carlos | 0 | 0% | 5,160.00 | 0.02% | 0 | 0% | 0.01% | No |
| Daval Group, LLC | 0 | 0% | 17,205.00 | 0.08% | 0 | 0% | 0.04% | No |
| Dickinson, Dan | 0 | 0% | 975.00 | 0.00% | 0 | 0% | 0.00% | No |
| Dittrich, D.O., Freya, J. | 0 | 0% | 3,431.00 | 0.02% | 0 | 0% | 0.01% | No |
| Donaldson (Friedman/Bee) | 0 | 0% | 33,944.00 | 0.15% | 0 | 0% | 0.07% | No |
| Dotro, Thomas and Marisa | 0 | 0% | 3,440.00 | 0.02% | 0 | 0% | 0.01% | No |
| EMC Helathcare Services | 0 | 0% | 1,840.00 | 0.01% | 0 | 0% | 0.00% | No |
| Femia, Sharon L. | 0 | 0% | 15,136.00 | 0.07% | 0 | 0% | 0.03% | No |
| Friedman, Kim and Robert (Kim Donaldson and ex-spouse) | 0 | 0% | 12,040.00 | 0.05% | 0 | 0% | 0.02% | No |
| Gorenstein, S | 0 | 0% | 14,550.00 | 0.07% | 0 | 0% | 0.03% | No |
| Greenman, Rochelle A. | 0 | 0% | 14,785.00 | 0.07% | 0 | 0% | 0.03% | No |
| Guillen, Steve | 0 | 0% | 1,720.00 | 0.01% | 0 | 0% | 0.00% | No |
| Holterman, Robert | 0 | 0% | 3,034.00 | 0.01% | 0 | 0% | 0.01% | No |
| Hugh Zaretsky, Trustee of Royal Empire Venture, Inc. 401K | 0 | 0% | 6,880.00 | 0.03% | 0 | 0% | 0.01% | No |
| Kaplan, Julius A. | 0 | 0% | 4,816.00 | 0.02% | 0 | 0% | 0.01% | No |
| Katz, Alan A. | 0 | 0% | 9,506.00 | 0.04% | 0 | 0% | 0.02% | No |
| Kelley, Colleen and Mendolia, Antonino | 0 | 0% | 3,443.00 | 0.02% | 0 | 0% | 0.01% | No |
| Kieldighter, Myrl | 0 | 0% | 10,750.00 | 0.05% | 0 | 0% | 0.02% | No |
| Koval, Richard | 0 | 0% | 42,995.00 | 0.19% | 0 | 0% | 0.09% | No |
| Lanigan, Michael David | 0 | 0% | 6,502.00 | 0.03% | 0 | 0% | 0.01% | No |

| Name | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Lawlor, John | 0 | 0% | 1,124,842.00 | 5.09% | 0 | 0% | 2.29% | Yes |
| Light, Andrea M. | 0 | 0% | 5,177.00 | 0.02% | 0 | 0% | 0.01% | No |
| Long, Heather | 0 | 0% | 10,062.00 | 0.05% | 0 | 0% | 0.02% | No |
| Mankowitz, Scott L. | 0 | 0% | 1,881.00 | 0.01% | 0 | 0% | 0.00% | No |
| Mary D'Agostino Mix (Alex D'Agostino) | 0 | 0% | 5,160.00 | 0.02% | 0 | 0% | 0.01% | No |
| McMannon, Donna | 0 | 0% | 2,589.00 | 0.01% | 0 | 0% | 0.01% | No |
| Mehta, Nimish H. | 0 | 0% | 3,170.00 | 0.01% | 0 | 0% | 0.01% | No |
| Mehta, Nimish H. & Minal | 0 | 0% | 6,863.00 | 0.03% | 0 | 0% | 0.01% | No |
| Miller, Leslie J | 0 | 0% | 10,011.00 | 0.05% | 0 | 0% | 0.02% | No |
| Miller, Leslie J. and Salzar, Alicia J. | 0 | 0% | 3,010.00 | 0.01% | 0 | 0% | 0.01% | No |
| Millstein, Eric | 0 | 0% | 6,020.00 | 0.03% | 0 | 0% | 0.01% | No |
| Nazziola, Eric A. | 0 | 0% | 11,020.00 | 0.05% | 0 | 0% | 0.02% | No |
| Oswari, A. | 0 | 0% | 26,645.00 | 0.12% | 0 | 0% | 0.05% | No |
| Oswari, Dan | 0 | 0% | 762.00 | 0.00% | 0 | 0% | 0.00% | No |
| Pegasus Emergency Medicine Group, NY, PC | 0 | 0% | 3,440.00 | 0.02% | 0 | 0% | 0.01% | No |
| Pollack, Michael | 0 | 0% | 20,640.00 | 0.09% | 0 | 0% | 0.04% | No |
| Radke, Cynthia | 0 | 0% | 16,531.00 | 0.07% | 0 | 0% | 0.03% | No |
| Raskin, Russell | 0 | 0% | 66,250.00 | 0.30% | 0 | 0% | 0.13% | No |
| Ritterman, Michael | 0 | 0% | 28,896.00 | 0.13% | 0 | 0% | 0.06% | No |
| Ruzich, Jeffery V. | 0 | 0% | 397.00 | 0.00% | 0 | 0% | 0.00% | No |
| Ruzich, Jeffry & Canning, Scott | 0 | 0% | 17,217.00 | 0.08% | 0 | 0% | 0.04% | No |
| Sama, Michael | 0 | 0% | 43,410.00 | 0.20% | 0 | 0% | 0.09% | No |
| Schamban, Neil | 0 | 0% | 3,440.00 | 0.02% | 0 | 0% | 0.01% | No |
| Sharma, Rahul | 0 | 0% | 1,720.00 | 0.01% | 0 | 0% | 0.00% | No |
| Sheff, Stanley A. | 0 | 0% | 65,353.00 | 0.30% | 0 | 0% | 0.13% | No |
| Stark, Susan S. | 0 | 0% | 18,060.00 | 0.08% | 0 | 0% | 0.04% | No |
| Strauss, Robert | 0 | 0% | 129,759.00 | 0.59% | 0 | 0% | 0.26% | No |
| Strauss, Susan | 0 | 0% | 64,879.00 | 0.29% | 0 | 0% | 0.13% | No |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Teed, Shawn and Deirdre | 0 | 0 | 0% | 6,880.00 | 0.03% | 0 | 0% | 0.01% | No |
| Thomas, James | 0 | 0 | 0% | 3,094.00 | 0.01% | 0 | 0% | 0.01% | No |
| Trankovich, Michelle | 0 | 0 | 0% | 482.00 | 0.00% | 0 | 0% | 0.00% | No |
| Trpis, Martin | 0 | 0 | 0% | 36,151.00 | 0.16% | 0 | 0% | 0.07% | No |
| Van der Steeg, John | 0 | 0 | 0% | 3,440.00 | 0.02% | 0 | 0% | 0.01% | No |
| Weis, Michael and McIntosh, Jane | 0 | 0 | 0% | 5,160.00 | 0.02% | 0 | 0% | 0.01% | No |
| Devine, Mark | 0 | 0 | 0% | 165,924.00 | 0.75% | 0 | 0% | 0.34% | Yes |
| Alan Lemerande | 0 | 0 | 0% | 36,120.00 | 0.16% | 0 | 0% | 0.07% | No |
| Yu, Kenneth | 0 | 0 | 0% | 60,212.00 | 0.27% | 0 | 0% | 0.12% | No |
| Marquis, David | 0 | 0 | 0% | 2,408.00 | 0.01% | 0 | 0% | 0.00% | No |
| Deatrich, Dylan | 0 | 0 | 0% | 2,408.00 | 0.01% | 0 | 0% | 0.00% | No |
| Prescott-Coraggio, Jennifer | 0 | 0 | 0% | 6,020.00 | 0.03% | 0 | 0% | 0.01% | No |
| Puopolo, Anthony | 0 | 0 | 0% | 2,408.00 | 0.01% | 0 | 0% | 0.00% | No |
| Staff 72 | 0 | 0 | 0% | 6,020.00 | 0.03% | 0 | 0% | 0.01% | No |
| Staff 73 | 0 | 0 | 0% | 6,020.00 | 0.03% | 0 | 0% | 0.01% | No |
| Staff 74 | 0 | 0 | 0% | 6,020.00 | 0.03% | 0 | 0% | 0.01% | No |
| DiGuiseppe, James | 0 | 0 | 0% | 35,639.00 | 0.16% | 0 | 0% | 0.07% | No |
| Sheft, Stanley | 0 | 0 | 0% | 35,639.00 | 0.16% | 0 | 0% | 0.07% | No |
| Boren, Dan | 0 | 0 | 0% | 35,639.00 | 0.16% | 0 | 0% | 0.07% | No |
| Doerflinger, Preston | 0 | 0 | 0% | 35,639.00 | 0.16% | 0 | 0% | 0.07% | No |
| **TOTAL** | **$29,000,000.00** | **27,016,217.58** | **100.00%** | **22,114,272.00** | **100.00%** | **18,387,898.00** | **100.00%** | **100.00%** | |

# Exhibit 2



---

**From:** Stephen Lerch <slerch@revive.health>
**Date:** Wednesday, January 11, 2023 at 4:15 PM
**To:** Chris Barton <chrisbartontx@gmail.com>
**Subject:** Cap table

Chris:
here is the cap table
Steve

# Post Close Capitalization Table

| | Current Cap Table | | Post-Close with Fully Diluted Ownership | | | |
| | Units | % Ownership | Total Common Units | Total Preferred Units | Total Stock Value | % Ownership |
|---|---|---|---|---|---|---|
| Preferred | - | - | - | 27,016,217.58 | $29,000,000.00 | 52.82% |
| **Revive Common - Revive** | **18,387,897.58** | **94.40%** | **18,387,899.00** | **-** | **$19,738,109.88** | **35.95%** |
| Howard Buff | 3,581,958.00 | 18.39% | 3,581,958.00 | - | 3,844,978.73 | 7.00% |
| John Walker | 3,301,958.00 | 16.95% | 3,301,958.00 | - | 3,544,418.52 | 6.46% |
| Mark Dumoff | 2,660,000.00 | 13.66% | 2,660,000.00 | - | 2,855,321.98 | 5.20% |
| Jeff Bernhard | 300,000.00 | 1.54% | 300,000.00 | - | 322,028.80 | 0.59% |
| L. Andrew Eskew | 525,000.00 | 2.70% | 525,000.00 | - | 563,550.39 | 1.03% |
| Anthony Atala | 275,000.00 | 1.41% | 275,000.00 | - | 295,193.06 | 0.54% |
| Troy Hilbert and Marie Reid Hilbert | 300,000.00 | 1.54% | 300,000.00 | - | 322,028.80 | 0.59% |
| Anthony Sedberry | 150,000.00 | 0.77% | 150,000.00 | - | 161,014.40 | 0.29% |
| Robin Handy | 250,000.00 | 1.28% | 250,000.00 | - | 268,357.33 | 0.49% |
| Elisabeth Stambaugh and Peter Sojka | 75,000.00 | 0.39% | 75,000.00 | - | 80,507.20 | 0.15% |
| Scott Disch | 10,000.00 | 0.05% | 10,000.00 | - | 10,734.29 | 0.02% |
| Karen Pollard | 4,000.00 | 0.02% | 4,000.00 | - | 4,293.72 | 0.01% |
| Brian Moorman | 250,000.00 | 1.28% | 250,000.00 | - | 268,357.33 | 0.49% |
| Pat Loughren | 100,000.00 | 0.51% | 100,000.00 | - | 107,342.93 | 0.20% |
| Matt Bernhard | 50,000.00 | 0.26% | 50,000.00 | - | 53,671.47 | 0.10% |
| Lisa Soucy | 100,000.00 | 0.51% | 100,000.00 | - | 107,342.93 | 0.20% |
| Adam Leggette | 50,000.00 | 0.26% | 50,000.00 | - | 53,671.47 | 0.10% |
| Greg Licata | 25,000.00 | 0.13% | 25,000.00 | - | 26,835.73 | 0.05% |
| Apero Med, LLC | 764,973.05 | 3.93% | 764,973.00 | - | 821,144.45 | 1.50% |
| Discidium Capital, LLC | 1,137,390.15 | 5.84% | 1,137,390.00 | - | 1,220,907.77 | 2.22% |
| Joyce Storm | 28,884.87 | 0.15% | 28,885.00 | - | 31,006.01 | 0.06% |
| Daniel Lascano | 61,311.92 | 0.31% | 61,312.00 | - | 65,814.10 | 0.12% |
| Daniel Lascano 2012 Family Trust | 72,484.32 | 0.37% | 72,484.00 | - | 77,806.45 | 0.14% |
| The Samaritan Project, Inc. | 100,715.05 | 0.52% | 100,715.00 | - | 108,110.43 | 0.20% |
| Pacific Premier Trust, Custodian FBO Daniel 'R' Lascano, IRA | 40,438.62 | 0.21% | 40,439.00 | - | 43,408.41 | 0.08% |
| Pacific Premier Trust, Custodian FBO Emil Costa, ROTH IRA | 7,629.93 | 0.04% | 7,630.00 | - | 8,190.27 | 0.01% |
| Pacific Premier Trust, Custodian FBO Suleman Lunat, IRA | 3,814.96 | 0.02% | 3,815.00 | - | 4,095.13 | 0.01% |
| Pacific Premier Trust, Custodian FBO Jake Foley III, IRA | 15,259.86 | 0.08% | 15,260.00 | - | 16,380.53 | 0.03% |
| Christopher Stuart Barton | 15,259.86 | 0.08% | 15,260.00 | - | 16,380.53 | 0.03% |
| Michael J. Dubilier | 15,259.86 | 0.08% | 15,260.00 | - | 16,380.53 | 0.03% |
| Mail Venture Partners, LLC | 15,259.86 | 0.08% | 15,260.00 | - | 16,380.53 | 0.03% |
| John Troubh | 38,149.64 | 0.20% | 38,150.00 | - | 40,951.33 | 0.07% |
| Edward Nahem | 15,259.86 | 0.08% | 15,260.00 | - | 16,380.53 | 0.03% |
| Chadwick S. Lange, Jr 1993 Irrevocable Trust | 7,629.93 | 0.04% | 7,630.00 | - | 8,190.27 | 0.01% |
| Bob O'Donnell | 15,259.86 | 0.08% | 15,260.00 | - | 16,380.53 | 0.03% |
| ISREVIVEINVESCO, LLC | 1,500,000.00 | 7.70% | 1,500,000.00 | - | 1,610,143.98 | 2.93% |
| Hill Creek – Revive SPV, LLC | 1,850,000.00 | 9.50% | 1,850,000.00 | - | 1,985,844.24 | 3.62% |
| Ken Goulet | 350,000.00 | 1.80% | 350,000.00 | - | 375,700.26 | 0.68% |
| EQV Capital | 325,000.00 | 1.67% | 325,000.00 | - | 348,864.53 | 0.64% |
| | | | | | | |
| **Phantom Equity - Revive** | **1,089,998.00** | **5.60%** | **2,015,833.00** | **-** | **$2,163,854.24** | **3.94%** |
| Kara Walker | 25,000.00 | 0.13% | 25,000.00 | - | 26,835.73 | 0.05% |
| Dave Kovel | 350,000.00 | 1.80% | 350,000.00 | - | 375,700.26 | 0.68% |
| Samantha Guidici Berdecia | 25,000.00 | 0.13% | 25,000.00 | - | 26,835.73 | 0.05% |
| Alex Mohseni | 8,333.00 | 0.04% | 8,333.00 | - | 8,944.89 | 0.02% |
| Sergio Wagner | 16,666.00 | 0.09% | 50,000.00 | - | 53,671.47 | 0.10% |
| Jordan Taflin | 16,666.00 | 0.09% | 50,000.00 | - | 53,671.47 | 0.10% |
| John Dallo | - | 0.00% | 10,000.00 | - | 10,734.29 | 0.02% |
| Sheronda Malcolm | - | 0.00% | 10,000.00 | - | 10,734.29 | 0.02% |
| Doug Aldeen | - | 0.00% | 37,500.00 | - | 40,253.60 | 0.07% |
| Stephen Lerch | 70,000.00 | 0.36% | 70,000.00 | - | 75,140.05 | 0.14% |
| Dr. Julie Guenther | - | 0.00% | 0.00 | - | - | - |
| Mark Orlando | 50,000.00 | 0.26% | 50,000.00 | - | 53,671.47 | 0.10% |
| Health Alford | 10,000.00 | 0.05% | 10,000.00 | - | 10,734.29 | 0.02% |
| Eric Josovitz | 10,000.00 | 0.05% | 10,000.00 | - | 10,734.29 | 0.02% |
| Jeff Bernhard | 200,000.00 | 1.03% | 935,000.00 | - | 1,003,656.41 | 1.83% |
| Lisa Soucy | - | 0.00% | 15,000.00 | - | 16,101.44 | 0.03% |
| Adam Leggette | - | 0.00% | 10,000.00 | - | 10,734.29 | 0.02% |
| Greg Licata | - | 0.00% | 25,000.00 | - | 26,835.73 | 0.05% |
| Robin Handy | 8,333.00 | 0.04% | 25,000.00 | - | 26,835.73 | 0.05% |
| L. Andrew Eskew | 300,000.00 | 1.54% | 300,000.00 | - | 322,028.80 | 0.59% |

| SwiftMD Common - SwiftMD | 297,658.09 | 100.00% | 3,726,373.00 | - | $3,999,998.03 | 7.29% |
|---|---|---|---|---|---|---|
| Ajbani, Keyur | 466.71 | 0.16% | 5,619.00 | - | $6,031.60 | 0.01% |
| Algozzine, Keith | 1,741.86 | 0.59% | 20,972.00 | - | 22,511.96 | 0.04% |
| Bachman, Michael C. | 562.25 | 0.19% | 6,770.00 | - | 7,267.12 | 0.01% |
| Bianciella-Thomas, Mary Ann | 295.00 | 0.10% | 3,552.00 | - | 3,812.82 | 0.01% |
| Bibighaus, Michael | 2,471.50 | 0.83% | 29,757.00 | - | 31,942.04 | 0.06% |
| Brown, Bruce | 13,052.86 | 4.39% | 157,157.00 | - | 168,696.93 | 0.31% |
| Butterfass, Andrew | 192.00 | 0.06% | 2,312.00 | - | 2,481.77 | 0.00% |
| Caputo, Amy Wray | 89,391.83 | 30.03% | 1,076,283.00 | - | 1,155,313.73 | 2.10% |
| Collin, Carlos | 428.57 | 0.14% | 5,160.00 | - | 5,538.90 | 0.01% |
| Daval Group, LLC | 1,429.00 | 0.48% | 17,205.00 | - | 18,468.35 | 0.03% |
| Dickinson, Dan | 81.00 | 0.03% | 975.00 | - | 1,046.59 | 0.00% |
| Dittrich, D.O., Freya, J. | 285.00 | 0.10% | 3,431.00 | - | 3,682.94 | 0.01% |
| Donaldson (Friedman/Bee) | 2,819.25 | 0.95% | 33,944.00 | - | 36,436.48 | 0.07% |
| Dotro, Thomas and Marisa | 285.71 | 0.10% | 3,440.00 | - | 3,692.60 | 0.01% |
| EMC Helatheare Services | 152.86 | 0.05% | 1,840.00 | - | 1,975.11 | 0.00% |
| Femia, Sharon L. | 1,257.14 | 0.42% | 15,136.00 | - | 16,247.43 | 0.03% |
| Friedman, Kim and Robert (Kim Donaldson and ex-spouse) | 1,000.00 | 0.34% | 12,040.00 | - | 12,924.09 | 0.02% |
| Gorenstein, S | 1,208.50 | 0.41% | 14,550.00 | - | 15,618.40 | 0.03% |
| Greenman, Rochelle A. | 1,228.00 | 0.41% | 14,785.00 | - | 15,870.65 | 0.03% |
| Guillen, Steve | 142.86 | 0.05% | 1,720.00 | - | 1,846.30 | 0.00% |
| Holterman, Robert | 252.00 | 0.08% | 3,034.00 | - | 3,256.78 | 0.01% |
| Hugh Zaretsky, Trustee of Royal Empire Venture, Inc. 401K | 571.43 | 0.19% | 6,880.00 | - | 7,385.19 | 0.01% |
| Kaplan, Julius A. | 400.00 | 0.13% | 4,816.00 | - | 5,169.64 | 0.01% |
| Katz, Alan A. | 789.50 | 0.27% | 9,506.00 | - | 10,204.02 | 0.02% |
| Kelley, Colleen and Mendolia, Antonino | 286.00 | 0.10% | 3,443.00 | - | 3,695.82 | 0.01% |
| Kicklighter, Myrl | 892.86 | 0.30% | 10,750.00 | - | 11,539.37 | 0.02% |
| Koval, Richard | 3,571.00 | 1.20% | 42,995.00 | - | 46,152.09 | 0.08% |
| Lanigan, Michael David | 540.00 | 0.18% | 6,502.00 | - | 6,979.44 | 0.01% |
| Lawlor, John | 93,425.00 | 31.39% | 1,124,942.00 | - | 1,207,438.38 | 2.20% |
| Light, Andrea M. | 430.00 | 0.14% | 5,177.00 | - | 5,557.14 | 0.01% |
| Long, Heather | 835.75 | 0.28% | 10,062.00 | - | 10,800.85 | 0.02% |
| Mankowitz, Scott L. | 156.25 | 0.05% | 1,881.00 | - | 2,019.12 | 0.00% |
| Mary D'Agostino Mix (Alex D'Agostino) | 428.57 | 0.14% | 5,160.00 | - | 5,538.90 | 0.01% |
| McManmon, Donna | 215.00 | 0.07% | 2,589.00 | - | 2,779.11 | 0.01% |
| Mehta, Nimish H. | 263.25 | 0.09% | 3,170.00 | - | 3,402.77 | 0.01% |
| Mehta, Nimish H. & Minal | 570.00 | 0.19% | 6,863.00 | - | 7,366.95 | 0.01% |
| Miller, Leslie J | 831.50 | 0.28% | 10,011.00 | - | 10,746.10 | 0.02% |
| Miller, Leslie J. and Salzar, Alicia J. | 250.00 | 0.08% | 3,010.00 | - | 3,231.02 | 0.01% |
| Millstein, Eric | 500.00 | 0.17% | 6,020.00 | - | 6,462.04 | 0.01% |
| Nazziola, Eric A. | 915.25 | 0.31% | 11,020.00 | - | 11,829.19 | 0.02% |
| Oswari, A. | 2,213.00 | 0.74% | 26,645.00 | - | 28,601.52 | 0.05% |
| Oswari, Dan | 63.25 | 0.02% | 762.00 | - | 817.95 | 0.00% |
| Pegasus Emergency Medicine Group, NY, PC | 285.71 | 0.10% | 3,440.00 | - | 3,692.60 | 0.01% |
| Pollack, Michael | 1,714.29 | 0.58% | 20,640.00 | - | 22,155.58 | 0.04% |
| Radke, Cynthia | 1,372.97 | 0.46% | 16,531.00 | - | 17,744.86 | 0.03% |
| Raskin, Russell | 5,502.50 | 1.85% | 66,250.00 | - | 71,114.69 | 0.13% |
| Ritterman, Michael | 2,400.00 | 0.81% | 28,896.00 | - | 31,017.81 | 0.06% |
| Ruzich, Jeffery V. | 33.00 | 0.01% | 397.00 | - | 426.15 | 0.00% |
| Ruzich, Jeffry & Canning, Scott | 1,430.00 | 0.48% | 17,217.00 | - | 18,481.23 | 0.03% |
| Sama, Michael | 3,605.50 | 1.21% | 43,410.00 | - | 46,597.57 | 0.08% |
| Schamban, Neil | 285.71 | 0.10% | 3,440.00 | - | 3,692.60 | 0.01% |
| Sharma, Rahul | 142.86 | 0.05% | 1,720.00 | - | 1,846.30 | 0.00% |
| Sheft, Stanley A. | 5,428.00 | 1.82% | 65,353.00 | - | 70,151.83 | 0.13% |
| Stark, Susan S. | 1,500.00 | 0.50% | 18,060.00 | - | 19,386.13 | 0.04% |
| Strauss, Robert | 10,777.25 | 3.62% | 129,759.00 | - | 139,287.11 | 0.25% |
| Strauss, Susan | 5,388.63 | 1.81% | 64,879.00 | - | 69,643.02 | 0.13% |
| Teed, Shawn and Deirdre | 571.43 | 0.19% | 6,880.00 | - | 7,385.19 | 0.01% |
| Thomas, James | 257.00 | 0.09% | 3,094.00 | - | 3,321.19 | 0.01% |
| Trankovich, Michelle | 40.00 | 0.01% | 482.00 | - | 517.39 | 0.00% |
| Trpis, Martin | 3,002.57 | 1.01% | 36,151.00 | - | 38,805.54 | 0.07% |
| Van der Steeg, John | 285.71 | 0.10% | 3,440.00 | - | 3,692.60 | 0.01% |
| Weis, Michael and McIntosh, Jane | 428.57 | 0.14% | 5,160.00 | - | 5,538.90 | 0.01% |
| Devine, Mark | 13,781.00 | 4.63% | 165,924.00 | - | 178,107.69 | 0.32% |
| Alan Lemerande | 3,000.00 | 1.01% | 36,120.00 | - | 38,772.27 | 0.07% |
| Yu, Kenneth | 5,001.00 | 1.68% | 60,212.00 | - | 64,633.33 | 0.12% |
| Marquis, David | 200.00 | 0.07% | 2,408.00 | - | 2,584.82 | 0.00% |
| Deatrich, Dylan | 200.00 | 0.07% | 2,408.00 | - | 2,584.82 | 0.00% |
| Prescott-Coraggio, Jennifer | 500.00 | 0.17% | 6,020.00 | - | 6,462.04 | 0.01% |
| Puopolo, Anthony | 200.00 | 0.07% | 2,408.00 | - | 2,584.82 | 0.00% |
| Warrant - McCrary, Jeannine | 500.00 | 0.17% | 6,020.00 | - | 6,462.04 | 0.01% |
| Warrant - McNeil, Ross | 500.00 | 0.17% | 6,020.00 | - | 6,462.04 | 0.01% |
| Warrant - Owens, Lorraine | 500.00 | 0.17% | 6,020.00 | - | 6,462.04 | 0.01% |
| DiGuiseppe, James | 0.00 | 0.00% | 35,639.00 | - | 38,255.95 | 0.07% |
| Sheft, Stanley | 0.00 | 0.00% | 35,639.00 | - | 38,255.95 | 0.07% |
| Boren, Dan | 0.00 | 0.00% | 35,639.00 | - | 38,255.95 | 0.07% |
| Doerflinger, Preston | 0.00 | 0.00% | 35,639.00 | - | 38,255.95 | 0.07% |
| **Total - All Entities** | **19,775,553.67** | **100.00%** | **24,130,105.00** | **27,016,217.58** | **$54,901,962.15** | **100.00%** |

# Exhibit 3

| Stockholder | Number of Class A Common Shares | Number of Class B Common Shares | Number of Series A-1 Preferred Shares | Number of Series A-2 Preferred Shares |
|---|---|---|---|---|
| Howard Buff | 2,500,000 | | 271,958 | |
| John Walker | 3,000,000 | | 381,958 | |
| Mark Dumoff | 2,500,000 | | 61,958 | |
| L. Andrew Eskew | | 325,000 | | 200,000 |
| Anthony Atala | | 275,000 | | |
| Troy Hilbert and Marie Reid Hilbert | | 300,000 | | |
| Anthony Sedberry | | 150,000 | | |
| Robin Handy | | 100,000 | | |
| Elisabeth Stambaugh and Peter Sojka | | 75,000 | | |
| Scott Disch | | 10,000 | | |
| Brain Wellness, International, PLLC (Dr. Karen Pollard) | | 4,000 | | |
| Jeff Bernhard | | | 50,000 | |
| ISREVIVEINVESCO, LLC | | | | 1,150,000 |
| Hill Creek – Revive SPV, LLC | | | | 1,000,000 |

# Exhibit 4

## STOCKHOLDER OWNERSHIP

| Stockholders | Shares |
|---|---|
| Howard Buff | 3,581,958 |
| John Walker | 3,301,958 |
| Mark Dumoff | 2,660,000 |
| L. Andrew Eskew | 525,000 |
| Anthony Atala | 275,000 |
| Troy Hilbert and Marie Reid Hilbert | 300,000 |
| Anthony Sedberry | 150,000 |
| Robin Handy | 250,000 |
| Elisabeth Stambaugh and Peter Sojka | 75,000 |
| Scott Disch | 10,000 |
| Karen Pollard | 4,000 |
| Brian Moorman | 250,000 |
| Pat Loughren | 100,000 |
| Matt Bernhard | 50,000 |
| Lisa Soucy | 100,000 |
| Adam Leggette | 50,000 |
| Greg Licata | 25,000 |
| Apero Med, LLC | 764,973 |
| Discidium Capital, LLC | 1,037,390 |
| Joyce Storm | 28,885 |
| Daniel Lascano | 61,312 |
| Daniel Lascano 2012 Family Trust | 72,484 |
| The Samaritan Project, Inc. | 100,715 |
| Pacific Premier Trust, Custodian FBO Daniel 'R' Lascano, IRA | 40,439 |
| Pacific Premier Trust, Custodian FBO Emil Costa, ROTH IRA | 7,630 |
| Pacific Premier Trust, Custodian FBO Suleman Lunat, IRA | 3,815 |
| Pacific Premier Trust, Custodian FBO Jake Foley III, IRA | 15,260 |
| Christopher Stuart Barton | 15,260 |
| Michael J. Dubilier | 15,260 |
| Mail Venture Partners, LLC | 15,260 |
| John Troubh | 38,150 |
| Edward Nahem | 15,260 |
| Chadwick S. Lange, Jr 1993 Irrevocable Trust | 7,630 |
| Bob O'Donnell | 15,260 |
| Jeff Bernhard | 300,000 |
| ISREVIVEINVESCO, LLC | 1,500,000 |
| Hill Creek – Revive SPV, LLC | 1,850,000 |
| Ken Goulet | 350,000 |
| EQV Capital | 325,000 |
| Mark Orlando | 100,000 |
| **Total Shares** | **18,387,898** |

# EXHIBIT D



**RSUI Group, Inc.**
William Nielsen
945 East Paces Ferry Road
Suite 1800
Atlanta, GA 30326-1125

Phone   (404) 504 3756



October 13, 2023

**CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
Alan Wachs, Esq.
Smith Gambrell Russell
Bank of America Tower
50 N. Laura Street, Suite 2600
Jacksonville, FL 32202
Email: awachs@sgrlaw.com

| Re: | Insured: | **ReviveHealth, Inc.** |
|-----|----------|------------------------|
|     | Claimant(s): | **Daniel Lascano, et al.** |
|     | Policy: | **NPP703174** |
|     | Policy Period: | **12/14/22 – 12/27/22** |
|     | Limit of Liability: | **$2,000,000** |
|     | Issuing Company: | **RSUI Indemnity Company ("RIC")** |
|     | RSUI File: | **703—187074** |

Dear Mr. Wachs:

As previously advised, I am the representative at RSUI Group, Inc. ("RSUI") for RIC in connection with the above-referenced matter, which includes a lawsuit filed on July 25, 2023 in Delaware Chancery Court, styled *Daniel Lascano, et al., v. Howard Buff, et al.*, Case No. 2023-0758 (the "Lawsuit"). The Lawsuit has been tendered for defense and indemnity under the Private Company Management Liability Policy (the "Policy") referenced above. RSUI was first notified of the Lawsuit on September 12, 2023.

According to the Lawsuit, the Plaintiffs became stockholders of defendant Revive Holding Company, Inc. ("Revive Holdco") as part of a July 2022 transaction in which Revive Holdco acquired control of Advanced Pharmacy Concepts, LLC. Upon information and belief, Revive Holdco owned Revive Operating Company, Inc., which in turn owned the operating subsidiaries Advanced Pharmacy Concepts, LLC, and ReviveHealth, Inc. (the named Insured on the Policy). The Plaintiffs allege that their ownership interest in Revive Holdco was diluted when defendants Eir Partners Capital, LLC, and Eir RH Midco, LLC acquired all of the stock in Revive Holdco in December 2022, and Revive Holdco chairman and controlling shareholder Howard Buff received one million preferred units in Eir RH Midco despite paying nothing in connection with the Eir transaction. The Plaintiffs allege that Howard Buff, Jeff Bernhard, and Stephen Lerch breached their fiduciary duties as directors/officers of Revive Holdco by approving the Eir transaction for self-interested reasons, and that Eir RH Midco, LLC, Eir RH SPV, LLC, Eir Partners Capital, LLC, and Brett Carlson aided and abetted this breach by awarding Howard Buff the extra preferred units knowing that he had paid no consideration as part of the Eir transaction. Please note that by reference to these allegations we attribute no merit, but merely reference them as part of the description of the matter we received.

RSUI has reviewed the allegations of the Lawsuit in conjunction with the terms, conditions and exclusions of the captioned policy. The purpose of this letter is to provide you with RSUI's current coverage position and the workings of the Policy referenced above. Based on the Policy issued to ReviveHealth and the Lawsuit, under the Policy terms and conditions, coverage is precluded under the Policy for the reasons set forth below.

We direct your attention to the Policy's Insuring Agreements, at Section 1 of the Policy. The Policy's pertinent Insuring Agreement(s) are Insuring Agreement(s) B and C, which provide as follows:

In consideration of the payment of premium and in reliance upon all statements made to the Insurer in the Application, and subject to the terms, conditions, definitions, exclusions and limitations hereinafter provided, the Insurer agrees:

### SECTION I. - INSURING AGREEMENTS

B.   With the **Insured Organization** that if a **Claim** for a **Wrongful Act** is first made against any **Insured Person** during the **Policy Period** and reported in accordance with SECTION V — CONDITIONS, C. Notice of Claim or Circumstance of this policy, the **Insurer** will pay on behalf of the **Insured Organization** all **Loss** for which the **Insured Organization** is required or permitted to indemnify the **Insured Person.**

C.   With the **Insured Organization** that if a **Claim** for a **Wrongful Act** is first made against the **Insured Organization** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance of this policy, the **Insurer** will pay on behalf of the **Insured Organization** all **Loss** the **Insured Organization** is legally obligated to pay.

The Policy is triggered, subject to all other Policy terms, conditions and exclusions, by Claims for Wrongful Acts that are "first made" against the Insured Person under Insuring Agreement B, or against the Insured Organization under Insuring Agreement C, during the Policy Period and reported in accordance with conditions for notice of Claim.[1]

Insured Organization as defined in the Policy means:

H.   **Insured Organization** means:

1.   The organization named in Item 1. of the Declarations Page and any **Subsidiary** existing prior to or at the inception date of this policy; or
2.   Subject to SECTION V. – CONDITIONS, G. Merger, Consolidation or Acquisition of this policy, **Insured Organization** shall include any **Subsidiary** created or acquired after the inception date of this policy; or

---

[1] The Policy expired on December 27, 2022, but ReviveHealth elected to purchase an Extended Reporting Period Election, which provides that the Insured Organization shall have the right to give written notice of Claims first made against an Insured during the Extended Reporting Period for any Wrongful Act that occurred prior to December 27, 2022 and otherwise covered by the Policy. A Claim alleging any Wrongful Act that occurred on or subsequent to December 27, 2022 shall not be a covered Claim.

3. In the event a bankruptcy proceeding shall be instituted by or against the foregoing entities, the resulting debtor-in-possession (or equivalent status outside the United States), if any.

Subsidiary is defined in the Policy as:

Any entity of which the **Insured Organization**, either directly or indirectly, or through one or more of its **Subsidiaries**:

1. Owns more than fifty percent (50%) of the voting stock and/or outstanding securities; or

2. Has the right to elect or appoint more than fifty percent (50%) of the voting directors, management committee members or members of the Board of Managers.

Insured Person is defined in the Policy as:

1. Any past, present or future director, officer, or **Employee**, management committee members or members of the Board of Managers or Advisory Board Member of the **Insured Organization**….

The named defendants in the Lawsuit are Howard Buff, Jeff Bernhard, Stephen Lerch, Revive Holdco, Eir RH Midco, LLC, Eir RH SPV, LLC, Eir Partners Capital, LLC, and Brett Carlson. Revive Holdco, Eir RH Midco, LLC, Eir RH SPV, LLC, and Eir Partners Capital, LLC are not listed as Insured Organizations or Additional Named Insureds in the Policy, nor do they qualify as Subsidiaries of ReviveHealth, Inc. As such, these entities do not constitute Insureds under the Policy.

Howard Buff, Jeff Bernhard, and Stephen Lerch are named as defendants in their capacities as directors, officers, and/or stockholders of Revive Holdco, and Brett Carlson is named as a defendant in his capacity as the founder, CEO, and/or manager of Eir Partners Capital, LLC, and Eir RH Midco, LLC. With respect to an Insured Person, Wrongful Act is defined as any act, error, omission, misstatement, misleading statement or breach of duty "while acting in his or her capacity as [an Insured Person] and on behalf of the Insured Organization or any matter claimed against them solely by reason of their status as an Insured Person..." (emphasis added). Our understanding is that Howard Buff, Jeff Bernhard, and Brett Carlson are past, current, and/or future directors or officers of ReviveHealth, Inc.; however, the allegations asserted against them (and Stephen Lerch) in the Lawsuit are based solely on their actions taken as and in furtherance of their interests as directors, officers, and/or shareholders of Revive Holdco, Eir Partners Capital, LLC, and Eir RH Midco, LLC, which are not Insureds under the Policy. As such, the allegations made against them in the Lawsuit are not in connection with their statuses as Insured Persons of ReviveHealth, Inc., and therefore the Policy's Insuring Agreements are not triggered as to these individuals.

In view of the basis for this denial of coverage, RSUI has not recited all other Policy terms, conditions, or exclusions which maybe applicable. However, RSUI reserves any and all rights under the policy and available at law to deny coverage on additional and/or alternative basis.



Sincerely,

**William J. Nielsen**
Chief Claim Specialist
Management Liability Claims
P: (404) 504 3756
wnielsen@rsui.com

cc:     Howard Buff, ReviveHealth (hbuff@revive.health)
        Ashley Salane, Smith Gambrell Russell (asalane@sgrlaw.com)

# EXHIBIT E

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

Daniel Lascano, Daniel Lascano 2012 )
Family Trust, The Samaritan Project )
Inc., Pacific Premier Trust, Custodian )
FBO Daniel 'R' Lascano, IRA, )
Edward Nahem, Joyce Storm, Pacific )
Premier Trust, Custodian FBO Jake )
Foley III, IRA, Pacific Premier Trust, )
Custodian FBO Emil Costa, Roth IRA, )
John Troubh, Christopher Stuart )
Barton, Pacific Premier Trust, )
Custodian FBO Suleman Lunat, IRA, )
Michael J. Dubilier, and Robert )
O'Donnell, )
                       )
      *Plaintiffs,* )
                       )   C.A. No. 2023-0758-NAC
     v. )
                       )
Howard Buff, Jeff Bernhard, Stephen )
Lerch, Revive Holding Company, Inc., )
ReviveHealth, Inc., Eir RH Midco, )
LLC, Eir RH SPV, LLC, Eir Partners )
Capital, LLC, and Brett S. Carlson, )
                       )
      *Defendants*. )

## AMENDED COMPLAINT

Plaintiffs Daniel Lascano, Daniel Lascano 2012 Family Trust, The

Samaritan Project Inc., Pacific Premier Trust, Custodian FBO Daniel 'R' Lascano,

IRA (the first four plaintiffs together, the "Lascano Plaintiffs"), Edward Nahem,

Joyce Storm, Pacific Premier Trust, Custodian FBO Jake Foley III, IRA, Pacific

Premier Trust, Custodian FBO Emil Costa, Roth IRA, John Troubh, Christopher

Stuart Barton, Pacific Premier Trust, Custodian FBO Suleman Lunat, IRA, Michael J. Dubilier, and Robert O'Donnell (together, "Plaintiffs") hereby bring this Complaint against defendants Howard Buff, Jeff Bernhard, Stephen Lerch, Revive Holding Company, Inc., ReviveHealth, Inc., Eir RH Midco, LLC, Eir RH SPV, LLC, Eir Partners Capital, LLC, and Brett S. Carlson (together, "Defendants") as set forth below:

## INTRODUCTION

1.     In a July 2022 transaction (the "July Transaction"), Revive Holding Company, Inc. ("Revive Holdco") acquired control of Advanced Pharmacy Concepts, LLC d/b/a Manifest Pharmacy ("ManifestRx").   Plaintiffs became stockholders in Revive Holdco in that transaction; the Lascano Defendants paid $1.5M for Revive Holdco stock which was valued and sold at approximately $5.46 per share.

2.     Plaintiffs had positive expectations for Revive Holdco given personal assurances by defendant Howard Buff.  Buff was Revive Holdco's controlling stockholder; he was also a director and its Executive Chairman.  He assured Plaintiffs that Revive Holdco had closed significant preferred stock investments providing it with sufficient near-term capital.  He also assured them that, in any

event, there was also no reason for concern because Buff was wealthy and was willing to fund Revive Holdco himself.

3.      In December of 2022 – five months later – another transaction was announced (the "December Transaction").  In that transaction, a subsidiary of private equity company Eir Partners Capital, LLC ("Eir Partners"), Eir RH Midco, LLC ("Eir Midco"), acquired all stock in Revive Holdco.  Plaintiffs' stock was cancelled and replaced with common units in Eir Midco.  Eir Partners paid $28M in merger consideration, of which most went to purchase the stock of another entity, Telemedicine Management, Inc. d/b/a SwiftMD ("SwiftMD").  None went to stockholders of Revive Holdco including plaintiffs.

4.      Another subsidiary of Eir Partners, Eir RH SPV, LLC ("Eir SPV" and, together with Eir Midco, Eir Partners, and Brett S. Carlson, CEO of Eir Partners, the "Eir Defendants"), received more than 26M preferred units in Eir Midco.

5.      By way of the December Transaction, defendants unlawfully transferred most of the value of Plaintiffs' stock in Revive Holdco to themselves:

- Eir Partners was allowed to invest at, and Plaintiffs' new units in Eir Midco were massively diluted to, $1.07 per unit.  This deprived Plaintiffs of almost five-sixths of the value their stock was represented to be worth only five months before.

- While Plaintiffs only received common units, Eir Partners (and Buff) received millions of preferred units. Those units had rights which drastically lowered any remaining value in the Eir Midco common units. Preferred units had distribution rights giving themselves all distributions unless Eir Midco was a massive success.

- Plaintiffs were denied preemptive rights they were owed under the Revive Holdco stockholders agreement, even though defendants admitted the December Transaction triggered such rights.

- Defendants demanded that, in order to receive any supposed merger consideration, Plaintiffs sign a release approving the December Transaction and its merger agreement, and for circumstances in connection with Revive Holdco, contrary to black-letter Delaware law while withholding and concealing material information.

- Buff received side benefits of almost one million preferred units (not to mention 810,000 more common units) in Eir Midco despite paying no consideration in the December Transaction. Defendants actively and continuously concealed this fact from Plaintiffs by withholding an exhibit from the (already closed) merger agreement for almost one month to attempt to defraud them into agreeing to the transaction and signing the release without revealing it.

6. Substantial benefits went to Eir Defendants and Buff. The end-of-year transaction was driven by tax benefits potentially worth millions of dollars to Eir Partners. Eir Midco received substantial synergies by acquiring Revive Holdco along with SwiftMD, including because Revive Holdco management was to continue to manage the combined business. Plaintiffs received no premium for these synergies and benefits.

7. On information and belief, the Revive Holdco board of directors (the "Board") at the time of the December Transaction consisted of Buff as well as managers Jeff Bernhard and Stephen Lerch (the "Director Defendants"). The Board violated its fiduciary duties to Plaintiffs by approving the December Transaction which transferred much or all value from Plaintiffs' Revive Holdco stock to units owned by Buff and the Eir Defendants for self-interested reasons.

8. Buff was a controlling stockholder; he received substantial awards of units for no merger consideration and was able to demand the release to avoid liability in connection with Revive Holdco.

9. Bernhard and Lerch were not independent of Buff, and interested in the December Transaction themselves as they would keep their jobs at Eir Midco and were, like Buff, in a position to benefit from the release.

10. By this complaint, Plaintiffs brings legal claims: (1) to declare the release invalid; (2) to vindicate their preemptive rights; (3) for breach of fiduciary

duty against the Director Defendants who approved and caused the December Transaction; (4) against the Eir Defendants for aiding and abetting this breach in order to transfer most of the value of Plaintiffs' Revive Holdco stock to themselves; and (5) for breach of fiduciary duty against the Director and Eir Defendants for soliciting Plaintiffs to sign an unlawful release while not disclosing and concealing material facts concerning that release.

## THE PARTIES

11.    Plaintiffs Daniel Lascano, Daniel Lascano 2012 Family Trust, The Samaritan Project Inc., Pacific Premier Trust, Custodian FBO Daniel 'R' Lascano, IRA, Edward Nahem, Joyce Storm, Pacific Premier Trust, Custodian FBO Jake Foley III, IRA, Pacific Premier Trust, Custodian FBO Emil Costa, Roth IRA, John Troubh, Christopher Stuart Barton, Pacific Premier Trust, Custodian FBO Suleman Lunat, IRA, Michael J. Dubilier, and Robert O'Donnell are and/or were stockholders in Revive Holdco.

12.    Defendant Howard Buff is and/or was a director, Executive Chairman, and a substantial and controlling stockholder of Revive Holdco; and a director of ReviveHealth, Inc.

13.    Defendant Jeff Bernhard is and/or was a director and Chief Executive Officer of Revive Holdco and a director of ReviveHealth, Inc.

14.     Defendant Stephen Lerch is and/or was a director and Chief Financial Officer of Revive Holdco and a director of ReviveHealth, Inc.

15.     Defendant Revive Holding Company, Inc. ("Revive Holdco") is a Delaware corporation.

16.     Defendant ReviveHealth, Inc. ("ReviveHealth") is a Delaware corporation which is a subsidiary of Revive Holdco.

17.     Defendant Eir RH Midco, LLC ("Eir Midco") is a Delaware limited liability company.

18.     Defendant Eir RH SPV, LLC ("Eir SPV") is a Delaware limited liability company and a member of Eir Midco.

19.     Defendant Eir Partners Capital, LLC ("Eir Partners") is a Delaware limited liability company and the Manager of Eir SPV.

20.     Defendant Brett S. Carlson is Founder and Chief Executive Officer of Eir Partners; and Manager of Eir Midco.


## JURISDICTION

21.     This Court has personal jurisdiction over Revive Holdco and ReviveHealth as they are organized under Delaware law.  8 *Del. C.* § 321(a).

22. This Court has personal jurisdiction over the Director Defendants under 10 *Del. C.* § 3114(a) as they are and/or were directors of Delaware corporation Revive Holdco and ReviveHealth.

23. This Court has personal jurisdiction over Eir Midco, Eir SPV, and Eir Partners as they are each Delaware limited liability companies. 6 *Del. C.* § 18-105.

24. This Court has personal jurisdiction over Brett S. Carlson as manager of Eir Midco, a Delaware limited liability company. 6 *Del. C.* § 18-109.

25. Given that this is a proceeding asserting a claim of breach of fiduciary duty by directors of Revive Holdco, Article XII of the Certificate of Incorporation of Revive Holdco, dated July 13, 2022 (the "Revive Holdco Certificate of Incorporation"), effective at the time of that service, vests exclusive jurisdiction in the Court of Chancery in the State of Delaware.

26. Plaintiffs assert a claim for breach of fiduciary duty, an equitable claim over which this Court has subject matter jurisdiction.

27. In Section 8.13 of the Agreement and Plan of Merger regarding the December Transaction (the "Merger Agreement"), the parties to that agreement, including Eir Midco, Revive Holdco, Buff, and Bernhard, agreed to the exclusive jurisdiction of a state court located in Wilmington Delaware, such as this Court of Chancery, for claims which are related to the agreement such as these.

# FACTUAL ALLEGATIONS

## A. Buff Solicits Investments And A Transaction With ManifestRx In The Summer of 2022 With Funding Representations.

28. In the summer of 2022, Buff was soliciting support for, and additional investors in, a transaction (the "July Transaction") by which ReviveHealth Inc. would acquire Advanced Pharmacy Concepts, LLC d/b/a Manifest Pharmacy ("ManifestRx").

29. Buff held at least two meetings in late June 2022 with potential and existing investors.

30. One of the meetings was a video call on June 23. Plaintiffs Daniel Lascano and Jake Foley III attended, along with other ManifestRx members. Also in attendance were each of the Director Defendants – Buff, Bernhard and Lerch.

31. Another meeting occurred on June 27 that included Lascano, Foley, and Buff (both meetings, the "June 2022 Meetings").

32. At the June 2022 Meetings, Buff stated that a round of investment in A-2 Preferred stock (the "A-2 Round") for Revive Holdco was fully funded.

33. He stated that because of the A-2 Round, Revive Holdco was solvent and that there would be no need of fundraising or capital raises for the near future.

34. Buff was asked if there could be additional subscriptions to the A-2 round. Buff replied negatively, stating that the A-2 Round was fully funded and there was no equity.

35. Buff also assured Lascano and Foley that funding would be no problem because he was wealthy and would provide necessary funding as a backstop.

**B. July Transaction Contemplates Revive Holdco Stock Worth Approximately $5.46 Per Share.**

36. In the July Transaction, existing members of ManifestRx, as well as new investors such as the Lascano Plaintiffs, received shares of stock in Revive Holdco.

37. In connection with July Transaction, the Lascano Plaintiffs paid $1.5M for a total of 274,950 shares of Revive Holdco stock – approximately $5.46 per share.

38. Schedule 3 to the Transaction Framework Agreement governing the July Transaction, signed by Revive Holdco, ReviveHealth, Bernhard, and Buff, contemplates that the Lascano Plaintiffs would pay a total of "**$1,500,000**" for such stock.  (emphasis in original)

39. Defendants, including Buff and his team, set up the July Transaction and its terms, specifically including the Lascano Plaintiffs' per-share payment price.   Plaintiffs Lascano and Foley asked defendants to lower that price. Defendants refused.

40. That price was a function of the valuation of Revive Holdco which defendants provided leading up to the July Transaction.  Defendants valued Revive

Holdco at $100M, which divided by the number of stockholders listed in that transaction (18,387,898) equals about $5.44, approximately the price per share the Lascano Plaintiffs paid.

41. Defendants repeatedly asserted that Revive Holdco was worth $100M leading up to (and after) the July Transaction. For example, on the June 23 call referenced above, Buff claimed Revive Holdco was worth $100M; when there were questions on the basis of such valuation, Lerch briefly summarized its financial basis. Buff also stated that Revive Holdco was worth $100M on the June 27 call referenced above.

42. The $100M valuation of Revive Holdco was a key part of July Transaction, including in dictating the exchange rate at which ManifestRX unitholders received shares in Revive Holdco. A written action by the ManifestRX Board of Managers approving the July Transaction stated that members would receive stock "in Revive Holdco based on a $100,000,000 valuation". A lower valuation would have given them – and all Plaintiffs – more stock in Revive Holdco.

**C. Revive Holdco Encounters Funding Problems Contrary To Buff's Representations.**

43. Shortly after the July Transaction, it was reported by former ManifestRx executive, Hunter Lipton, who was involved in Revive Holdco subsequently, that Revive Holdco was not paying bills or vendors.

44. On October 27, 2022, certain Revive Holdco stockholders received an update regarding Revive Holdco and the A-2 Round. It was reported at that time that A-2 preferred stockholders never in fact invested any money. This angered Plaintiffs including Lascano and Foley, who were previously told it had fully funded.

45. A follow-up call was scheduled involving, among others, Buff, Lascano, Foley, Bernhard, Lerch, and Lipton. It was scheduled for November 2, then rescheduled for November 22.

46. On the November 22 call, it was disclosed that Revive Holdco had not in fact received committed funds from – or even closed on – the A-2 Round.

**D.    Lascano Seeks Books and Records; Revive Holdco Uses Technical Objections To Refuse To Provide Any Documents.**

47. Lascano through counsel made a demand on or about December 9, 2022, to Revive Holdco under Delaware law seeking books and records (the "Section 220 Demand"). Documents he requested included Revive Holdco's current capitalization table and balance sheet, share purchase commitment documents regarding the supposedly closed A-2 investment, and documents sufficient to show when any such commitments fell through.

48. Revive Holdco denied the demand on technical grounds, including demanding that any stockholder "not a record holder" provide "documentary evidence of beneficial ownership of the stock". It did so despite the fact that the

Lascano Plaintiffs had just acquired their stock five months before. Revive Holdco refused to provide any documents even after further correspondence.

**E.  The Eir Defendants Purportedly Acquire Revive Holdco, Diluting The Face Value of Units Provided To Plaintiffs To $1.07 Per Share.**

49.     Pursuant to the Merger Agreement dated as of December 27, 2022, a stock-for-stock merger was caused to occur (the "December Transaction") in which Eir Partners subsidiary Eir Midco acquired Revive Holdco as a subsidiary.

50.     In the transaction, ReviveHealth caused its subsidiary to acquire SwiftMD. Section 1.01(b) of the Merger Agreement provides that Eir Midco would pay $23M to be used to acquire SwiftMD; and that it would also pay an additional $4.9M, less closing expenses above $150,000, as additional cash consideration.

51.     Page one of the Merger Agreement states that the Board of Revive Holdco approved and adopted the Merger Agreement and recommended it to the stockholders. Similarly, the board of directors of ReviveHealth caused that corporation to take actions required of ReviveHealth in the December Transaction. Neither any December Transaction documents sent to Plaintiffs stockholders, nor a December 29, 2022 letter to stockholders regarding the transaction (the "Stockholders Letter"), disclose the directors that voted on the Merger Agreement or were on the Board at that time. On information and belief, the Board (as well as

the ReviveHealth board of directors which had the same directors) consisted of defendants Buff, Bernhard, and Lerch.

52.     The Merger Agreement provided for Plaintiffs' stock in Revive Holdco to be cancelled and, provided Plaintiffs fulfilled certain conditions, replaced with units in Eir Midco.

53.     Defendant Carlson signed the Merger Agreement as Manager of Eir Midco.  Eir Midco's controlling member is Eir RH SPV, LLC ("Eir SPV").  On information and belief, Eir SPV is owned by Eir Partners.  Carlson is also Eir Partners' Founder and CEO.

54.     In the transaction, Eir Partners and Buff were provided units at, and existing Revive Holdco stockholders were devalued to, a price of approximately $1.07 per share – *barely 1/5 of the price of Revive Holdco stock in the July Transaction only five months previously.*

55.     At $1.07 per share, owners of the preferred units received "**52.82%**" "**Ownership**" of Eir Midco.  Ex. 1 (emphasis in original).

56.     If instead Eir Partners had been provided with units at their investment of approximately $28M at the price held out as fair in connection with the July Transaction, they would have received barely 10% of the common and preferred units – not a majority.

**F.    Preferred Units Had Rights Which Siphoned Much Remaining Value From Common Units.**

57.    Moreover, while the common units provided to plaintiffs were nominally allotted a value of $1.07 per unit, the preferred units provided to Eir Partners and Buff had rights that siphoned much or all of the remaining value to themselves.

58.    Pursuant to Section 5.1 of the Amended and Restated Limited Liability Company Agreement of Eir Midco (the "LLC Agreement"), preferred units had advantages over common units in distributions: (a) the preferred units' designated distribution was 150% of their contribution, and until preferred units received their designated distribution common units were entitled to nothing; and (b) the distribution was to be determined by the Board, which the preferred units controlled, at its "sole discretion".    Moreover, notwithstanding Plaintiffs' substantial equity and prior investment, it is incorrectly stated in Section 4.1 and Exhibit A to that agreement that their collective capital contribution was $0.  These rights threatened to deprive Plaintiffs of much or all of any return for their substantial investments.

59.    Plaintiffs were also provided certain earnout units in the December Transaction.    Pursuant to Section 3.7(b) of the LLC Agreement, however, the preferred units had to receive a total return multiple of "3.5" before holders of such units could receive any distributions, depriving them of most or all value.

**G.** **Revive Holdco Provided Substantial Tax And Synergy Benefits For Which Plaintiffs Were Not Paid Any Premium.**

60. Plaintiffs understand that the reason the December Transaction was accomplished by the end of 2022 was that the Eir Defendants thereby derived a substantial tax advantage. In a telephone conversation with plaintiff Chris Barton, CFO Lerch stated the paperwork for the transaction needed to be done by the end of the year in order for Eir Partners to achieve a favorable tax treatment.

61. Revive was necessary for such benefit including because it was to supply the management for the combined entity. The tax benefits to the Eir Defendants for the December Transaction were considerable, potentially worth the time value of delaying paying taxes (*e.g.*, 21-35%) of the transaction cash consideration ($28M), which could be worth millions of dollars. Yet not only did Plaintiffs not receive a premium for such enabled value, but by contrast value was taken from them.

62. Revive Holdco also provided additional synergy value to the transaction apart from its standalone value, as it provided business synergies with SwiftMD including a management structure by which the combined entity, including SwiftMD, could be managed. Yet not only did Plaintiffs not receive a premium for such enabled value, most of the value of their stock was wrongfully taken from them.

**H.** **The Merger Agreement Violates Plaintiffs' Preemptive Rights.**

63.    In connection with the July Transaction, Revive Holdco stockholders signed a joinder to the Revive Holdco stockholders agreement (the "Stockholders Agreement").

64.    Section 3 of the Stockholders Agreement provides all Revive Holdco stockholders with the right to their respective allotment of any additional securities or rights Revive Holdco issues.

65.    Section 1.02(c) of the Merger Agreement provides for Revive Holdco to newly issue common stock.  The Merger Agreement provides for no ability for Plaintiffs to receive their respective allotment of such newly issued stock, thereby violating the Stockholders Agreement.

**I.**    **CEO Bernhard States Plaintiffs Are "Required" To Sign A Bogus Release.**

66.    On December 29, 2022, the Stockholders Letter from Bernhard was sent to only certain of Revive Holdco stockholders.

67.    That same day, Dorsey & Whitney LLP ("Dorsey") circulated certain documents pertaining to the December Transaction for Plaintiffs to review and sign (together, the "December Documents") on behalf of Defendants.  Dorsey was Revive Holdco's counsel according to the Stockholders Letter.

68.    The December Documents, on information and belief, included certain documents related to the December Transaction such as the Merger

Agreement, but not certain appendices or exhibits. The December Documents were circulated via DocuSign; since then, however, defendants have deleted them so that they are unavailable.

69. Bernhard states in the Stockholders Letter that "all Revive Holdco stockholders are required to execute" among other things an Acknowledgment and Release (the "Release") included with the December Documents which "acknowledges the consummation of the transaction and gives a release".

70. The December Documents also included a joinder to an amended LLC agreement for Eir Midco (the "LLC Agreement"). The December Documents did not include Exhibit A to the LLC Agreement, which was the Membership Ledger of Eir Midco. Ex. 2. The Membership Ledger withheld from the stockholders reports that, "As of December 27, 2022," Buff owned 931,593.73 preferred units in Eir Midco. *Id.*

71. The Release states that Eir Midco and stockholder "agree that the acknowledgment, release and other agreements herein are good and valuable consideration for the Units." It states that the undersigned stockholder "has received and reviewed" documents including the "Merger Agreement" and "understands and approves of the transactions and agreements contemplated thereby". Yet plaintiffs were not provided a disclosure of all material information sufficient for the stockholders to approve the transaction in an informed manner.

The Release was evidently rushed, as it disappointingly referred to Plaintiff's affiliates as "suck Stockholder's" affiliates.

72.     The Release states that Plaintiffs agree to release Revive Holdco and each of its "Personnel, Representatives, . . . stockholders, . . . and Affiliates" from any claims arising out or relating to Plaintiffs' capacity as a Revive Holdco stockholder prior to the December Transaction.

73.     Section 4 of the Release states, "The undersigned acknowledges that the undersigned will not receive the Units allocable to the undersigned until this Acknowledgment and Release is received by the Purchaser."

74.     Section 1.03(a) of the Merger Agreement states that stockholders in Revive Holdco would be entitled to receive their units upon "the execution of" certain documents.  The Merger Agreement does not, however, require Plaintiffs to sign any release.

75.     The Release is therefore invalid under Delaware law, including for lack of consideration as it was not referenced specifically in the Merger Agreement.  *Cigna Health & Life Ins. Co. v. Audaxx Health Solutions, Inc.*, 107 A.3d 1082, 1091 (Del. Ch. 2014).  This precedent is well known among M&A practitioners and available upon a simple internet search of the issue.

76.     Dorsey, which describes itself as to its M&A practice as "An International Leader in M&A", was on information and belief aware of *Cigna* and

advised Director Defendants that such a release was invalid. dorsey.com/services/mergers_acquisitions (accessed June 12, 2023).

77. Director Defendants nevertheless purported to require Plaintiffs to sign it anyway, knowing it was invalid. They did so to personally benefit by eliminating legal claims against themselves, and to deceive Plaintiffs into signing it thinking it was "required" when it was not.

78. Indeed, Bernhard had Dorsey send the "DocuSign" for the documents Bernhard was requesting stockholders sign, including the Release Bernhard incorrectly told stockholders was "required".

79. At the time Bernhard sent the letter, Revive Holdco had been acquired by Eir Midco, which was controlled by Eir SPV, Eir Partners, and Carlson (the "Eir Defendants"). Therefore, on information and belief the Eir Defendants approved the Stockholders Letter. The Eir Defendants on information and belief were represented by Ice Miller LLP, which bills its own mergers & acquisitions practice as "one of the most experienced and recognized firms in the united States in structuring, negotiating and documenting business transactions". https://www.icemiller.com/practices/business-transactions-mergers-and-acquisitions/ (accessed June 19, 2023). On information and belief, therefore, Ice Miller also knew that the release was invalid and informed the Eir of Defendants

that, but the Eir Defendants approved and/or acquiesced to the Stockholders Letter regardless.

80.     The Release is further evidence of defendants' bad faith in connection with the December Transaction, and desire to avoid liability stemming from Revive Holdco, whether in regard to the circumstances referenced herein or otherwise.

**J.     Plaintiffs Ultimately Discover That Buff Received Almost One Million Extra Preferred Units In The December Transaction.**

81.     The Membership Ledger, which was not provided to Plaintiffs until January 25, 2023, lists Buff as receiving 931,593.71 preferred units in Eir Midco. Ex. 2.  Buff is the only person or entity to receive any preferred units in Eir Midco other than Eir SPV.

82.     This document lists Eir Midco as having contributed $28M in "capital contributions," of which as much as $27,900,000 is documented as merger consideration in Section 1.01(b) of the Merger Agreement.

83.     The Membership Ledger, however, purports that Buff provided $1M in "capital contributions".  The Merger Agreement does not provide for Buff providing any consideration, whether cash or otherwise.

84.     The Membership Ledger lists all other Eir Midco members as providing $0.

85.     Buff therefore received preferred units in Eir Midco despite paying $0 in cash or assets in the December Transaction.  Buff was the only Revive Holdco stockholder, indeed the only preferred stockholder, to receive preferred units in Eir Midco.

**K.      Director Defendants And Other Revive Health Insiders Receive Other Benefits In Connection With The December Transaction.**

86.     In addition to the almost one million preferred units granted to Buff for no merger consideration, Revive Health insiders including the Director Defendants also received other benefits of stock or cash in connection with the December Transaction in which they also provided no merger consideration:

   a.     Defendant Buff received 810,000 extra common units in Eir Midco for no merger consideration.  *Compare* Ex. 3 (July Transaction – 2,771,958 total stock in Revive Holdco) *with* Ex. 2 (December Transaction – 3,581,958 total common units in Eir Midco).

   b.     Significant stockholder John Walker was paid for 80,000 of his shares in Revive Holdco for no merger consideration.  *Compare* Ex. 3 (July Transaction – 3,381,958 total stock in Revive Holdco) *with* Ex. 2 (December Transaction – 3,301,958 total common units in Eir Midco).  At about $5.46 per share, he was paid as much as $436,800.

c.     Significant stockholder Mark Dumoff received 98,042 extra common units in Eir Midco for no merger consideration. *Compare* Ex. 3 (July Transaction – 2,561,958 total stock in Revive Holdco) *with* Ex. 2 (December Transaction – 2,660,000 total common units in Eir Midco).

d.     Defendant Bernhard received 250,000 extra common units in Eir Midco for no merger consideration, more than five times what he had previously been entitled to. *Compare* Ex. 3 (July Transaction – 50,000 total stock in Revive Holdco) *with* Ex. 2 (December Transaction – 300,000 total common units in Eir Midco).

e.     Unidentified insiders received $35,000 more in loan repayment for no merger consideration. A September 2022 spreadsheet sent by Lerch listed "Founder/CEO Bridge notes" for "Repayment" of "395,000". The December Transaction projected closing balance sheet, however, lists "Notes payable-shareholder" as "425,000". On information and belief, a portion of the merger consideration paid by Eir Partners was used to pay off this supposed debt in connection with the December Transaction.

87.     The inference of benefits in connection with the December Transaction is heightened by Revive Holdco's funding problems leading up to that transaction, which imply that before the December Transaction insiders were not paying cash for or being paid cash for such stock or debt.

## L.     The Director Defendants Conceal Buff's Extra Preferred Units And The Violation of Plaintiffs' Preemptive Rights.

88.     Neither the Membership Ledger nor the Eir Midco issuance of preferred units to Buff were disclosed to Plaintiffs in December of 2022.  Rather, defendants attempted to procure Plaintiffs' signature of the Release and cooperation with the December Transaction without knowledge of such issuance.

89.     The Shareholder Letter incorrectly states that "Eir Partners made an initial investment of $29,000,000".  Section 1.01(b) of the Merger Agreement, however, only refers to up to $27.9M being paid.  Rather, Buff was treated as if he had paid $1M in merger consideration (he in fact paid $0 in merger consideration).

90.     Neither the Shareholder Letter nor the December Documents disclose the December Transaction triggering Plaintiffs' preemptive rights or that such rights would be complied with, or expressly state that Plaintiffs were being asked to waive such rights.

**M.**     **Under Pressure From Plaintiffs, The Director Defendants Admit Plaintiffs' Preemptive Rights Are Triggered But Continue To Actively Conceal The Extra Preferred Units Going To Buff.**

91.     In early January 2023, Plaintiff Chris Barton became concerned about the incompleteness of the December Documents and the questions he had regarding the December Transaction.

92.     Dorsey again asked for signatures on January 2, 2023, and again on January 6.

93.     Early in the morning of January 8, Bernhard again asked Barton to sign, stating if Barton signed, "we can ensure all is taking [sic] care of."

94.     Later that morning, Barton emailed Bernhard regarding the transaction:

- Barton asked Bernhard to "please send all appendices and exhibits completed including cap table", as at least the Membership Ledger and the closing balance sheet (the "Balance Sheet") (and possibly other exhibits) were missing.

- Barton noted that in a prior communication, Bernhard had "indicated pre-emptive rights are maintained for shareholders if I want to buy up for anti dilution". Barton asked how the Merger Agreement preserved preemptive rights and how he could exercise them.

95.     That afternoon, Barton began coordinating with other Plaintiffs regarding their common and growing concerns about the December Transaction.

96.     On January 9, an email from Bernhard to Revive Holdco stockholders was sent, copying Lerch. Bernhard again asked for stockholders' signature

notwithstanding that he knew the December Documents were incomplete. He responded to the fact that "[s]everal of you have reached out with questions" by referencing the attached Stockholders Letter that had previously been sent. Bernhard knew, however, that the Stockholders Letter did not answer Barton's questions. Instead, Bernhard (inauspiciously) requested signatures by "Friday, January 13."

97. Later that afternoon, Barton responded to the email, again asking questions and proposing a group call with other stockholders he had spoken with.

98. That evening, Lerch responded to certain of Barton's questions:

- On the missing exhibits, Lerch replied "not sure what's missing but I will check".

- As to preemptive rights, Lerch stated, "Refer to Section 4.6 [of the Eir Midco LLC Agreement]; Common units retain their preemptive rights on future unit issuances; the waiver relates only to Step one of this transaction".

99. Thus, while Director Defendants continued to admit Plaintiffs' preemptive rights were triggered, now Director Defendants' position was that they were requesting Plaintiffs to provide a "waiver" as to them in the December Transaction.

100. Lerch also disclosed that while Eir Partners would invest "$28 million" resulting in "51% ownership on a fully diluted basis," "Total preferred"

would be "52.8%". This was the first disclosure that the Eir Defendants would not own all the preferred units. Lerch, however, was still concealing that the other preferred units would go to Buff.

101. As to Barton's request for "Balance sheets/FS prior to merger," Lerch wrote, "not currently available." The Balance Sheet, however, was Exhibit D to the Merger Agreement, and the December Transaction had already closed.

102. The morning of January 11, Dorsey once again requested signatures despite the fact that the Director Defendants had been put on notice that the December Documents were incomplete.

103. That morning, Barton emailed Lerch, Buff, and Bernhard to "reiterate that I cannot sign the paperwork in its present form as it is incomplete". He wrote, "I am sure an unaudited FS has been agreed to with EIR", and again requested a "cap table".

104. Late that day, Barton had a telephone call with defendant Lerch regarding the December Transaction.

105. Shortly before the call, Lerch emailed him "the cap table". Ex. 1. Lerch did not at this time, however, provide either the table listing Revive Holdco stockholders as of the December Transaction (Ex. 4) or the Membership Ledger for Eir Midco (Ex. 2), both of which should have been, but were not, included with the December Documents.

106. Rather, this "Post Close Capitalization Table," purportedly dated "12/27/22", lists the same total number of preferred units and value as the Membership List. However, it does not break out the number of "Units" or "Ownership" as between Buff and Eir, simply listing them in both categories as "-". This was yet another attempt to conceal that Buff was receiving almost one million extra self-interested preferred units and thereby facilitate getting signatures and releases from Plaintiffs ignorant of that circumstance.

107. On Barton's call with Lerch, Lerch stated he did not know that a capitalization table was not attached to the December Documents and stated words to the effect that Dorsey had made a mistake by not attaching it. He also stated that the December Transaction closed in December 2022 for Eir Defendants' tax purposes.

## N. Defendants Do Not Provide Documents Disclosing Buff's Extra Preferred Units Until January 25.

108. On January 24, 2023, the December Transaction was announced via press release.

109. On January 25, Dorsey sent a new batch of documents for stockholders to review and sign, along with a mailing from Bernhard. Bernhard claimed that the new mailing included "all final schedules and exhibits," and that the delay was "due to certain post-transaction cleanup matters". Once again

Bernhard incorrectly claimed that stockholders were required to sign an "Acknowledgment and Release".

110. Bernhard's claim that the delay was due to "post-transaction cleanup" is unbelievable, including because the withheld Membership Ledger expressly states it is "As of December 27, 2022". Ex. 2.

111. The Membership Ledger, first provided to Plaintiffs on January 25, was the first disclosure that Buff would be receiving preferred units in Eir Midco.

112. Also provided with these documents was Exhibit A to the Merger Agreement, a chart of stockholder ownership of Revive Holdco immediately prior to the December Transaction (the "Revive Holdco Stockholder Chart"). Ex. 4.

**O. The Director Defendants Intentionally Concealed Buff's Preferred Units In Eir Midco To Defraud Plaintiffs Into Supporting The December Transaction.**

113. The Director Defendants intentionally concealed that Buff would be receiving preferred units in the December Transaction, even in the face of persistent questioning by Plaintiffs including Barton. They did so to defraud Plaintiffs into signing the Release and otherwise supporting the December Transaction.

114.     This conclusion is supported by many facts:

- The Merger Agreement, dated December 27, 2022, references and incorporates the LLC Agreement, Exhibit A to which is the Membership Ledger which documented the units going to Buff.

- Director Defendants knew that revealing that almost one million preferred units were going to Buff would make Plaintiffs less likely to sign the Release or otherwise support the December Transaction because it was therefore a self-dealing transaction and because Buff had enticed Plaintiffs into participating in the July Transaction on the basis of his financial support of the entity.

- Long before the Membership Ledger was provided to Plaintiffs, Director Defendants revealed that there were additional capital contributions above what Eir was contributing, and additional preferred units beyond what Eir would receive. On information and belief, those capital contributions and preferred units were intended to be Buff's.

- Director Defendants' shifting and unbelievable explanations and targets for blame, including their own counsel.

- Buff's and Director Defendants' past pattern of misrepresentation and statements leading to fraud allegations as to Revive Holdco.

**P. Director Defendants Bernhard And Lerch Keep Their Jobs.**

115. The January 24, 2023 press release announcing the December Transaction ("Press Release") demonstrates that Eir Midco would keep the services of existing Revive Holdco management – most prominently Director Defendants Lerch and Bernhard.

116. That press release referred to Buff as "ReviveHealth Executive Chairman" and Bernhard as "ReviveHealth CEO," leading to the inference that they would continue to function as such post-transaction.

117. Presumably, then, director Lerch, ReviveHealth Chief Financial Officer, was to be treated the same. In the Stockholders Letter, Bernhard stated that stockholders were to "direct" any questions to "Lerch", suggesting that he also would continue.

118. In the Press Release, Brett Carlson of Eir Partners stated that "we believe we have the leadership . . . to execute on our ambitious vision," excluding Eir Midco finding other outside "leadership" to replace Bernhard or Lerch.

119. Section 7.1(a) of the Eir Midco LLC Agreement references Bernhard as one of its initial managers along with Buff.

**Q.**  **The December Transaction Was At An Unfair Price As To Plaintiffs.**

120.   The December Transaction was at an unfair price for Plaintiffs as to their prior shares of stock in Revive Holdco, including for the reasons explained above.

121.   Buff and the Eir Defendants were given or benefitted from preferred units that, as explained above, by their rights expropriated much of the value of Eir Midco to themselves.

122.   Even the face amount that the common units were allocated, $1.07 per unit, was a massive devaluation from the $5.46 valuation defendants themselves had referenced only months before.  Eir SPV was given more than 26M preferred units in Eir Midco, which consisted approximately 97% of all preferred units (Buff received the rest) and 53.09% of the total units.

123.   Revive Holdco enabled and provided synergy and tax benefits that its stockholders including plaintiffs were not paid for.

124.   Moreover, Buff and other insiders including the Director Defendants claimed for themselves units and other personal benefits for no apparent consideration, further significantly diluting and lowering the consideration Plaintiffs received for their Revive Holdco stock.

**R.** **Each Director Defendant Was Interested And/or Not Independent.**

125. As to the December Transaction, each Director Defendant was interested and/or not independent of Buff.

126. **Howard Buff** – Buff was personally interested in the December Transaction. Unlike any other stockholder, even any other preferred stockholder, Buff was to get preferred (and additional common) units in Eir Midco without (unlike the Eir Defendants) providing any merger consideration. Moreover, he was to use the December Transaction to attempt to escape liability in connection with Revive Holdco by virtue of the unlawful Release – and by virtue of the fact that eliminating Plaintiffs' stock in Revive Holdco eliminated the Lascano Plaintiffs' ability to pursue their Section 220 Demand via litigation in this Court.

127. **Jeff Bernhard** – Bernhard was interested as the December Transaction ensured he would keep his job as an executive in Eir Midco, and because the proposed Release would eliminate his liability for Revive Holdco's business activities in the Fall of 2022 that violated Buff's representations to stockholders given at the June 23, 2022 meeting Bernhard attended. He was provided 250,000 extra common units in Eir Midco for no indicated consideration in the December Transaction. He was also not independent of Buff, as he relied upon his support to keep his job, not having significant voting stock holdings himself.

128.  **Stephen Lerch** – Lerch was interested as the December Transaction ensured he would continue to have employment as to the new business, and because the proposed Release would eliminate his liability for Revive Holdco's business activities in the Fall of 2022 that violated Buff's representations to stockholders given at the June 23, 2022 meeting Lerch attended.  He was also not independent of Buff, as he relied upon his support to keep his job, not having any stock holdings himself.

**S.  Buff Was Revive Holdco's Controlling Stockholder.**

129.  Pursuant to Article IV of the Revive Holdco Certificate of Incorporation, while Revive Holdco had two classes each of Common and Preferred stock, generally only the A Common and A-1 Preferred had voting rights.

130.  As of the July Transaction, the following stockholders had voting power:

| Name | A Common | A-1 Preferred | TOTAL | Percentage |
|------|----------|---------------|-------|------------|
| Howard Buff | 2,500,000 | 271,958 | 2,771,958 | **31.6%** |
| John Walker | 3,000,000 | 381,958 | 3,381,958 | **38.6%** |
| Mark Dumoff | 2,500,000 | 61,958 | 2,561,958 | **29.2%** |
| Jeff Bernhard | 0 | 50,000 | 50,000 | **0.6%** |
| **TOTAL** | **8,000,000** | **765,874** | **8,765,874** | |

131. As of the December Transaction, Buff was Revive Holdco's controlling stockholder.

132. He was Revive Holdco's Executive Chairman. He presented himself as being Revive Holdco's controlling stockholder before the December Transaction even without a formal officer role, providing assurances and representations on behalf of himself and Revive Holdco in the June 2022 Meetings.

133. Given his stock holdings, he only needed to persuade one of stockholders John Walker and Mark Dumoff to have an absolute majority of Revive Holdco's stock.

134. Walker was not independent of Buff. Walker previously worked for BuffCo Holdings, whose Managing Partner is Buff, until December of 2020. He is also associated with Buff in the litigation involving S&S Healthcare Strategies, Ltd. ("S&S Healthcare") discussed below. He became Chief Medical Officer of S&S Healthcare, under Buff as sole Manager and Chief Executive Officer. Walker thus needed to stay in Buff's good graces if he was to continue at S&S Healthcare. Moreover, as someone who had often previously worked with Buff and presumably wished to preserve future opportunities with Buff and/or his network, he would not be in a position to vote down the December Transaction that personally benefitted Buff.

135. Dumoff was also not independent of Buff. Dumoff was a co-Founder of Revive Holdco's predecessor. As someone who had previously worked with Buff and presumably wished to preserve future opportunities with Buff and/or his network, he would not be in a position to vote down such a transaction that personally benefitted Buff.

136. For reasons as set forth above, Buff should be treated as if he controlled Walker's and Dumoff's votes, as he effectively did.

**T. The Eir Defendants Knowingly Aided The Director Defendants In Their Wrongdoing.**

137. The Eir Defendants knew of wrongdoing set forth above but agreed to the December Transaction regardless in an attempt to profit at Plaintiffs' expense.

138. Defendant Carlson is not only Founder and CEO of Eir Partners, but also Manager of Eir Midco, and as such personally signed the Merger Agreement.

139. In the January 24, 2023 press release announcing the December Transaction, Carlson displayed his intimate knowledge of the deal:

> "It is a massive opportunity and unmet need in the market to deliver a truly disruptive employee healthcare experience," said Brett Carlson, Managing Member at Eir Partners. "We can do much better in this country and we believe we have the leadership, solution set, and mission to execute on or ambitious vision."

140. The "leadership" and "mission" he referenced referred largely or entirely to Revive Holdco, while the "solution set" referenced Revive Holdco plus SwiftMD. Carlson boasted about acquiring a valuable business including Revive

Holdco and its synergies, yet he knew he had paid no cash for that business to its stockholders, but rather had massively diluted them.

141. The Stockholders Letter, sent on behalf of an entity, Revive Holdco, which Eir Defendants at that time controlled, attempted to require Plaintiffs to sign a release that violated black-letter Delaware law.

142. The Eir Defendants knew that Buff did not in fact pay any "Contribution" in the December Transaction. Defendant Carlson nevertheless signed the Merger Agreement that treated Buff differently than any other Revive Holdco stockholder. The Stockholders Letter did not include an exhibit revealing the extra preferred units going to Buff.

143. The Eir Defendants knew the synergies and tax benefits that Revive Holdco provided or assisted providing but Plaintiffs were not paid for.

144. The Eir Defendants knew that the two Revive Holdco directors other than Buff would be continuing on as management, giving them a natural motive to favor the transaction.

145. The Eir Defendants knew that the Director Defendants were willing to move quickly to enable Revive Holdco to participate in the December Transaction for no additional per share cash consideration to accommodate the Eir Defendants' desire for the deal to be accomplished in 2022, given the benefits being provided to the Director Defendants.

146. The Eir Defendants knew that the LLC Agreement, which their counsel drafted or approved, gave considerable distribution preferences to the preferred units.

147. The Eir Defendants knew that Plaintiffs there would be no disclosure of all material facts regarding the December Transaction despite the request for approval of it via the Release.

148. The Eir Defendants knew by virtue of any minimal due diligence that plaintiffs had just months previously invested $1.5M at $5.46 per share. The Eir Defendants knew that their new investment at a face value of $1.07 per unit would anger and outrage Plaintiffs.

149. The Eir Defendants knew that Plaintiffs admittedly had preemptive rights that the December Transaction was violating, yet went forward with the transaction regardless without complying with such rights.

## COUNT I – DECLARATORY JUDGMENT

### (Against All Defendants)

150. Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

151. The Merger Agreement does not require Plaintiffs to sign any release to receive any units in the December Transaction.

152. 8 *Del. C.* 251(b)(5) requires the Merger Agreement to set forth the consideration that stockholders are entitled to receive upon the cancellation of their shares.

153. Defendants purported to require Plaintiffs to sign the Release before receiving any units or other consideration in the December Transaction.

154. The Release is invalid for lack of consideration.

155. There is a ripe controversy between Plaintiffs and Defendants, parties with real and adverse interests, warranting a declaratory judgment pursuant to 10 *Del. C.* § 6501 *et seq.*

156. Plaintiffs are therefore entitled to a declaratory judgment that the Release is (a) invalid and (b) unnecessary for Revive Holdco unitholders to sign to receive units pursuant to the Merger Agreement.

## COUNT II – VIOLATION OF PREEMPTIVE RIGHTS

### (Against Revive Holdco and Eir Midco)

157. Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

158. Section 3 of the Stockholders Agreement provides all Revive Holdco stockholders with the right to receive their respective allotment of any additional securities Revive Holdco issues.

159. In the Merger Agreement, Revive Holdco newly issues common stock. The Merger Agreement provides for no ability for Plaintiffs to receive their respective allotment of such newly issued stock, thereby violating the Stockholders Agreement.

160. Plaintiffs are entitled to injunctive relief providing to them their preemptive rights that were violated; or alternatively damages for such violation.

## COUNT III – BREACH OF FIDUCIARY DUTY

### (Against the Director Defendants)

161. Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

162. The Director Defendants have and at all relevant times had fiduciary duties to Revive Holdco, ReviveHealth, and their stockholders.

163. The Director Defendants knowingly, recklessly, and in bad faith breached their fiduciary duties of loyalty and good faith by approving and causing ReviveHealth to comply with the December Transaction.

164. Entire fairness review applies to the December Transaction because:

    a.    Buff as controlling stockholder stood on both sides of the December Transaction.

b.      Buff was a conflicted controller, one stockholder who received greater and different consideration than any other stockholder.

c.      Each director on the Board that voted to approve the December Transaction was conflicted based upon self-interest and/or lack of independence.

d.      The Director Defendants acted in bad faith, including by awarding extra shares to Buff and Bernhard for no transaction consideration, by attempting to defraud Plaintiffs into supporting the December Transaction without knowing that Buff was to receive almost one million preferred units in Eir Midco, and by attempting to use the December Transaction to force Plaintiffs to sign the Release releasing them from legal liability in connection with Revive Holdco which they knew was unlawful.

165.    The Director Defendants voted in favor of and complied with the December Transaction for self-interested reasons, including to protect themselves from liability in connection with Revive Holdco, to provide Buff and Bernhard with equity in a new entity for no merger consideration, and to give themselves future employment at an expanded company that included SwiftMD.

166. The Director Defendants also violated their fiduciary duties to Plaintiffs by requiring them to sign the Release approving the December Transaction and otherwise releasing rights of Plaintiffs without any meaningful disclosures, while they attempted to conceal material information regarding personal benefits going to such Director Defendants.

167. The December Transaction was and is not entirely fair to Plaintiffs.

168. Plaintiffs have no adequate remedy at law.

## COUNT IV – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against the Eir Defendants)

169. Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

170. The Director Defendants by virtue of being directors to Revive Holdco had a fiduciary duty to Revive Holdco and its stockholders, including Plaintiffs.

171. The Individual Defendants breached that duty, as alleged above.

172. The Eir Defendants knowingly participated in that breach, including but not limited to because they knew that the Release demanded was invalid but nevertheless approved and/or acquiesced to demanding it; because they profited from the December Transaction at the expense of Plaintiffs and received most of

such benefit; and because they agreed to give Buff close to one million preferred units in Eir Midco knowing he had not contributed cash or assets in the December Transaction.

173. Plaintiffs were damaged by the concerted actions of the Director Defendants and the Eir Defendants, including by Eir Defendants' receipt of unfair consideration in the December Transaction.

## COUNT V – BREACH OF FIDUCIARY DUTY
### (Against Director Defendants and the Eir Defendants)

174. Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

175. The December Transaction was effective on December 27, 2022.

176. Once the December Transaction was effective, the Eir Defendants controlled Eir Midco and, through it, Revive Holdco.

177. After the December Transaction was effective, defendants demanded that Plaintiffs sign the Release, which in addition to other things approved the Merger Agreement. The Release was demanded on behalf of the Board of Revive Holdco (*i.e.*, the Director Defendants).

178. By doing so, the Director Defendants, and the Eir Defendants who controlled Revive Holdco, breached their duties of loyalty, good faith, and

disclosure to Plaintiffs, who were then stockholders in Revive Holdco and Eir Midco, including for the reasons as set forth above. The Release violated Delaware law, demanded approval of a transaction without disclosing and concealing material facts concerning that transaction, and selfishly facilitated a transaction that benefitted them at the expense of Plaintiffs.

179.   The Release was and is not entirely fair to Plaintiffs.

180.   Plaintiffs have no adequate remedy at law.

## PRAYER FOR RELIEF

Wherefore Plaintiffs respectfully requests that this Court enter an order:

1.   Declaring that the Director Defendants and the Eir Defendants breached their fiduciary duties owed to Revive Holdco and Plaintiffs;

2.   Declaring that the Eir Defendants aided and abetted breaches of fiduciary duty owed to Plaintiffs;

3.   Declaring that the Release is (a) invalid and (b) unnecessary for Revive Holdco unitholders to sign to receive units pursuant to the Merger Agreement;

4.   Injunctive relief allowing Plaintiffs to exercise their preemptive rights;

5.   Awarding damages or equivalent equitable relief to Plaintiffs, including as to assets improperly received by the Director Defendants as a result of

their breaches of fiduciary duty and for the violation of Plaintiff's preemptive rights;

6.      Awarding pre- and post-judgment interest;

7.      Awarding Plaintiffs their costs; and

8.      Granting such other relief as the Court deems proper.

*/s/ Evan Williford*
Evan O. Williford (#4162)
The Williford Firm LLC
1007 N. Orange Street, Ste. 235
Wilmington, DE 19801
  *Attorney for Plaintiffs*

DATED: January 5, 2024

# EXHIBIT F



**RSUI Group, Inc.**
William Nielsen
945 East Paces Ferry Road
Suite 1800
Atlanta, GA 30326-1125

Phone (404) 504 3756

February 1, 2024

<u>**VIA EMAIL ONLY**</u>

Jonathon Pressley, Esq.
Smith Gambrell Russell
Bank of America Tower
50 N. Laura Street, Suite 2600
Jacksonville, FL 32202
Email: jpressley@sgrlaw.com

|       |                    |     |                                       |
| ----- | ------------------ | --- | ------------------------------------- |
| Re:   | **Insured**        | :   | **ReviveHealth, Inc. ("ReviveHealth")** |
|       | **Claimant(s)**    | :   | **Daniel Lascano, et al.**            |
|       | **Policy**         | :   | **NPP703174**                         |
|       | **Policy Period**  | :   | **12/14/22 – 12/27/22**               |
|       | **Limit of Liability** | : | **$2,000,000**                       |
|       | **Issuing Company** | :  | **RSUI Indemnity Company ("RIC")**    |
|       | **RSUI File**      | :   | **703—187074**                        |

Dear Mr. Pressley:

As previously advised, I am the representative at RSUI Group, Inc. ("RSUI") for RIC in connection with the above-referenced matter, which includes a lawsuit filed on July 25, 2023 in Delaware Chancery Court, styled *Daniel Lascano, et al., v. Howard Buff, et al.*, Case No. 2023-0758 (the "Lawsuit"). The Lawsuit was tendered for defense and indemnity under the Private Company Management Liability Policy (the "Policy") referenced above, and RSUI issued a coverage declination on October 13, 2023 on the basis that none of the entity defendants qualified as Insured Organizations and that no allegations were made against the individual defendants in connection with their status (if any) as Insured Persons of ReviveHealth. On January 22, 2024, you advised RSUI that an amended complaint had been filed on January 5, 2024 (the "Amended Complaint") which added ReviveHealth and its directors as defendants.

The Plaintiffs allege that they became stockholders of defendant Revive Holding Company, Inc. ("Revive Holdco") as part of a July 2022 transaction in which Revive Holdco acquired control of Advanced Pharmacy Concepts, LLC. Upon information and belief, Revive Holdco owned Revive Operating Company, Inc., which in turn owned the operating subsidiaries Advanced Pharmacy Concepts, LLC, and ReviveHealth, Inc. (the named Insured on the Policy). The Plaintiffs allege that in a December 27, 2022 transaction, defendants Eir Partners Capital, LLC, and Eir RH Midco, LLC acquired all of the stock in Revive Holdco, and that pursuant to the transaction all of Plaintiffs' stock was cancelled and replaced with common units of Eir RH Midco.

The Plaintiffs allege that in the December 27, 2022 transaction, their shares in Revive Holdco were devalued to one-fifth of the value assigned to them in the July 2022 transaction, while preferred unit holders benefitted at their expense. The Plaintiffs further allege that Howard Buff, Revive Holdco's

controlling stockholder and chairman, received an additional one million preferred units for which he had paid no consideration. The Plaintiffs allege that Howard Buff, Jeff Bernhard, and Stephen Lerch breached their fiduciary duties as directors/officers of Revive Holdco by approving the Eir transaction for self-interested reasons, and that Eir RH Midco, LLC, Eir RH SPV, LLC, Eir Partners Capital, LLC, and Brett Carlson aided and abetted this breach by awarding Howard Buff the extra preferred units.

The Plaintiffs further contend that on December 29, 2022, counsel for Revive Holdco circulated the merger agreement and certain other documents related to the December 27, 2022 transaction, and stated that "all Revive Holdco stockholders are required to execute" a release which acknowledged the transaction and gave a release. The Plaintiffs allege the release was improper under Delaware law as it was not referenced in the Merger Agreement and was not supported by any consideration. The Plaintiffs also contend that they would not have executed the release had they known that Howard Buff would receive the additional preferred shares of Revive Holdco for no consideration.

The Amended Complaint was filed on January 5, 2024 and added ReviveHealth and its directors as defendants. With respect to ReviveHealth and its directors, the Amended Complaint alleges that ReviveHealth directors Howard Buff, Jeff Bernhard, and Stephen Lerch breached their fiduciary duties of loyalty and good faith by causing ReviveHealth to comply with the terms of the December 27, 2022 Merger Agreement for self-interested reasons and to the detriment of Plaintiffs. Please note that by reference to these allegations we attribute no merit, but merely reference them as part of the description of the matter we received.

RSUI has reviewed the allegations of the Lawsuit and Amended Complaint in conjunction with the terms, conditions and exclusions of the captioned policy. The purpose of this letter is to provide you with RSUI's current coverage position and the workings of the Policy referenced above. Based on the Policy issued to ReviveHealth, the Lawsuit, and the Amended Complaint, under the Policy terms and conditions, coverage is precluded under the Policy for the reasons set forth below.

We direct your attention to the Policy's Insuring Agreements, at Section 1 of the Policy. The Policy's pertinent Insuring Agreement(s) are Insuring Agreement(s) B and C, which provide as follows:

In consideration of the payment of premium and in reliance upon all statements made to the Insurer in the Application, and subject to the terms, conditions, definitions, exclusions and limitations hereinafter provided, the Insurer agrees:

### SECTION I. - INSURING AGREEMENTS

B.  With the **Insured Organization** that if a **Claim** for a **Wrongful Act** is first made against any **Insured Person** during the **Policy Period** and reported in accordance with SECTION V — CONDITIONS, C. Notice of Claim or Circumstance of this policy, the **Insurer** will pay on behalf of the **Insured Organization** all **Loss** for which the **Insured Organization** is required or permitted to indemnify the **Insured Person.**

C.  With the **Insured Organization** that if a Claim for a **Wrongful Act** is first made against the **Insured Organization** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance of this policy, the **Insurer** will pay on behalf of the **Insured Organization** all **Loss** the **Insured Organization** is legally obligated to pay.

 *A member of Alleghany Insurance Holdings LLC*

The Policy is triggered, subject to all other Policy terms, conditions and exclusions, by Claims for Wrongful Acts that are "first made" against the Insured Person under Insuring Agreement B, or against the Insured Organization under Insuring Agreement C, during the Policy Period and reported in accordance with conditions for notice of Claim.

Insured Organization as defined in the Policy means:

> H. **Insured Organization** means:
>
> 1. The organization named in Item 1. of the Declarations Page and any **Subsidiary** existing prior to or at the inception date of this policy; or
> 2. Subject to SECTION V. – CONDITIONS, G. Merger, Consolidation or Acquisition of this policy, **Insured Organization** shall include any **Subsidiary** created or acquired after the inception date of this policy; or
> 3. In the event a bankruptcy proceeding shall be instituted by or against the foregoing entities, the resulting debtor-in-possession (or equivalent status outside the United States), if any.

Subsidiary is defined in the Policy as:

> Any entity of which the **Insured Organization**, either directly or indirectly, or through one or more of its **Subsidiaries**:
>
> 1. Owns more than fifty percent (50%) of the voting stock and/or outstanding securities; or
>
> 2. Has the right to elect or appoint more than fifty percent (50%) of the voting directors, management committee members or members of the Board of Managers.

Insured Person is defined in the Policy as:

> 1. Any past, present or future director, officer, or **Employee**, management committee members or members of the Board of Managers or Advisory Board Member of the **Insured Organization**….

The named defendants in the Amended Complaint are Howard Buff, Jeff Bernhard, Stephen Lerch, Revive Holdco, ReviveHealth, Eir RH Midco, LLC, Eir RH SPV, LLC, Eir Partners Capital, LLC, and Brett Carlson. Revive Holdco, Eir RH Midco, LLC, Eir RH SPV, LLC, and Eir Partners Capital, LLC are not listed as Insured Organizations or Additional Named Insureds in the Policy, nor do they qualify as Subsidiaries of ReviveHealth, Inc. As such, these entities do not constitute Insureds under the Policy.

With respect to an Insured Person, Wrongful Act is defined as any act, error, omission, misstatement, misleading statement or breach of duty "while acting in his or her capacity as [an Insured Person] and on behalf of the Insured Organization or any matter claimed against them solely by reason of their status as an Insured Person..." (emphasis added). Brett Carlson is named as a defendant in his capacity as the founder, CEO, and/or manager of Eir Partners Capital, LLC, and Eir RH Midco, LLC. As these entities are not Insureds under the Policy, the allegations made against Brett Carlson are not in connection with his status (if any) as an Insured Person of ReviveHealth, and therefore the Policy's Insuring Agreements are not triggered with respect to Brett Carlson.



Howard Buff, Jeff Bernhard, and Stephen Lerch are named as defendants in their capacities as directors, officers, and/or stockholders of Revive Holdco, as well as in their capacities as directors of ReviveHealth. To the extent the allegations asserted against them in the Lawsuit are in connection with actions taken or not taken as and in furtherance of their interests as directors, officers, and/or shareholders of Revive Holdco, Eir Partners Capital, LLC, and Eir RH Midco, LLC, which are not Insureds under the Policy, such acts do not constitute Wrongful Acts under the Policy.

The Amended Complaint adds ReviveHealth as a defendant, and also alleges wrongful conduct against Howard Buff, Jeff Bernhard, and Stephen Lerch in, at least in part, their capacities as directors of ReviveHealth. Although the Amended Complaint has added an Insured Organization and Insured Persons as defendants in the Lawsuit, no coverage is afforded for these entities/individuals as the Claim does not fall within the terms of the Policy's Extended Reporting Period Election endorsement, which provides as follows:

The following is added to the Common Policy Terms and Conditions Coverage Section:

This policy shall terminate and this Extended Reporting Period Election Endorsement shall become effective December 27, 2022 at 12:01 A.M.

It is hereby understood and agreed that the **Insured Organization** named in Item 1. of the Declarations Page has exercised the option under the policy to purchase an Extended Reporting Period that will expire on December 27, 2028 at 12:01 A.M. The **Insured Organization** shall have the right to give written notice to the **Insurer** of **Claims** first made against any **Insured** during said Extended Reporting Period for any **Wrongful Act** that occurred prior to December 27, 2022 and otherwise covered by this policy. A **Claim** alleging any **Wrongful Act** that occurred on or subsequent to December 27, 2022 shall not be a covered **Claim**.

Here, the allegations against ReviveHealth and Howard Buff, Jeff Bernhard, and Stephen Lerch relate to alleged conduct which occurred on or after December 27, 2022; specifically, that the parties caused ReviveHealth to comply with the terms of the December 27, 2022 transaction and notified Plaintiffs on December 29, 2022 that they were required to sign an allegedly unlawful release. Because the Lawsuit alleges "any Wrongful Act that occurred on or subsequent to December 27, 2022," the Lawsuit is not a covered Claim pursuant to the terms of the Extended Reporting Period Election endorsement.

In view of the basis for this denial of coverage, RSUI has not recited all other Policy terms, conditions, or exclusions which maybe applicable. However, RSUI reserves any and all rights under the policy and available at law to deny coverage on additional and/or alternative basis.

Sincerely,

**William J. Nielsen**
Chief Claim Specialist
Management Liability Claims
P: (404) 504 3756
wnielsen@rsui.com



cc:     Howard Buff, ReviveHealth (hbuff@revive.health)
        Ashley Salane, Smith Gambrell Russell (asalane@sgrlaw.com)

